UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ISMAIL ABDUL MALIK,
a/k/a ROY THOMAS,
      Plaintiff,

      v.                       Civil Action No. 05-1374(RMC)

DISTRICT OF COLUMBIA, et al.,
      Defendants.

---

I.   OPPOSITION OF THE PLAINTIFF TO:
DEFENDANT DISTRICT OF COLUMBIA'S
MOTION TO DISMISS THE COMPLAINT

Plaintiff, Ismail Abdul Malik, pro se opposes Defendant District of Columbia's motion to Dismiss The Complaint due to the fact that the complaint properly names the District of Columbia as a defendant in this action. The averments of the complaint contradict the reasons claimed to justify dismissal. In any event, the contentions are in dispute and warrant a trial on the matter, rather than dismissal.

As set out more fully in the attached Memorandum Of Points And Authorities the Defendant District of Columbia's Motion To Dismiss should be denied.

RECEIVED

NOV 2 1 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Respectfully submitted,

_Ismail Abdul Malik_

Ismail Abdul Malik

Reg. No. 11340-007
USP-Big Sandy
P.O. Box 2068
Inez, KY 41224

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing Plaintiff's Opposition to Defendant District of Columbia's Motion To Dismiss, along with Memorandum Of Points And Authorities in support thereof, upon counsel, Michael Bruckhein, Esq., Asst. Atty. General For The District of Columbia, 441 4th Street, N.W., Sixth Floor South, Washington, D.C., by placing a copy thereof in the legal mailbox of this prison, postage prepaid, addressed as above, this __14th__ day of __Nov__, 2005.

_Ismail Abdul Malik_

Ismail Abdul Malik, pro se

Executed this __14th__ day of __Nov__, 2005, at Inez, KY, pursuant to 28 U.S.C. §1746.

_Ismail Abdul Malik_

Ismail Abdul Malik

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ISMAIL ABDUL MALIK,          :
a/k/a ROY THOMAS,            :
           Plaintiff,        :
                             :
     v.                      :    Civil Action No. 05-1374(RMC)
                             :
                             :
DISTRICT OF COLUMBIA, et al.,:
                             :
                             :
_____:

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S OPPOSITION TO:
DEFENDANT DISTRICT OF COLUMBIA'S
MOTION TO DISMISS THE COMPLAINT

     Defendant District of Columbia's (the "District"), motion to dis-
miss the complaint herein should be denied since the contentions there-
in are unsupported and the complaint states a viable claim which can
be proven at trial and thereby entitle plaintiff to the relief sought
therein.

     The court is to accept as true the clear, factual allegations
of the complaint.  See Cruz v. Beto, 405 U.S. 319,322, 92 S. Ct. 1079
(1972), cited in Hughes v. Rowe, 449 U.S. 5, 101 S. Ct. 173,176(1980);
Jamieson v. Robinson, 641 F. 2d 138,141(3d Cir. 1981).

          "[A] complaint should not be dismissed for failure to state
     a claim unless it appears that the plaintiff can prove   no
     set of facts in support of his claims whlich would   entitle
     him to relief."  Conley v. Gibson, 355 U.S. 41, 78 S.   Ct.

2.

99(1957); <u>See also</u>: <u>Scheyer v. Rhodes,</u> 416 U.S. 232,236,
94 S. Ct. 1683(1974).

In ruling on a motion to dismiss for failure to state a claim,
the factual allegations of the complaint must be presumed true and
construed liberally in favor of the plaintiff. <u>Shear v. National</u>
<u>Rifle Ass'n</u>, 606 F. 2d 1251,1253(D.C. Cir. 1979). The court may dis-
miss a complaint only if it appears that the plaintiff can prove no
set of facts in support of his or her claim that would warrant relief.
Rule 12(b)(6), Fed. R. Civ. P.; <u>see</u>: <u>Kowal v. MCI COMMONICATIONS</u>
<u>CORP.,</u> 16 F. 3d 1271,1276(D.C. Cir. 1994); <u>Thomas v. District of Col-</u>
<u>umbia</u>, 887 F. Supp. 1,5 n.2(D.D.C. 1995). A complaint filed by a pro
se party, however, is held "to less stringent standards than formal
pleadings drafted by lawyers," <u>Haines v. Kerner</u>, 404 U.S. 519,520(1972).

A district court is to liberally construe the filings of <u>pro se</u>
prisoners and to interpret that technical errors alone do not cause
injustice. <u>United States v. Sanchez</u>, 88 F. 3d 1243(D.C. Cir. 1996).
<u>See also</u>: <u>Redwood v. Council of the District of Columbia</u>, 679 F. 2d
931(D.C. Cir. 1982); <u>Boag v. MacDouugall</u>, 454 U.S. 364, 70 L. Ed. 2d
551, 102 S. Ct. 700(1982); <u>McCormick v. City of Chicago</u>, 230 F. 3d
319(7th Cir. 2000)(Pro se litigants pleadings are to be construed lib-
erally and held to less stringent standard than formal pleadings draf-
ted by lawyers; if court can reasonably read pleadings to state valid
claim on which litigant could prevail, it should do so despite failure
to cite proper legal authority, confusion of legal theories, poor
syntax and sentence construction, or litigant's unfamiliarity with

3.

pleading requirements.).

## I.    DEFENDANT'S GROUNDS FOR DISMISSAL

Defendant, the District, claims that the complaint should be dismissed for four reasons:

> "(1.)   The District properly delegated all duties of in-
> mate care to the Corrections Corporation of Amer-
> ica (CCA); (2.) the complaint fails to state    a
> claim for municipal liability under 42 U.S.C.    §
> 1983 and the doctrine of <u>Monell v. Dep't of    So-
> cial Services of the City of New York</u>, 436   U.S.
> 658,694(1978); (3.) the complaint fails to allege
> a violation of the plaintiff's Constitutional ri-
> ghts; and (4.) the case should be dismissed    for
> failure to state a claim.

At the beginning, it should be noted that the District has not disputed the factual allegations of the complaint.  Therefore, the Court should accept as true plaintiff's version of what transpired during the incident.  The court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under **any set of facts that could be proved consistent with the alle-gations.** (emphasis supplied)  See: <u>Hishow v. King & Spalding</u>, 467 U.S. 69,73, 81 L. Ed. 2d 59, 104 S. Ct. 2229(1984); <u>Atchison v. District of Columbia</u>, 315 U.S. App. D.C. 318, 73 F.3d 418,421(D.C. Cir. 1996).

## II.    THE DISTRICT OF COLUMBIA IS LIABLE UNDER 42 U.S.C. §1983

Defendant District of Columbia is a unit of government and a "person" under 42 U.S.C. §1983.  The District of Columbia Department

4.

of Corrections ("DCDC") is a unit of the government of the District of Columbia. D.C. Code §24-441. The DCDC is "responsible for the safekeeping, care, protection, instruction, and discipline" of all persons committed to its custody. D.C. Code §24-442. Under the doctrine of respondeat superior, the District is liable for violations of District of Columbia law committed by District employees acting within the scope of their employment. Under §1983 the District is liable for Federal Constitutional violations that are (a) committed under color of law by District of Columbia policymaking employees or (b) caused by District custom, policy, or practice.

The complaint herein alleges and supports that the District is liable on several different theories. The facts and circumstances of this case clearly support a finding that the District is liable and cannot avoid its responsibility by claiming that the other named defendants' acts were unforeseeable. The District has manifested a custom and practice of physically abusing prisoners. The District of Columbia custom and practice of inadequately investigating, and tolerating, physical abuse of prisoners manifests, and for several years has manifested, deliberate indifference to the right of District of Columbia prisoners to be free of cruel and unusual punishment.

Contrary to the District's allegations that, "[t]he District properly delegated all duties of inmate care to the Corrections Corporation of America (CCA)", the District in its contract with CCA specifically agreed that:

5.

> "The Contractor shall not transfer any of the District's
> inmates from the Contractor's Facilities to any    other
> appropriately classified facility without the    express
> written approval of the District of Columbia  Department
> of Corrections (DCDC)."(contract, #7239-AA-NS-1-HT, page
> 1; complaint exhibit - attachment One).

Additionally, under Article 4 of the contract between the Dis-

trict and CCA, the District was obligated to provide to CCA plaintiff's

medical records at the time of transfer, which failure to do so contri-

buted to plaintiff being transported in a manner that was inherently

dangerous to the asthmatic condition. (Contract #7239-AA-NS-1-HT,

page 7, Article 4; Complaint attachment Two). The Complaint sets out

that plaintiff was forced to endure inhumane treatment and life-threa-

tening second-hand smoke, intentionally to punish plaintiff for being

a recipient of the awards in the class-action lawsuit against the

District, CCA, and others in Youngstown, OH. It is conceivable that

had the District provided plaintiff's medical records to the other

Defendants, care may have been taken to ensure that plaintiff was

transported on a "non-smokers only" bus, or in a separate vehicle.[1]

However, as alleged in the complaint, the intent was to punish plain-

tiff and all aboard the bus on July 2, 2001, as evidenced by the other

outrageously wanton and vile conditions on the bus trip. It is beyond

---

footnote[1]

While transporting prisoners, on a bus, corrections officials rou-
tinely have an accompanying van or paddy wagon where plaintiff co-
uld have been separated from the high volume of smoke on the  bus.

6.

doubt that an official from the District approved plaintiff's trans-
fer (due to the contract requirement) on, conversely, plaintiff was
transported in violation of the contractual agreement.  The District
had a duty to make sure plaintiff was only transported pursuant to
the contract and that the trip would not infringe upon plaintiff's
right under the Eighth Amendment to not be subjected to cruel and
unusual treatment.  The District cannot avoid its responsibility to
ensure that plaintiff's serious medical condition would not be ignor-
ed due to "deliberate indifference" or intentional, retaliatory acts
and/or omissions.

 The complaint set out several prior cases and incidents where
DCDC officials have approved, and/or acquired similar abusive or re-
taliatory acts.  In the case at bar, plaintiff alleges and can sup-
port the principle that the District made a conscious decision through
its official acts to make sure that all D.C. prisoners who benefited
from the settlement agreement[2] in In re:  NOCC 4:97 CVO1995, were
punished.  The District was well aware that CCA's main concern was
in making money.  In an effort to achieve this goal CCA would abuse
and neglect inmates.  See:  Transcript of NBC-DATELINE NBC, pages
1-7, October 11, 1998 (attached as Exhibit "A")

-------

[2]

Under the terms of the "settlement", CCA placed one million Six hun-
dred thousand ($1,650,000.00) dollars in a settlement fund.

7.

"Woman #2:[3]   I wouldn't treat a dog the way they were treated.  I'm sorry, but I could not stand the way CCA was running it.  There--there is no human element at all.  It's the dollar, the dollar, the dollar.  "( NBC - DATELINE NBC, transcript of program October 11, 1998, PS.5, lines 20-21).

In fact the thought pattern at CCA's, NOCC, was "If one inmate kills the other one they'll send us another inmate, so don't worry about it. "(trans., <u>NBC DATELINE NBC</u>, October 11, 1998, Exhibit "A", page 4, line 32-33).

On May 2, 1999, CBS News' <u>60 Minutes</u> asked State Senator Bob Hagan if he would recommend CCA to other communities, to which the Senator responded:  "I wouldn't recommend CCA to any community.  I wouldn't recommend them.  I think they've failed miserably at doing the job that they claim they do best.  The job that they do best is make money, period."  (Copy of May 2, 1999, transcript, <u>CBS - 60 Min-tes</u> program reflects, CCA attempted to place blame on the District for sending violent prisoners to NOCC, and eventually CCA lost millions of dollars because of the conditions at NOCC.  The District knew, or should have known that CCA would retaliate against the prisoners who benefitted from the settlement agreement given one last opportunity on a 40-plus hour bus ride.

Additionally, defendant the District, and the nation were in-formed of the abusive nature of CCA in newspaper articles in <u>The Nation</u>, of January 5, 1998, "Prisons For Profit", and June 7, 1999, "CCA, the Sequel."  (Copy of "CCA, The Sequel, in  Appendix as Exhibit "C").

---

3

Woman number two indicated at start of the interview that she was afraid of the officers, inmates, and the City of Youngstown,  be-cause of the troubled CCA prison.

8.

> "At another prison in Tennessee, CCA covered up abuse of
> inmates transported from Wisconsin, who were thrown again-
> st walls and zapped with stun guns. Eight company emplo-
> yees, including the security chief, were fired after the
> indicent became public. In New Jersey the company impro-
> perly restrainted and forcibly sedated immigrants awaiting
> hearings; in Arizona inmates demonstrated at a CCA prison
> to protest the lack of recreational and educational pro-
> grams. "(The Nation, "CCA, The Sequel", pg. 22, 1P 5).

The defendant District of Columbia had a duty to ensure that its
prisoners were not abused during transfer to CADF, and that CCA ex-
pended the necessary funds to ensure that inmates with asthma were
not exposed to second-hand smoke which could have triggered a fatal
asthma attack (especially since the method of restraint prevented use
of an inhaler) or, as in the case at bar, long-lasting side effects.

### III. WHETHER, OR NOT, THE CONTRACT WAS LAWFUL
### HAS NO BEARING ON THE LIABILITY OF THE DISTRICT

As stated above, and the District concedes the District contract-
ed with CCA to house its prisoners, however, the contract specifically
set out that the District retained the sole discretion as to when a
D.C. prisoner would be transferred. Similarly, the D.C. Department
of Corrections, pursuant to D.C. Code Sec. 24-442(1996) has responsi-
bility for "the safekeeping, care, protection... and discipline" of
its inmate population. The District's reliance on <u>Herbert v. District
of Columbia</u>, 716 A2d 196,199(D.C. 1997, is misplaced. The case at
bar alleges and supports constitutional deprivations of the Eighth
Amendment. In <u>Herbert</u>, <u>supra</u>, the motions judge rejected the conten-
tion that the District was liable because Herbert had not alleged a

9.

constitutional deprivation. Herbert had alleged that contracted
prison medical personnel were negligent in their care, concern, and
treatment of her ailments. The motions Judge went on to rule that,
"the District of Columbia has a non-delegable duty only insofar as
**the plaintiff has suffered a constitutional deprivation.** (Emphasis
supplied). The D.C. Court of Appeals upheld this ruling. Herbert,
supra, at 198. The present case presents conduct which gives rise
to an Eighth Amendment claim.

> "It is obduracy and wantoness, not inadvertence or error in
> good faith, that characterize the conduct prohibited by the
> Cruel and Unusual Punishment Clause ....". Whitley v. Alb-
> ers, 475 U.S. 312,319, 89 L. Ed. 2d 251, 606 S. Ct. 1078
> (1986).

Plaintiff was transferred to and from NOCC contrary to the law
since there-were no pretransfer hearings as dictated by the Interstate
Corrections Compact. D.C. Code §§24-1001, and 24-1002. Additionally,
the District had an obligation to ensure that the transfer was in
accord with the regulations of the American Correctional Association
(ACA). As it turns out, the contract and the conditions set out there-
in may have been lawful, but the manner in which the contract was
carried out was contrary to the law. The District should not be allow-
ed to absolve itself of liability simply by claiming that CCA and
Transcor were at fault. All of the named defendants acted "under color
of law." Street v. Corrections Corporation of America, 102 F. 3d
810(6th Cir. 1996). Defendant District of Columbia alleges, falsely,
that the responsibility for plaintiff's transfer was delegated to CCA.
(Mot. To Dismiss, page 4). However, as stated above, (Section II,
Memo. In Support Of Opposition), the contract explicitly forbidded

10.

the transfer of any of the District's inmates, without the express
written approval of the District of Columbia Department of Corrections.

### IV. PLAINTIFF'S SECTION 1983 CLAIMS DID ARISE
### OUT OF AN UNCONSTITUTIONAL POLICY OR CUSTOM OF
### <u>DEFENDANT THE DISTRICT OF COLUMBIA</u>

As has been set out in the many cases and examples cited in the
original complaint, the District and its Department of Corrections has
a long history of retaliating against and abusing prisoners in its
care. Although plaintiff cannot allege that District officials were
on the bus, it is obvious that, but for the District's approval plain-
tiff could not have been transferred and the prior incidents should
have prompted the District to monitor and enforce the terms of the
contract.

Plaintiff suffers from asthma, and it is common knowledge that
exposure to second-hand smoke triggers asthma attacks, and that asthma
attacks can be fatal. The District being in possession of plaintiff's
medical records should have insisted that plaintiff would be harmed.

The Supreme Court has held that "acts or omissions sufficiently
harmful to evidence deliberate indifference to serious medical needs
offend the 'evolving standards of decency' in violation of the Eighth
Amendment. <u>Estelle v. Gamble</u>, 429 U.S. 97,106(1976). In 1994, the
Supreme Court added a subjective state of mind to the deliberate in-
difference standard.

> [A] prison official cannot be found liable under the
> Eighth Amendment for denying an inmate humane condi-
> tions of confinement unless the official knows    of
> and disregards an excessive risk to inmate    health
> and safety; the official must both be aware of facts
> from which the inference could be drawn that a subs-
> tantial risk of serious harm exists, and he must al-
> so draw the inference. <u>Farmer v. Brennen</u>, 511   U.S.
> 825, 128 L. Ed. 2d 811, 114 S. Ct. 1970, at    1979
> (1994).

The plaintiff can show a substantial risk of serious harm by
the transfer without plaintiff's medical records and disregard for
the asthmatic condition,

> [D]eliberate indifference can be evidenced by 'repeated
> examples of negligent acts which disclose a pattern  of
> conduct by prison medical staff 'or it can be demonstr-
> ated by' 'proving there are such systemic and gross de-
> ficiencies in staffing, facilities, equipment, or  pro-
> cedures that the inmate population is effectively deni-
> ed access to adequate medical care.'

<u>Wellman v. Faulkner</u>, 715 F.2d 269,272(7th Cir. 1983); <u>See</u> also, <u>Bass</u>
<u>By Lewis v. Wallenstein</u>, 769 F. 2d 1173(7th Cir. 1985).

The medical personnel at Lorton's Central Facility were D.C.
employees, they knew of plaintiff's asthmatic condition and they had
a responsibility to inform the defendants who transported plaintiff
of his medical condition.

Plaintiff can show a persuasive pattern of indifference.  In
<u>Hill v. Marshal</u>, 962 F. 2d 1209(6th Cir. 1992), cert. denied, _____
U.S. _____, 113 S. Ct. 2992(1993), an Ohio prisoner, was prescribed
medication called INH after receiving a positive TB test result.
Hill took the drug until he was transferred to SOCF (Lucasville).

12.

Hill alleged he stood in pill line, but his medication was never provided. SOCF disputed the claim, but could not produce a log to show Hill refused the medication or tht the medication was provided. Hill also showed that the health care facility was poorly run. A report by an independent investigator (Shirley Pope) showed that many inmates complained about not receiving their medication "such that there was a pervasive pattern of failing to provide proper medication for inmates." Hill, supra, at 1212. Prison officials admitted that prescriptions were not always filled or received by inmates and that despite knowing these problems for months, little or nothing was done. Id. A jury determine that Hill was not given his medication and found the deputy superintendent of treatment deliberately indifference to Hill's medical needs and awarded $95,000 in compensatory damages and $900,000 in punitive damages. The defendant was deliberatelly indiffent to an inmate's medical needs because his compliaints went un-anwered and there was a "pervasive pattern of indifference to inmate's medical needs generally." Hill v. Marshall, 962 F. 2d 1209(6th Cir. 1992).

The Sixth Circuit upheld the jury verdict and held that the defendant's failure to do his job, to review and respond to inmate's medical needs, "was so likely to result in the violation of the in-mates's constitutional rights that we find that he was deliberately indifferent to their serious medical needs." Hill, supra, at 1214. In so holding, the Sixth Circuit ruled that Hill did not need to show more than 50% risk of developing TB, only "that his risk had increas-ed due to the deprivation. Hill, supra, at 1214(emphasis supplied).

13.

Deliberate indifference can be shown when there is "strong proof of a pervasive pattern of indifference." Id. See also, Boretti v. Wiscomb, 930 F. 2d 1150(6th Cir. 1991) where an inmate repeatedly requested help from unresponsive nurses and was denied a prescribed plan of treatment.

The deprivation is exacerbated in this case, due to the plaintiff being restrained in a manner that prevented getting to his inhaler. The prison doctors knew or should have known that plaintiff had a constitutional right not to be exposed to second-hand smoke in the limited confines of a bus for more than 40 hours. The resultant pain and swelling from the shackles and impairment of bodily functions, exhibit the deliberate nature of the deprivations. The D.C. Court of Appeals has held that, with respect to medical care, physicians owe the same duty of care to prisoners in the District's custody that they owe to non-incarcerated patients. District of Columbia v. Mitchell, 533 A2d 623,648(D.C. 1987).

Deliberate indifference to future harm is actionable under the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 113 S. Ct. 2475 (1993). The Supreme Court held in this second-hand smoke case, that the inmate had stated a cause of action against prison officials by alleging the defendants were deliberately indifferent to an unreasonable risk of damage to his future health. "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." Id. at 2481. The court does not need to wait for a tragedy to occur. Id. See also, Boyd v. Knox, 47 F. 3d 966(8th Cir.

14.

1995)(prison official's knowledge of deliberate indifference to prisoner's serious medical needs may be established by circumstantial evidence). If this court finds deliberate indifference to a serious medical need, it necessarily precludes finding of qualified immunity. Weaver v. Clarke, 45 F. 3d 1253(8th Cir. 1995).

"Defendant's callous and deliberate indifference to inmates' needs is particurly evinced by their failure to institute any substantive quality control. Quality control procedures represent the first critical steps of self-evaluation that could help defendants remedy widespred deficiencies. Madrid v. Gomez, 889 F. Supp. As in Madrid, the District has failed to institute any meaningful quality control iniatives, to ensure that abuses did not recur; that prisoners were not transferred without prior written approval from the District; and that the other defendants abided by the contract concerning the proper treatment of District of Columbia prisoners. The Eighth Circuit has held that the "[a]bdication of policymaking responsibilities can reach the level of deliberate indifference and result in the wanton infliction of pain to prisoners when tacit authorization of sub-ordinates's unnecessary misconduct causes constitutional injury," Johnson v. Lockhart, 941 F. 2d 705(8th Cir. 1991). Plaintiff does not need to establish any levels of second-hand smoke due to the fact that the prolonged exposure (40 hours or more) was perpetrated upon a person who suffers with asthma. Minuscule levels of smoke could cause   a fatal asthma attack.

15.


## V. PLAINTIFF COULD LIKELY SUCCEED ON A THIRD PARTY
## BENEFICIARY CLAIM


Plaintiff is a third party beneficiary of the contract between defendants D.C. and CCA.    Third parties who are merely incidental beneficiaries may not separately sue to enforce a contract. Hill v. Sonitrol, 36 Ohio St. 3d 36(1988).  In that case an employee of a retail store sued a commercial security company after her rape and beating on the premises of the store.  She claimed rights to enforce the contract between the store and the security company.  The Supreme Court denied her claim because the contract at issue was "entered into for the protection of the property, not people."  The court relied on the Sixth Circuit opinion Norfolk & Western Co. v. United States, 641 F. 2d 1201,1208(6th Cir. 1980) to describe the applicable test:  Namely, a party is an "intended" beneficiary with a right to sue for breach of promise extended in a contract if "the performance of that promise... also satis[fies] a duty owed by the promisee to the beneficiary." Hill, supra, at 40.  Moreover, it is because of the excessive litigation brought by prisoners in the D.C. Department of Corrections custody that Lorton closed and alternatives such as NOCC were pursued.  There can be no question, therefore, that the contract satisfies duties owed to the inmates by the promisee, the District. The inmates confined at NOCC were intended beneficiaries of the CCA-District of Columbia contract.  This analysis is supported by the restatement of Contracts, 2d, §302 which provides:

"(1)  Unless otherwise agreed between promisor and promisee,

> a beneficiary of a promise is an intended beneficiary if
> recognition of a right to performance in the beneficiary
> is appropriate to effectuate the intention of the part-
> ies and ... (b) The circumstances indicate that the pro-
> misee intends to give the beneficiary the benefit of the
> promised performance."

The contract between CCA and the District does not address third party rights. Therefore, the parties to that contract have not "otherwise agreed" and the inmates are free to assert third party rights. By contrast, the development agreement between the City of Youngstown and CCA specifically excludes third party beneficiary rights. Note also that the CCA - District contract has been amended several times since first negotiated and it has never included an exclusion for third party rights. Finally, the third party beneficiary status of the inmates is supported by Anderson v. Olmstead Utility Co., 60 Ohio St. 3d 124(1991). In that action an employee of the City of Niles used a "cherry picker" truck that had been rebuilt to satisfy an interest by the city in achieving "100% Holan specifications and safety." Id. at 130. The Court held that since the safety of the linemen who were to use the truck was the purpose of rebuilding the aerial device, the plaintiffs were the intended beneficiaries under the contract. Clearly, since compliance with its duty to hold and transfer the inmates safely was the reason for contracting with CCA, the inmates are the intended beneficiaries under the contract.

## VI.    CONCLUSION

17.

The complaint alleges and supports a valid claim and Defendant District of Columbia's motion to dismiss should be denied and the matter scheduled for trial on all issues so triable.

Respectfully submitted,

Ismalk Abdul Malik, <u>pro se</u>
a.k.a Roy Thomas
Reg. No. 11340-007
USP-Big Sandy
P.O. Box 2068
Inez, Kentucky 41224

Executed this _____ 14th _____ day of November, 2005, at Inez, Kentucky, pursuant to 28 U.S.C. § U.S.C. §1746.

Ismail Abdul Malik, <u>pro se</u>
a.k.a Roy Thomas
Reg. No. 11340-007
USP-Big Sandy
P.O. Box 2068
Inez, Kentucky 41224

Index                                                  Page

Dateline-NBC, Transscript, October 11, 1998................. 1

CBS-60 Minutes, Transcript, May 2, 1999.................... 8

"CCA, The Sequel," The Nation, June 7, 1999...............13

January 20, 1999, Memorandum, Transportation Costs for In-
mates in External beds.................................... 15

ATTACHMENT ONE

(Transcript, Dateline-NBC, October 11, 1998)

# NBC

## Dateline NBC

## October 11, 1998

Copyright (c) 1998 National Broadcasting Company, Inc.  All Rights Reserved.  Prepared by Burrelle's Information
Services, which takes sole responsibility for accuracy of transcription.  User may not reproduce any copy of the material,
in whole or in part, except for user's personal or internal use.

Dateline NBC
October 11, 1998

CO-HOSTS: Jane Pauley and Stone Phillips

Announcer: This is DATELINE Sunday, October 11, 1998. Tonight:

They shared their community with hundreds of convicts, but when six inmates escaped, some residents said the private prison put their families in danger.

Unidentified Woman #1: You may not be so concerned about my safety or the safety of my grandchildren, but I am. Shut it down.

Announcer: Is the prison putting its bottom line above public safety?

ROB STAFFORD reporting: What was the number-one concern at that prison?

Unidentified Woman #2: Money.

Unidentified Man #1: Money. Profit.

Unidentified Man #2: Profit.

Woman #2: Profit.

Announcer: Rob Stafford on corporations and convicts.

In marriage, we love, honor and obey. So why do some men stray and stray and stray?

Unidentified Man #3: Four to 8 percent of men in the US have sexual compulsive traits.

Announcer: Experts say some men just can't help it.

Man #3: It's not about a high sex drive, it's about repetitive activities of sexuality that keep getting you into trouble that you can't stop.

Announcer: But can you really be addicted to sex?

KEITH MORRISON reporting: Isn't this just a way of justifying what is now considered to be immoral behavior?

Announcer: Keith Morrison on everything you wanted to know about sexual compulsion.

They're masters of the universe beneath the waves.

Mr. FRED SHARP: Well, the humpback is sort of the--the prima donna of the--the whale family.

Announcer: But are they more like us than we might imagine?

DENNIS MURPHY reporting: How smart, how human do you think they are?

Announcer: This man says his whale watching has revealed some extraordinary traits.

Mr. SHARP: They obviously have some ability to think about the future.

Announcer: Dennis Murphy with secrets from the deep, a DATELINE/Discovery Channel exclusive.

He's a New Yorker in harmony with nature, but it wasn't always this way.  He was taken off to court speedily for chaining a bike to a tree.

Mr. HENRY STERN:  You should not put chains around trees, just as you should not put chains around people.

Announcer:  Why not just "leaf" him alone?  Josh Mankiewicz on the bike, the bark and the blues.

DATELINE with Jane Pauley and Stone Phillips, plus Tom Brokaw, Katie Couric and Maria Shriver.

From our studios in New York, here is Jane Pauley.

JANE PAULEY:  Good evening.

HOUSE OF CORRECTION?

JANE PAULEY:  How would you like to have murderers, rapists and thieves living in your neighborhood?  It's a frightening prospect, even if they're kept behind bars, barbed wire, and under the watchful eyes of prison guards. But, believe it or not, some towns actually welcome prison facilities because of the jobs they create.  That's what many residents of one such community were thinking about when they invited a corporation to build a prison near them.  But now some of them fear for their safety, even their lives.  Here's Rob Stafford.

Unidentified Woman #1:  I'm sick and tired of hearing about jobs.  I'm sick and tired of the politics.  You're dealing with people's lives.

ROB STAFFORD reporting:  (Voiceover) Outrage at a town meeting.

(House of Correction?  graphic; town meeting; cell door)

Mr. GEORGE McKELVEY:  They will be sorry that they did this to Youngstown.  I can assure you they will be sorry.

STAFFORD:  (Voiceover) Anger over what was supposed to be an ideal partnership.

(Prison interior)

Unidentified Woman #2:  I am afraid for the officers over there, the inmates, and the city of Youngstown.

STAFFORD:  (Voiceover) And fear about a private prison some say turned out to be anything but ideal.

(Cell doors; police vehicles; police officers)

STAFFORD:  If other communities are considering allowing a private prison to open in their area, what is your advice?

Mr. McKELVEY:  My advice is you'd better be damn careful that you know what you're doing, that you have corrections experts on your side negotiating any development agreement for a prison in your community.

STAFFORD:  The Northeast Ohio Correctional Center in Youngstown is no ordinary lockup, it's Ohio's first private prison, part of a fast-growing business billed as a more efficient and a less expensive way to house our nation's criminals.  But after inmate stabbings, murders, and even an escape, there is now fear and finger-pointing over what happened and why; with residents, city officials, and even the company that built the prison all saying they were misled.

(Voiceover) In the beginning, the prison seemed like a great opportunity to the city of Youngstown, a city so depressed by the collapse of the steel industry it lost half its population in just 20 years. So when the Corrections Corporation of America, CCA, promised to pump millions of dollars into the economy by building a privately run prison, the community welcomed it with open arms.

(Construction of prison; factory; city street; prison being built; finished prison; community officials)

Mr. McKELVEY: I believe the facility would have worked, I believe it would have had a positive impact on our community.

STAFFORD: (Voiceover) George McKelvey is the mayor of Youngstown, Ohio. He was elected after the prison was built.

(George McKelvey on telephone; prison)

STAFFORD: Do you feel that this community was deceived?

Mr. McKELVEY: Oh, absolutely we were deceived.

STAFFORD: (Voiceover) Youngstown would get 350 desperately needed new jobs in return for providing cheap land for a 1500-bed medium security correctional facility, as stated in their development agreement, a facility built and operated by the nation's largest private prison company. Traded on the New York Stock Exchange, CCA is a multimillion dollar company, operating more than 75 private prisons. CCA came on with good references from other cities across the country. Youngstown officials weren't worried.

(City street; land; documents; CCA flag; New York Stock Exchange; prisons; inmates)

Mr. PHILIP CHANCE: We were originally told this was going to be a medium-level security operation.

STAFFORD: (Voiceover) Philip Chance is the sheriff of Mahoning County, Ohio.

(Philip Chance at desk)

STAFFORD: Do you think violent predators were dumped into your community?

Mr. CHANCE: Absolutely.

STAFFORD: (Voiceover) Violent offenders can be housed in medium-security facilities. CCA says it told the city that violent offenders would be housed at the Youngstown prison, and at least one news report supports that. But Sheriff Chance says the city signed an agreement for a medium-security prison, and expected inmates who were only of medium-security risk. But that's not how it turned out.

(Prison; newspaper article; prison interiors)

STAFFORD: CCA has said that this is a medium-security facility that only would house medium-security prisoners.

Mr. CHANCE: That's correct.

STAFFORD: So what happened?

Mr. CHANCE: Obviously they lied to us or their system broke down. Either way, the community is paying, isn't it?

Dateline NBC
October 11, 1998

Page 4

STAFFORD:  (Voiceover) In May, 1997, barely one year after signing the deal, the prison was built.  The inmates came from here, Washington DC's crumbling Loudon Jails.  CCA contracted with DC to send medium and high-medium inmates to the prison.  But these six former guards say it didn't sound like they were being prepped for medium-security inmates.

(City officials; prison; inmates; DC jail; documents; guards)

STAFFORD:  What were you told during training about the kinds of inmates you were going to be supervising?

Woman #2:  We were going to get the scum of the earth.

Unidentified Man #1:  Plan on getting the worst inmates that Washington DC Department of Corrections can send us, because that's what we're going to get.

STAFFORD:  (Voiceover) The former guards, all Youngstown residents, were among the first group hired by CCA.  None was fired, all say they quit, in part over the way the prison was run.  They say just two weeks after the doors opened the trouble began.

(Guards; prison)

Offscreen Voice #1:  (From videotape) That's the... (unintelligible.)

Offscreen Voice #2:  (From videotape) Whoa!

STAFFORD:  (Voiceover) You're looking at videotape shot by a guard using gas on inmates for threatening a riot.  Inmates say they were angry their belongings from Washington had not arrived.  And soon there was more trouble.  Former guards say violent prisoners who were known risks to each other should have been separated here, but were not.  CCA disagrees.  But within 10 months, two inmates were murdered and at least 13 stabbed by other inmates.

(Videotape of inmates; prison exteriors)

Ms. KAREN SESSOMS:  He was stabbed 17 times--slashed across the eye, the ribs and the back, both hands.

STAFFORD:  (Voiceover) Last March, Karen Sessoms received a frightening phone call.  Her brother, Larry Freeman, a Washington inmate housed at Youngstown for burglary and rape, had been attacked by three other inmates.

(Phone; photo of Larry Freeman)

Ms. SESSOMS:  He's lucky to be alive.

STAFFORD:  (Voiceover) And this former guard, who testified in a lawsuit filed by inmates against CCA and Washington DC, says incidents like that were not unusual.  And when violence broke out between inmates, he says a supervisor often told guards not to rush to help.

(Legal documents; guards; inmates)

Man #1:  Quote and an unquote, "If one inmate kills the other one they'll send us another inmate, so don't worry about it."

STAFFORD:  (Voiceover) Even Karen Sessoms admits prison should not be easy, that it's a place for punishment and rehabilitation, but she says something was very wrong with this prison in Youngstown.

(Karen Sessoms; prison)

Ms. SESSOMS: My question was where was the guards when the first person started stabbing him. How did he get to that point was where my anger came in, because they couldn't give me an answer.

STAFFORD: (Voiceover) But maybe this former guard can. He's upset to this day. He says there was constant danger inside the prison. He was on duty the day Karen's brother was stabbed.

(Prison; inmates)

Unidentified Man #2: It was right near shift change, and I was instructed to go ahead and head up to the clock.

STAFFORD: (Voiceover) He and other former guards say they were routinely told to leave their posts and punch out to save money on overtime, sometimes before proper backup arrived. They say the inmates knew there was less supervision during these shift changes, and they say that's often when violence occurred.

(Prison; inmates)

Unidentified Man #3: They'd pull us off our posts 15 minutes before shift change.

STAFFORD: You describe a prison that is out of control. But as corrections officers, wasn't it your job to keep it under control?

Unidentified Man #4: It's like any business, any country: You're only good as your leader.

STAFFORD: (Voiceover) Like many profitable companies, CCA has to try to control costs. And the former guards say limiting overtime was just one of many ways CCA would save money. They claim CCA also cut back on everything from food to medical care for the inmates.

(Prison; guards)

Woman #2: I wouldn't treat a dog the way they were treated. I'm sorry, but I could not stand the way CCA was running it. There—there is no human element at all. It's the dollar, the dollar, the dollar.

STAFFORD: (Voiceover) In fact, CCA's success has come from housing inmates for less than it costs the public sector. In this deal, Washington DC paid CCA 53.50 per prisoner per day, more than 28 million the first year alone. It's a lucrative contract for CCA, but less for the taxpayers who spent much more housing the same inmates at the public prison in Washington. How can this private company do it for less and still make a profit? These former guards say the drive to turn a profit was more important than security.

(Documents; prison; guards)

STAFFORD: What was the number-one concern at that prison?

Woman #2: Money.

Man #4: Money, profit.

Man #1: Money.

Woman #2: Profit.

STAFFORD: Not security?

Man #1:  No.

Man #4:  It's not about being a corrections officer, it's more promoting them and their company and their--and their stocks.

STAFFORD:  Are you disgruntled employees trying to get back at your bosses?

Man #4:  No.

Woman #2:  No.

STAFFORD:  Why are you talking?

Man #4:  There are fellow employees that were left there but are afraid to speak up.

STAFFORD:  (Voiceover) CCA says it believed none of inmates sent to Youngstown was maximum security, because that's what Washington DC promised.  After the inmates filed a lawsuit, a judge ordered all of the prisoners reclassify.  And CCA then found 113 inmates classified as maximum security.  That's about one of every 14.  The judge ordered them shipped out.  But no sooner had they left, there was yet another incident.

(Prison; legal documents)

Unidentified Man #5:  (From television newscast) This is 21 Action News at Six.

Unidentified Woman #3:  (From television newscast) The hunt continues for two of the six inmates who escaped from Youngstown private prison.

STAFFORD:  (Voiceover) The problems inside the prison suddenly spilled outside.  In July, six inmates escaped.  Four of them were serving time for murder.  Although escapes occur at public prisons, Sheriff Philip Chance wonders how these inmates were able to cut through two fences in broad daylight.

(Police officers searching for inmates; prison fence)

Mr.  CHANCE:  I actually saw people packing up their families, putting their belongings in the car, and they were leaving as we were going through their yards and--and searching.

STAFFORD:  People were scared?

Mr.  CHANCE:  They were scared to death.

STAFFORD:  (Voiceover) After a three-day search, five of the escapees were captured.  The sixth was on the run for four weeks, caught last month.  And just this week, an Ohio state legislative report criticized CCA for the escape.  But it also slammed Washington DC for the volatile mix of prisoners, even accusing DC of fraud, stating, "We find that DC officials knowingly, intentionally, deliberately and willfully transported maximum-security inmates to the prison."

(Police; escapees; documents)

STAFFORD:  We wanted to talk to prison officials in Washington DC, but they declined, saying the matter is under litigation.  We also wanted to talk to CCA to ask about the escape and the allegations that the company placed profit over security.  But CCA also declined DATELINE's repeated requests for an interview.

(Voiceover) But in letters and statements, CCA said, "As of now, all inmates are classified as medium-security, and we have identified the problems and corrected them."  They say the quality of food and medical care for

inmates meets or exceed industry standards. And after the escape, CCA said, "We took immediate disciplinary action."

(Documents)

Professor CHARLES LOGAN: I've been studying CCA since its inception in 1984.

STAFFORD: (Voiceover) Professor Charles Logan has been researching private prisons for 15 years. He's not associated with CCA, but says it has a strong record and the problems in Youngstown are not representative of CCA's prisons.

(Charles Logan; prison)

STAFFORD: Isn't the bottom line making money?

Prof. LOGAN: No, the bottom line is actually providing the best possible service at the lowest possible cost. This is the only way in which you survive as a private company in competition with other private companies.

STAFFORD: (Voiceover) And Logan says, because of bureaucracy in the public sector, private prisons often respond faster to problems; as CCA did just one month after the escapes in Youngstown, including additional razor wire, more on-perimeter patrols, and three new gun towers. And last March, CCA hired a new warden to run the prison. And under his leadership, some former and current guards and even Youngstown's mayor say the prison is getting safer. But despite what's changed inside the prison, many who live outside still say CCA lost their trust a long time ago.

(Prison officials; prison exteriors; warden; city street)

Woman #1: You may not be so concerned about my safety or the safety of my grandchildren, but I am. Shut it down. Shut it down.

PAULEY: The city of Youngstown has joined the inmates in their lawsuit, and the widow of one of the two inmates killed in the Youngstown prison is also suing; she's asking for 110 million.

Announcer: Still ahead, they sing, they dance and leap, and they seem to behave in some ways remarkably like us. Planning ahead, working together.

Mr. FRED SHARP: They're very carefully choreographed.

Announcer: Just what traits do we share with whales? It's a DATELINE/Discovery Channel exclusive.

(Announcements)

Announcer: From our studios in New York, here is Stone Phillips

STONE PHILLIPS: Whales. We're fascinated by these mysterious giants of the deep. But are they more like us than we realize?

(Voiceover) In June, DATELINE brought you the story of Keiko, the superstar of the "Free Willy" movies and his extraordinary journey from a small pool in a Mexican show to international fame, a move to Oregon, and now transfer to a sea pen in Iceland, another step closer to a possible ocean release. Millions have followed Keiko's progress, getting a unique glimpse into a whale's world, how they think, how they learn...

(Keiko)

ATTACHMENT TWO

(Transcript, CBS, 60 Minutes, May 2, 1999)

# CBS

## 60 Minutes

## May 2, 1999

(c) MCMXCIX, CBS Worldwide Inc.  All rights reserved.  Prepared by Burrelle's Information Services, which takes sole responsibility for accuracy of transcription.  No license is granted to the user of this material other than for research. User may not reproduce any printed copy of this material for commercial purposes or in any fashion that may infringe CBS Inc.'s copyrights or proprietary interests in such materials.

## MEDIUM SECURITY, MAXIMUM PROBLEMS

ED BRADLEY, co-host:

Three years ago, Youngstown, Ohio, a former steel town with double-digit unemployment, was approached by the Corrections Corporation of America with a proposal to build a prison, a prison that would mean at least 350 new jobs in Youngstown.  CCA is the largest private prison operator in the country, part of a growing industry that operates the same way hotels and motels do:  the higher the occupancy rate, the more money they make.  And today, with so many prisoners being locked up, state and local governments are increasingly turning to companies like CCA, making private prisons a profitable business.  Money was on Youngstown's mind, too.  The city was so anxious for the jobs CCA would offer, they rolled out the red carpet for them.

(Footage of Bradley and Hagan talking)

BRADLEY:  (Voiceover) Youngstown State Senator Bob Hagan wishes they hadn't.

State Senator BOB HAGAN:  Oh, they got the greatest deal in the world.  You know, you come to town and you say, `We're bringing all these jobs,' Youngstown says, `Great.  Here's what we'll do.  We'll give you free land or land for 1.  We'll hook your utilities up for free.  We'll give you 75-percent tax abatement for seven years.'  What better deal can you get?

(Footage of prison complex; prisoners in rec areas and cells; visuals of headlines reading, `Guard gets stabbed during prison fight,' `Second stabbing causes confusion,' `Former prison guard fears "riot waiting to happen",' `Police go to prison to probe assault report'; footage of guard patrolling fence parameter)

BRADLEY:  (Voiceover) But the sweet deal started to turn sour almost as soon as the medium-security prison opened.  CCA had signed a contract with Washington, DC, and took more than 1,500 inmates from DC's overburdened prison system.  Youngstown thought they were getting medium-security inmates--petty drug dealers, thieves, non-violent prisoners--but mixed in with them were hundreds of convicted murderers, rapists and violent prisoners.  Soon, there were reports of multiple assaults, stabbings and even an inmate revolt.  When Youngstown first tried to investigate, CCA refused to let them in.  The prison was private and Youngstown had no authority to monitor it.

Were there any laws on the book governing the prison when it opened?

State Sen. HAGAN:  Absolutely none.  The--this state of Ohio, as many states in--in our Union, here, in fact, do not have regulations for private prisons.  They can do what they want.

BRADLEY:  So was it illegal to escape from a private prison?  Was that a violation of the law?

State Sen. HAGAN:  There was no violation of the law whatsoever.  You could escape from this prison and walk out and the sheriff's department and the Youngstown city police department had no authority whatsoever to arrest that individual.

(Addressing Legislature) This place is out of control, ladies and gentlemen.

(Footage of Hagan addressing Legislature; police car with sirens on; officer with dog; officers on road; prison yard; police searching buildings and fields; police in pickup)

BRADLEY:  (Voiceover) But in March of 1998, at Hagan's urging, the Ohio Legislature passed a bill regulating private prisons, including a provision that now makes it illegal to escape from one.  It was just in time, because in July, Youngstown's worst fears were realized, when the chaos inside the prison spilled out beyond the prison walls into the streets and neighborhoods of Youngstown.  Police and federal agents were called in to search for six inmates--five of them murderers--who broke out of the prison in broad daylight.

60 Minutes
May 2, 1999
<span style="float:right">Page 2</span>

Not one guard noticed the escape, and the surveillance system, motion detectors and cameras didn't pick it up, either. So how did the prison find out about the escape? According to the warden, an inmate told them.

(Footage of Mayor McKelvey in his office)

BRADLEY: (Voiceover) Youngstown Mayor George McKelvey was appalled.

Mayor GEORGE McKELVEY: I guess an inmate tapped a guard on the shoulder and said, `I want to tell you something.' `So what do you want to tell me?' `Well, there's a big hole in the fence, and six inmates are gone.' Yeah, the—you know, if I didn't laugh, I'd cry. This could have been the largest prison break in the history of the United States. There were more than 200 inmates in that yard who could have gone through that hole, because the guards—nobody knows where they were. Now that's incompetence.

(Footage of police with escaped inmates)

BRADLEY: (Voiceover) Although the six escapees were caught and no one was hurt, everyone asked the same question.

How did the escape happen?

State Sen. HAGAN: That place was so disorganized, they had problems with watching the inmates. And when you have problems watching the inmates, the inmates will get in trouble.

BRADLEY: Particularly if some of the inmates are the most violent, hard-core, maximum-security criminals Washington, DC, had in its system. Because unbeknownst to Youngstown, and in violation of its deal with CCA, that's just who Washington sent to the medium-security CCA prison: two-time murderers, inmates with life sentences, inmates with a history of prison violence, including some who had plotted to take over a DC prison. How did such dangerous, maximum-security inmates get to Youngstown's medium-security prison?

Mayor McKELVEY: Someone in Washington obviously said, `Let's dump on Youngstown.' You know, `They don't have—there's nobody there smart enough to even know what we're doing, so let's dump on them.'

BRADLEY: So did they put one over on CCA?

Mayor McKELVEY: I don't believe that. I don't believe that at all.

BRADLEY: Why not?

Mayor McKELVEY: CCA is one of the largest private prison operators in the United States. Are they telling me they are experts in the field, and somebody snuck inmates by them and they didn't notice a thing? Now wait a minute. Then they have to plead ignorance and incompetence, or they are guilty of the deceit and the deception in working with Washington, DC.

BRADLEY: But why would they do that? I mean, why—it would seem to be an invitation for problems. Why would they want problems at a facility?

Mayor McKELVEY: I don't think they wanted problems, but to the best of my recollection, this contract is worth 28 million a year. That's 28 million reasons to not do your due diligence when accepting inmates into your facility that you're being paid for.

(Footage of Bradley talking with former guards)

BRADLEY: (Voiceover) According to these former guards, who worked at the prison when it first opened, CCA knew from the start that they were getting inmates who shouldn't have been there.

What did they tell you about the inmates who were coming there?

Unidentified Man #1: They told us we were getting the worst of the worst inmates. These inmates were...

Unidentified Man #2: Murderers, rapists.

Man #1: Murderers, rapists.

Unidentified Man #3: Killers.

Man #2: Robbers.

Man #1: Robbers. Yeah, we're getting the worst.

BRADLEY: Did you express any of your concerns to any of your supervisors, superiors, the warden?

Unidentified Man #4: Didn't do any good.

Man #1: They--they had their own...

Man #4: Warden stood right there and told us, `This is what we've got to expect, because Washington, DC, is going to send us the worst first. They want to get rid of them.'

Man #2: I asked the warden. I--I said, `Well, it's a medium-security facility. How can you send maximum-security, high-risk inmates?' He said, `Well, we're reclassifying them.'

BRADLEY: So they're taking someone who's maximum-security and just putting a medium-security label on them.

Man #4: Right.

Man #2: Right.

(Footage of inmates in prison; India Chisley walking; photos of the Chisleys; footage of Alphonso White in court)

BRADLEY: (Voiceover) Not only did CCA house maximum-security inmates at Youngstown--which they shouldn't have--they housed them with less dangerous, medium-security inmates, the equivalent, prison experts say, of putting predators with their prey, as India Chisley found out. Her husband, Bryson Chisley, a medium-security drug offender at Youngstown, got in a brawl in December of 1997 with this man, Alphonso White, a maximum security, two-time convicted murderer. When India Chisley visited her husband, who was being housed in the same unit with White, he told her White was continuing to threaten him.

Ms. INDIA CHISLEY: He was, like, `I can't eat. I can't sleep. I constantly have to watch my back.' He was, like, `And I'm afraid.' He said, `I keep dreaming I'm going to die in here.' And I remember leaving there in tears saying, `Bryson, I'm going to get you out of here. I promise.'

(Visuals of letters written by Ms. Chisley)

BRADLEY: (Voiceover) India Chisley contacted everyone she could think of: elected officials, the DC Department of Corrections and CCA headquarters, asking them to help her husband.

Ms. CHISLEY: I wrote them letters. I talked to CCA directly. I told them he was getting death threats. I told then he feared for his life. I went as far as I could go, to the top. I went as far as I knew how to go.

(Photo of Bryson Chisley; footage of White in court; Eric Bolog and Bradley talking)

BRADLEY: (Voiceover) Despite India's effort, apparently nothing was done to protect her husband. Two-and-a-half months later, he was dead, brutally stabbed to death by Alphonso White as they returned together from recreation. Eric Bolog represents India Chisley in a lawsuit she's filed against Washington, DC, and CCA.

Mr. ERIC BOLOG: These two gentlemen should have been nowhere near each other, and yet they were housed cells apart from each other and allowed to go to recreation together. That is an absolute violation of any standard prison protocol.

(Visual of CCA Northeast Ohio Correctional Center sign)

BRADLEY: (Voiceover) Bolog says CCA's negligence caused Chisley's death.

Mr. BOLOG: Corrections Corporation of America knew Bryson Chisley was in trouble, and they did nothing to protect him, and as a result of that, he's dead.

Ms. CHISLEY: Why couldn't they just have listened to me? Why didn't they do their job? Why couldn't one person help me?

(Footage of James Austin on the street; visual of lawsuit papers; excerpts from transcript reading, `Q. Have you received any maximum security inmates from from D.C.' `A. No, no that I am aware of.'; footage of Austin and Bradley talking)

BRADLEY: (Voiceover) James Austin, a prison expert, was hired by CCA after prison inmates, and later Youngstown, sued the company for housing maximum-security inmates. CCA initially denied they had maximum-security inmates in Youngstown. In March `98, a judge ordered Austin to determine just who was being housed in the CCA facility.

When you looked at the files, was it obvious to you that some of these guys were maximum-security prisoners?

Mr. JAMES AUSTIN: Yes.

BRADLEY: Should this have been obvious to the officials of CCA?

Mr. AUSTIN: Yes.

BRADLEY: Why wasn't it?

Mr. AUSTIN: Well, there were--there were files, records from the DC Department of Corrections, which showed that some of the inmates were classified as maximum-custody inmates.

BRADLEY: And these would be maximum under anybody's system?

Mr. AUSTIN: Anybody's.

BRADLEY: Somebody was asleep at the wheel here.

Mr. AUSTIN: Yeah. Some bad things happened. I mean, I think there were--there were two things that happened simultaneously. The wrong inmates, you know, were sent to Youngstown, and the receiving facility, CCA, was not prepared to handle, you know, these types of inmates.

60 Minutes
May 2, 1999

Page 5

(Footage of Bradley and Austin talking)

BRADLEY: (Voiceover) Why did CCA accept inmates who didn't belong in their prison in Youngstown?

Mr. AUSTIN: One could only speculate. And this is, you know, what I would consider to be the potential dark side of privatization. If your beds are not full, you're not making money. And one has to wonder, you know, whether or not that profit interest was driving some of the decisions to let these kinds of inmates come to a prison that was not suited for them.

BRADLEY: Last December, this investigative report, commissioned by the US attorney general at the request of the governor of Ohio, found pivotal failures and fundamental breakdowns in CCA's operation of the Youngstown prison.

(Footage of report to attorney general; excerpt reading "a devastating convergence of security lapses...", "...preventable and should never have occurred.", "...informed, willing and mutually responsible players..."; footage of John Clark in his office)

BRADLEY: (Voiceover) It reported that Bryson Chisley's death was `a devastating convergence of security lapses' that was `preventable and should never have occurred,' and that Washington, DC, and CCA were `informed, willing and mutually responsible players' in sending maximum-security inmates to Youngstown. John Clark, who wrote that scathing report for the Justice Department, says over 800 inmates will be removed for safety reasons from the CCA prison by April. And why were any inmates in Youngstown who shouldn't have been?

Mr. JOHN CLARK: I think financial decisions were overriding good correctional judgment.

BRADLEY: And in putting prisoners in there because that's how they earn their dollars--their money--they're putting lives at risk, lives of inmates, lives of staff, and ultimately, lives of people who live in Youngstown.

Mr. CLARK: In the end, that was a practical effect, that the most basic correctional mission of the safety of the institution and the safety of the inmates was compromised.

(Footage of District of Columbia government letterhead; CCA letterhead with overlay of picture of Crants; excerpt from letter reading, "...we must respectfully decline your request for an interview."; Mayor McKelvey in his office)

BRADLEY: (Voiceover) The District of Columbia refused our repeated requests for an interview, citing ongoing litigation. CCA chairman Doc Crants agreed twice to an interview with us. Twice, he canceled. The last time, he also cited ongoing litigation. Mayor McKelvey of Youngstown isn't surprised CCA agreed to one thing and then did another. He believes CCA is one of the most deceitful corporations he's ever dealt with.

Mayor McKELVEY: I'm not a favorite of this company. The minute we knew that there were inappropriately classified inmates at the facility, I said, `You back the buses up to the front door, and you get them the hell out of my town.' And now they're doing that. They should have done it 12 months ago.

BRADLEY: For--for you, has this been a--a--a shell game, a--a--a cover-up, deliberate negligence? How would you categorize what's happened out there?

Mayor McKELVEY: All of the above.

BRADLEY: Would you recommend CCA to other communities?

State Sen. HAGAN: I wouldn't recommend CCA to any community. I wouldn't recommend them. I think they've failed miserably at doing the job that they claim they do best. The job that they do best is make money, period.

BRADLEY:   CCA now claims they've made major improvements in security, operations and training at the Youngstown prison, and they say they've overhauled the way inmates are classified.   Just last March, the company settled its lawsuit with prison inmates and the city of Youngstown, agreeing to pay them more than 2 million in legal fees and damages.   Meanwhile, John Clark, who wrote that report for the Justice Department, says the prison is still vulnerable to problems.

(Announcements)

ATTACHMENT THREE

(Newspaper Article, "CCA, The Sequel, <u>The Nation</u>, June 7, 1999).

team veer between apparent wide-eyed naïveté and truculence.

Is Thabo Mbeki's media shyness the result of a deep-rooted pathology—a hangover of Stalinism, a symptom of his paranoia, a lack of confidence—or is it a strategic gambit? Whereas Nelson Mandela continues to make a fetish of his biography, inviting the whole nation, nay, the whole world, to identify with it ("I was in chains, you were in chains; I am now free, you are now free; I can

forgive, you can forgive"), the Mbeki impulse is quite the opposite: He governs through being unknowable. The more distant he is, the more powerful he can be. "If you want to know me," he seems to be saying, "listen to my message. That's all that matters."

It's a good message, but can he implement it? Only when he has stepped out of the great man's shadow and into the light of his own presidency will we be able to tell.    ■

---

## THE LARGEST PRIVATE PRISON FIRM CONTINUES ITS PATTERN OF ABUSE AND PROFIT.

# CCA, the Sequel

### ERIC BATES

James Neal is a short, muscular man with close-cropped hair who has spent the past twelve years behind bars for armed robbery. He is also one of the most valuable commodities to trade hands in Youngstown, Ohio, since the steel industry abandoned the city more than a decade ago. In 1997 Neal was among the first "loads" of inmates bused from the District of Columbia to a new prison run by Corrections Corporation of America, the world's largest operator of for-profit lockups. CCA stood to make $182 million guarding the prisoners, and Youngstown-area residents lined up to apply for hundreds of jobs with the company. Those who toured the prison before it opened were assured they need not worry about the supply of out-of-state inmates. "If one of them dies," a company tour guide said, "they'll send another one."



The day after Neal arrived, a few of his fellow prisoners argued with guards about their treatment. Although the warden later admitted that no one was in danger and no property was threatened, CCA responded to the inmate complaints by dropping canisters of tear gas designed for outdoor use into four cellblocks. As hundreds of blinded and choking prisoners gasped for air, a team of black-uniformed officers in full riot gear known as the "Goon Squad" handcuffed them, beat them and sprayed them in the face with Mace. "It was kind of like a war atmosphere," says Neal, wearing a dark-green prison uniform. "You could hear the canisters whistling down and exploding—whump! No life or limb or property was at stake. CCA just overreacted. I thought, 'Damn, they could have killed me.'"

The excessive use of force proved to be a prelude to stark mistreatment at Youngstown. The medium-security prison was actually taking many maximum-security inmates, and the inexperienced CCA guards were ill prepared to handle the volatile mix. More than twenty prisoners were stabbed in the first ten months, and two died from their wounds. At least seven inmates died from medical conditions, and the company's own audit showed that the prison provided inadequate care to hundreds of prisoners. After Neal and other prisoners filed a class-action lawsuit over substandard treat-

ment and excessive force, CCA once again ordered the riot squad into the cellblocks, forcing inmates to strip, parade naked in front of female staff and lie on the concrete floors for hours while their cells were searched. "I felt like I was on a slave ship," Neal recalls. "I never felt anything so humiliating in my entire life."

Public officials paid scant attention to the abuse of prisoners, however, until the danger began spilling over the razor-wire fence surrounding the prison. Last July six inmates escaped in broad daylight by cutting through the fence—a technique they had routinely practiced in front of guards, snipping the wire to trip the alarms and then running back into crowds of inmates playing softball on a nearby field. After the breakout Ohio Governor George Voinovich called for the prison to be closed and Attorney General Janet Reno ordered a federal investigation.

The abuses at Youngstown are scarcely isolated incidents. Since *The Nation* reported on CCA last year [see "Prisons for Profit," January 5, 1998], the company has experienced more than its share of prisoner escapes and brutality by guards. Coming so close together, the repeated misconduct underscores the way private prisons cut corners at the expense of workers, prisoners and the public:

§ The lack of training for guards and the lack of programs for inmates in private prisons exacerbate violence. In Tennessee a prisoner transferred from Youngstown was stabbed and killed last August by another inmate shipped from Ohio. At another prison in Tennessee, CCA covered up abuses of inmates transported from Wisconsin, who were thrown against walls and zapped with stun guns. Eight company employees, including the security chief, were fired after the incident became public. In New Jersey the company improperly restrained and forcibly sedated immigrants awaiting hearings; in Arizona inmates demonstrated at a CCA prison to protest the lack of recreational and educational programs.

§ Lax security at CCA prisons across the country has enabled an unusually high number of escapes. At the company's South Central prison in Tennessee four prisoners cut through a fence last October with a bolt cutter they received in the mail; a guard who heard the alarm simply shut it off without investigating.

*Eric Bates is a staff writer for* The Independent, *an alternative weekly in Durham, North Carolina.*

In January a convicted killer walked out through the gates dressed in a guard's uniform given to him by a female employee. A Cuban immigrant overpowered a guard and fled from a CCA lockup in Houston, and a convicted killer in a DC jail run by the company climbed out a window undetected before falling eight floors to his death. Guards did not even notice anything amiss when an unidentified woman loaded the inmate's body into her car and drove him to a hospital.

Such an inability to handle the most basic function of a prison—keeping prisoners behind bars—seems to suggest that private companies are scarcely the efficient and reliable jailers they claim to be. After fifteen years of privatization, officials still have almost no reliable data to assess whether for-profit prisons are doing their job—or living up to their promise to save taxpayers money. "Only a few of the more than a hundred privately operated facilities in existence have been studied," a federal report concluded last October, "and these studies do not offer compelling evidence of superiority."

The lack of evidence hasn't stopped public officials from turning to private prisons like CCA. The company added more than 18,000 beds last year, thanks in no small part to its generosity. In Wisconsin, which has shipped more than 2,100 inmates to CCA prisons, the governor and six key legislators received $4,000 in campaign contributions from company chairman Doctor R. Crants. In Ohio the governor's brother received the contract to build the CCA prison in Youngstown.

Such friends in high places have helped CCA profit handsomely from crime. Net income for the first nine months of last year topped $60 million, up 63 percent from 1997. In April 1998 the company bought US Corrections Corporation, its second-largest rival, further securing its hold on the industry. But as competition declines, officials warn, so does the incentive for private prisons to offer competitive contracts. "CCA is so overwhelmingly bigger than everybody else, they'll win hands down," says Russell Boraas, who oversees private prisons for Virginia. "That's not good for the industry, and that's not good for taxpayers."

In reality, "CCA" now exists only as a brand name. The company stopped trading on the stock market in January, when it "merged" with a real estate trust it had formed. Prison Realty Corporation essentially operates as a tax shelter, enabling the company to evade paying any corporate income taxes. Under the arrangement, the trust rents its prisons to a management subsidiary run by the chairman's son. The subsidiary pays as much rent as possible, transforming its profits into tax-exempt "operating expenses" that it pays to the parent firm. The real estate trust, meanwhile, turns almost all of the rent money over to shareholders, thus sheltering its income from taxes as well. The scheme saves the trust $50 million a year in taxes—at the expense of CCA. On May 14 Prison Realty announced it would spend $86 million to prop up its troubled subsidiary. Its stock plummeted, and former shareholders filed a class-action lawsuit.

The real estate trust made out especially well in Youngstown. City officials eager to bring jobs to their depressed valley gave CCA 101 acres of land, free utility hookups and a five-year tax abatement for the prison. The company then sold the facility to the trust, pocketing $70 million. "This shows what private prisons are all about: profit," says Robert Hagan, a state senator from Youngstown. "That prison is nothing but a gulag."

The CCA prison in Youngstown stands on a hillside once home to several thriving steel-related industries. The area is now home to four major new prisons and a host of jails. "Prisons have become Youngstown's new economic base," says labor historian and activist Staughton Lynd. "It's so pathetic to see this working-class town, which has quite a proud history of militant unionism, become one more rural backwater living off the presence of prisons."

Like other nonunion operations, private prisons make most of their money by hiring fewer people and paying them less. Former guards say two-thirds of the Youngstown officers never worked in corrections before, and starting wages were $1,300 a year less than those of their counterparts at state-run prisons. "They don't care about the corrections officers, and they don't care about the inmates," former guard Daniel Eshenbaugh told the Cleveland Plain Dealer. "Everything there is about money." Another former guard explained how CCA got workers to fade food from inmates to boost profits. "They gave us a rundown saying two slices of bread per inmate costs this much," he said. "If you can cut corners here, it would mean a possible raise for us."

> *This shows what private prisons are all about: profit. That prison is nothing but a gulag.'—Ohio State Senator Robert Hagan*

While Youngstown represents some of the worst abuses at CCA prisons, it is also the scene of the biggest victory for inmates since privatization began. On April 20 a federal judge in Akron approved a landmark settlement of the class-action lawsuit filed by prisoners. The company has agreed to make cash payments of up to $1,000 to every inmate and create a common fund to settle claims by those with serious injuries—for a total of $1.65 million, the second-highest award ever paid to inmates in a class-action lawsuit. Even more startling, the prisoners were joined in their suit by the City of Youngstown, which will now employ two independent monitors to oversee conditions and medical treatment at CCA. The monitors have the power to order the warden to fix inadequacies and to fine the company if it fails to act.

"This is the first serious attempt to develop a way to hold a private prison accountable," attorney Al Gerhardstein said before the judge approved the settlement. "The inmates and the city are working together to hold them to the level of staffing and medical care and programs they promised. That raises a question: If you refuse to wink and let them get away with abuses as long as they come in under budget, can they still make a profit?"

Some activists feel the settlement doesn't go far enough. "We need to shut private prisons down," says Lynd. "The care and rehabilitation of prisoners is not consistent with the profit motive."

But until profiteering from prisons is stopped, inmates welcome any step that reins in firms like CCA. "They run this place like GM or Ford," says James Neal, who urged the judge to approve the settlement. "It's like the defects in the Pinto. A $12 piece of steel would have corrected the problem, but their accountant showed it was cheaper not to fix it, even if people burned to death. That's the same way CCA runs prisons. If someone gets killed, so what? They just pay the family and give them some roses. They'll still be making millions off of misery." ∎

ATTACHMENT FOUR

(Memorandum, Transfer of D.C. Inmates, January 20, 1999)



Government of the District of Columbia
DEPARTMENT OF CORRECTIONS
Suite N-102
1923 Vermont Avenue, N.W.
Washington, D.C. 20001

Office of the Deputy Director

January 20, 1999

## MEMORANDUM

TO      :   Elwood York
            External Confinement and
            Monitoring Administrator

FROM    :   Michelle R. Elzie
            Deputy Director Management Reform

SUBJECT :   Transportation Costs for Inmates in External Beds


This memorandum is in response to your January 6, 1999 correspondence concerning the transportation of inmates to CCA contract beds.

Please be advised that Case Management Services coordinates the movement of inmates to and from external beds. They have reviewed your memorandum and the following is submitted.

1.      It is not possible to provide a list of inmates to be released within the next ninety (90) days. Inmates are returned to D.C. Department of Corrections (DCDC) for the following reasons (in order of frequency):

A.      Parole grants
B.      Court appearances
C.      Mandatory release
D.      Medical/Mental Health issues
E.      Safety/Security needs

In addition, inmates are transferred from NEOCC to other CCA facilities for classification reasons to comply with the Ohio Federal court order. Transportation of these inmates in the past has been handled and paid for by CCA. However, they are now reluctant to do so and want DCDC to pay for the transfer of these inmates to other CCA facilities such as Torrence New Mexico and Florence Arizona. Under the contract, who is required to pay for these transfers?

Transportation Costs                                                    2

It is not possible to predict in advance which inmates will require transfer for the five (5) reasons specified above. Previous experience over the past twenty (20) months indicates that the Department must make bi-weekly trips to NEOCC to return inmates in these categories listed. These trips normally transport between five (5) and twenty (20) inmates back to DCDC. However, the Department also averages one to two unscheduled special transports per month. These transfers are due to court orders, significant medical needs, or sentence modifications.

Further, the Department does not always transport inmates to NEOCC to fill vacant beds on each of the bi-weekly trips. This is primarily due to the institution's inability to identify transfer candidates and prepare transfer packages in a timely manner. This process is further inhibited by the current requirements that inmates be Medium or lower custody on both the NEOCC and FBOP classification instruments. This process is now further compounded by the Department's transfer of 1250 inmates to the Virginia Department of Corrections (VADOC) which has diverted the institution's classification resources and dramatically reduced the pool of potential NEOCC transfer candidates. These factors will impact on the Agency's ability to replace inmates that are transferred out of NEOCC.

Additionally, according to Case Management Services, the following issues need to be addressed:

1.    Have arrangements been made with CCA to begin picking up our inmates housed in DCDC for transfer to CCA Facilities?

2.    If so, who is the contact person, how do we reach them and how much notice do they require for a trip?

3.    Will they return our inmates from NEOCC at no cost?

4.    If not, what is the cost per inmate? Is there a discount for large groups? If so, how large a group?

5.    In the near future we must transfer 300 High Custody inmate out of NEOCC and replace them to comply with a congressional mandate. Will CCA handle these transports at no costs? If no, at what cost?

6.    Is it more cost efficient to have DCDC staff return these inmates to DCDC? Case Management Services indicates that based on the Agency's previous use of CCA/Transfer services, it will most likely be more cost effective to use DCDC staff to return our inmates. A cost analysis needs to be prepared as soon as possible.

Transportation Costs                                                                    3

7.    If we are to use CCA to return our inmates, have funds been identified for these
      costs. It is my understanding that the Department had difficulty paying for
      previous transport services in FY 1998.

8.    What are the procurement rules for providing these services? Do we have to bid
      then out? Are there other vendors?

9.    Will CCA/Transcor be able to pick up and return special conveyance inmates
      within 24 hours to comply with court orders or medical needs or is the
      Department to continue to handle these transports?

10.   Does the current contract with CCA address these issues? Is there any
      upcoming amendments to the contract that will address any of these issues?

11.   Has a decision been made on Case Management Services proposal to transfer
      Maximum custody and Protective custody inmates to CCA beds in New Mexico
      and Tennessee?

It is my understanding that many of these issues were previously raised at a meeting
you attended with former Interim Director Calvin R. Edwards and you were assigned
the responsibility to investigate and determine the most effective operational and cost
effective resolution.

In conclusion, I concur with your assessment that the Department needs to transport
these inmates in an efficient and cost effective manner. However, in order to do so the
eleven (11) areas identified above must be resolved. In the interim, we must make a
trip to NEOCC to pick up inmates in the near future and also will have inmates identified
for transfer to that facility. Please let me know as soon as possible how we should
proceed until these issues are resolved and feel free to contact me if you have any
questions.


cc:    Devon Brown, Interim Director
       Adrienne R. Poteat, DDI
       Edmund P. Walsh, Administrator, CMS
EPW/lgc