# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Ismail Abdul Malik, a/k/a Roy Thomas,

Plaintiff,

v.

District of Columbia, *et al.*,

Defendants.

Civil Action No. 1:05-cv-1374 (RMC)

## DEFENDANTS DISTRICT OF COLUMBIA, CORRECTIONS CORPORATION OF AMERICA AND TRANSCOR'S MOTION FOR SUMMARY JUDGMENT

Defendants, through counsel, file this Motion for Summary Judgment pursuant to FED. R. CIV. P. 56 because no genuine material issues of fact exist which permit Plaintiff to demonstrate the elements necessary for a constitutional claim under 42 U.S.C. § 1983. Furthermore, should Plaintiff satisfy the legal prerequisites to establish a violation of his rights, Plaintiff's claims are barred both by time and 42 U.S.C. § 1997e(e). Finally, as a matter of law, Plaintiff is not entitled to an award of punitive damages against any defendant. This Motion is supported by the following Memorandum of Points and Authorities, separate Statement of Uncontroverted Material Facts ("SOF") and the pleadings on file with the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     FACTUAL BACKGROUND

### A.     Plaintiff's Allegations

Plaintiff filed a Complaint on July 11, 2005, in which he alleges his Eighth Amendment rights were violated by the District of Columbia, Corrections Corporation of America, Inc. ("CCA") and TransCor America, L.L.C. ("TransCor"), during his transport from the Northeast Ohio Correctional Center ("NEOCC") in Youngstown, Ohio to the Central Arizona Detention Center ("CADC") in Florence Arizona in July 2001. Plaintiff alleges that, as a result of is participation in a class action lawsuit against the District of Columbia and CCA, he was driven

on a bus where he was exposed to second-hand tobacco smoke, denied opportunities to use a toilet, and deprived of food and water. Plaintiff also alleges that during his transport, he was attached to another prisoner and was restrained with a belly chain, handcuff, leg shackles, and a "black box," which injured his wrists. Plaintiff further alleges that we was forced to endure humiliation and unpleasant conditions of confinement, due to the fact the toilet was clogged to the point of overflowing, and that several fellow inmates soiled themselves during the trip.

B.    **Procedural History**

Plaintiff filed his Complaint in Superior Court for the District of Columbia. Defendants removed the case to this Court in Civ. Action No. 03-944 (RMC). Defendants moved to dismiss based upon Plaintiff's failure to plead exhaustion of administrative remedies and failure to state a claim upon which relief could be granted. This Court dismissed Plaintiff's Complaint without prejudice on January 20, 2004 for Plaintiff's failure to state a claim against Defendants.

Plaintiff refiled his Complaint on July 11, 2005. On October 11, 2005, Defendant District of Columbia moved to dismiss based on Plaintiff's failure to allege a constitutional violation against it. Plaintiff filed his opposition on November 21, 2005, alleging, *inter alia,* that the District of Columbia had a custom and practice of (1) physically abusing prisoners, (2) inadequately investigating, and tolerating, physical abuse of prisoners, and (3) manifesting deliberate indifference to the rights of D.C. Department of Corrections prisoners to be free of cruel and unusual punishment.[1] On August 3, 2006, this Court concluded that "Plaintiff further manages, *barely*, to allege the District of Columbia's liability" and denied the District's motion to dismiss without prejudice, noting that "plaintiff's success in this action depends on his ability to prove the allegations of the complaint."[2]

This Court entered a Scheduling Order on November 6, 2006, after all parties answered the Complaint. The Scheduling Order provided that that parties were to exchange initial disclosures under FED. R. CIV. P. 26(a)(1) on or before January 2, 2007, Plaintiff's designation of

---

[1] Opp. to Mot. to Dismiss [Doc. #12] at 4.
[2] August 3, 2006 Memorandum Opinion [Doc. #17]  at 4-5.

experts and expert reports under FED. R. CIV. P. 26(a)(2) was to be served on or before February 2, 2007, and that all discovery was to be completed by July 2, 2007.[3]

On February 12, 2007, Defendants CCA and TransCor, joined by the District of Columbia, moved for Judgment on the Pleadings or, in the Alternative, for Summary Judgment, based on Plaintiff's failure to properly exhaust all available administrative remedies, as required by 42 U.S.C. 1997e(a), prior to filing suit. That motion has been fully briefed, and remains pending before the Court.

Discovery has now closed. The parties exchanged Rule 26(a)(1) disclosures, and plaintiff sought and received responses to written discovery. Neither party served a Rule 26(a)(2) disclosure of any expert witness or report.[4]

## II.    STANDARD OF REVIEW

Under FED. R. CIV. P. 56, a court may grant summary judgment when the pleadings, affidavits, depositions, answers to interrogatories, and admissions of record disclose no genuine issues of material fact and show that the moving party is entitled to judgment as a matter of law.[5] While the movant initially bears the burden of demonstrating the absence of a genuine, material fact issue, it is the answering party's duty to dispute the facts upon which movant relies.[6] If the answering party fails to specifically controvert any fact in the movant's Statement of Facts, all such uncontroverted facts are to be deemed admissions.[7] A disputed issue of material fact is genuine and may only preclude summary judgment if the Court determines that a reasonable jury could conceivably find in favor of the non-moving party on that fact issue.[8]

With the close of discovery, it is now ripe for the Court to consider, not what the Plaintiff alleges, but whether or not Plaintiff can present a genuine issue of material fact at trial to support his allegations of Defendants' liability, under 42 U.S.C. § 1983. In response to a Motion for

---

[3] November 6, 2006 Scheduling Order [Doc. #21] at 1-2.
[4] SOF ¶ 105.
[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).
[6] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[7] L.CV.R. 56.1
[8] *Anderson*, 477 U.S. at 248.

Summary Judgment, Plaintiff is "required to provide evidence that would permit a reasonable jury to find" in his favor.[9]  Defendants avow that he cannot.

## III.   *MONELL* **PRECLUDES A RECOVERY BY PLAINTIFF.**

Plaintiff names no individual defendant and only sues the District of Columbia and two separate business entities, CCA and TransCor, liable for the violation of his constitutional rights. Private corporations, such as CCA and TransCor, are to be considered  municipalities, such as the District of Columbia, in cases brought under 42 U.S.C. § 1983.[10]

Under *Monell*, a municipality or private corporation cannot be held liable under 42 U.S.C. § 1983 based on the theory of *respondeat superior.*[11]  Rather, Plaintiff must satisfy the two tests, set forth by the D.C. Circuit:  (1) Plaintiff must be able prove that he endured a predicate constitutional violation, and that (2) whether a policy or custom of Defendants caused the constitutional violation.[12]  In this case, there are three Defendants.  If Plaintiff fails to present a material issue of fact demonstrating liability of each defendant, those Defendants whom Plaintiff fails to demonstrate liability should be dismissed.

---

[9] *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

[10] *See Jackson v. Illinois Medi-Care, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002) (private corporation operating transportation service for police department); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (special police officer appointed and supervised by county sheriff, but employed by amusement park); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997) (private corporation contracting with county to provide medical services to inmates); *Street v. Corrections Corp. of America*, 102 F.3d 810, 818 (6th Cir. 1996) (private corporation operating prison under contract with county government); *Rojas v. Alexander's Department Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990) (special police officer appointed by and subject to orders of commissioner of police department of New York City, but employed by department store); *see also*, *Gabriel v. Corrections Corp. of America*, 211 F.Supp.2d 132, 138 (D.D.C. 2002) (private corporation operating prison under contract with District of Columbia).

[11] *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978); *Bd. Of County Comm'rs v. Brown*, 520 U.S. 397, 404-404 (1997) ("Courts "have consistently refused to hold municipalities liable under a theory of *respondeat superior*"); *see also Graham v. Davis*, 880 F.2d 1414, 1421 (D.C. Cir. 1989); *Garcia v. District of Columbia*, 56 F.Supp.2d 1, 7 (D.D.C. 1998); *Cockrell-El v. District of Columbia*, 937 F.Supp. 18, 22 (D.D.C. 1996) (assertion that employee "was acting fully within the scope of his employment and pursuant to the policies of defendant is not specific enough to withstand dismissal") (citation omitted). *Fields v. D.C. Dept. of Corrections*, 789 F.Supp. 20, 22 (D.D.C. 1992)

[12] *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

A.    **Plaintiff did not endure a constitutional violation.**

In his Complaint, Plaintiff alleges that the conditions of his transportation from NEOCC to CADC constituted cruel and unusual punishment.  In order to demonstrate a constitutional violation, Plaintiff must satisfy both the objective and subjective prongs of the *Farmer* test. Defendants may not "be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[13]    As such, Plaintiff must present evidence to the jury that the deprivation is objectively serious and that defendants subjectively were deliberately indifferent to Plaintiff's plight.[14]

1.    **The length of the transport, meals he was fed, or toilet conditions does not constitute cruel and unusual punishment.**

A Plaintiff must first show a substantial harm resulting from his claims.[15]  Plaintiff claims that due to the length of the transport, he was forced to urinate upon himself, suffer hunger, and endure stench and humiliation.[16]  Even if true, given the circumstances of the transport, those claims do not rise to the level of substantial harm required by the objective prong of the *Farmer* test, and, if it does, the limited duration of the conduct complained of fails to meet the subjective, deliberate indifference prong.[17]

---

[13] *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

[14] *Anderson-Bey v. District of Columbia,* 466 F.Supp.2d 51, 61 (D.D.C. 2006).

[15] *Valley Forge Christian College v. Americans United for Separate of Church and State, Inc.,* 454 U.S. 464, 472 (1982) (A plaintiff must prove "actual or threatened injury" to ensure that "the legal questions presented to the court  will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."). *See also, Lewis v. Casey,* 518 U.S. 343, 349-350 (1996) (Inmates must show actual harm in order to have standing to sue.)

[16] SOF ¶ 69.

[17] *See Estelle v. Gamble,* 429 U.S. 97 (1976) (no Eighth Amendment claim stated where prison officials, *inter alia,* inadvertently failed to fill prisoner's prescription for blood pressure medication for four days); *Glover v. Ridley,* 1994 WL 35849 at *5, 93-cv-492 (SSH) (D.D.C. 1994) (failure to provide the drug AZT on one occasion "clearly fail[s] to meet the deliberate indifference standard); *Cox v. District of Columbia,* 834 F.Supp. 439 (D.D.C. 1992) (two-week delay in providing medication to prisoner insufficient to state Eighth Amendment claim); *Bryan v. Administrative of F.C.I. Otisville,* 879 F.Supp. 134 (S.D.N.Y. 1995) (objective prong not met

Here, Plaintiff alleges that he suffered poor conditions of confinement, for over forty hours. However, the length of transport, coupled with the uncomfortable conditions concomitant therewith, does not constitute cruel and unusual punishment.[18]

Likewise, for the provision of fast food meals to constitute a constitutional violation, under *Farmer's* objective prong, Plaintiff must prove a specific physical harm or health risk, or that he was denied a nutritionally and calorically adequate diet.[19] Plaintiff cannot do so. The facts demonstrate that not only did plaintiff receive only four fast food meals during his trip, but that the agents on the bus customarily provided meals in excess of the caloric content required by TransCor policy.[20] The meals provided to the inmates were identical to the meals consumed by the TransCor agents during the trip.[21] As the TransCor agents consumed identical meals as Plaintiff, it is inconceivable that anyone would infer that they knew of and subsequently disregarded, any risk to the inmates from eating fast food.

Similarly, Plaintiff cannot show he was subjected to any harm as a result of his alleged

where prisoner was deprived of medicine for three days, causing fever and mouth infection); *Shapely v. Nevada,* 766 F.2d 404, 407 (9th Cir. 1985) (*per curiam)* (a "delay in medical treatment must have caused substantial harm" to constitute Eighth Amendment violation); *Wilson v. Seiter,* 501 U.S. 294, 303 (1991) ("the medical care a prisoner receives is just as much a condition of his confinement as … the temperature he is subjected to in his cell").

[18] *Barker v. Fugazzi,* 18 Fed.Appx. 663, 665 (9th Cir. 2001) (allegations that an inmates restraints were too tight during transport from Houston, TX to Pendleton, OR does not result in an injury "serious enough to satisfy the objective component of the test or to give rise to an inference that the officials on the bus knew about and disregarded an excessive risk to his health and safety."); *Juliano v. Camden County Dept. of Corrections,* Civ. Action No. 06-1110 (FLW) 2006 WL 1210845 (D.N.J. May 3, 2006) (During 10-day transport from Jamestown, CA to Camden NJ, complaints that full restraints made eating and using bathroom facilities impossible and that he was denied a varied diet by being served only McDonald's food are "not serious enough to satisfy the objective component of an Eight Amendment Claim [nor] give rise to an inference that defendants willfully disregarded an excessive risk to his safety, necessary to satisfy the deliberate inference standard"); *Jenson v. Jorgenson,* Civ. Action No. 03-4200, 2005 WL 2412379 (D.S.D. September 29, 2005) (During 10+ day transport from Sioux Falls, SD to Jenson, TX facts that inmate was fed fast food meals, was denied water between meals, was in full restraints with a black box, and was denied use of a toilet, "do not amount to sufficiently serious constitutional violations"); *Kinslow v. TransCor America, LLC,* Civ. Action No. 06-C-4023, 2006 WL 2927605 (N.D. Ill., October 10, 2006) (dismissing complaint relating to six day transport from Joliet, IL to Santa Fe, NM, where inmate was in full restraints for the last three days of the trip).

[19] *Berry v. Brady,* 192 F.3d 504, 508 (5th Cir. 1999).

[20] SOF ¶¶ 45-47 and 50-52.

[21] SOF ¶ 14.

denial of use of the toilet. A prisoner's mere discomfort, without more, does not offend the Eighth Amendment.[22] The undisputed facts demonstrate the toilet on Plaintiff's bus was designed so that it could not be clogged, that it was emptied just hours into the trip, and that it did not need to be emptied on a daily basis.[23] Moreover, as the TransCor agents on the bus, used the same toilet as the inmates, it is inconceivable that a reasonable jury would conclude that those agents exhibited deliberate indifference towards Plaintiff regarding the conditions of the toilet.[24]

Finally, while Plaintiff alleged in his complaint that he suffered humiliation and degrading conditions, during his psychological intake at both the U.S. Penitentiaries in Atlanta and at Big Sandy, Plaintiff disavowed any emotional injuries relating to the conditions of his transport.[25]

### 2. The manner and duration of Plaintiff's restraint is not a constitutional violation.

During the course of the transport, Plaintiff was in full restraints. Full restraints consisted of handcuffs, leg irons, a Martin (or belly) chain which was connected around a prisoner's waist, and a black box.[26] The black box, is a device which fits over the key holes in the handcuffs, so that a prisoner may not pick the lock, or escape in the event he obtains a handcuff key.[27] Because Plaintiff was on a bus, rather than inside the confines of a prison, with its multiple levels of security, he remained in full restraints, virtually for the entire duration of his transport.

---

[22] *See Cunningham v. Eyman*, 17 Fed. Appx. 449, 452 (7th Cir. 2001) (no Eighth Amendment claim stated where shackled prisoner forced to soil self); *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (temporary deprivation of toilet paper insufficient to state Eighth Amendment claim); *Smith v. Copeland*, 87 F.3d 265 (8th Cir. 1996) (exposure to raw sewage for four days does not implicate constitutional concerns when prisoner did not allege that he was exposed to disease or suffered any other consequences of the exposure to raw sewage); *Williams v. Delo*, 49 F.3d 442, 445-46 (8th Cir. 1995) (four days in strip cell without clothes, bedding or running water did not violate Eighth Amendment when prisoner's health was not impaired); *Anderson-Bey,* 466 F.Supp.2d at 64 ("Nor is it likely that the denial of bathroom breaks during the trip, without more, would constitute cruel and unusual punishment").
[23] SOF ¶¶ 7, 43-44, and 56.
[24] SOF ¶ 14.
[25] SOF ¶ 102.
[26] SOF ¶ 27.
[27] SOF ¶ 28.

Plaintiff alleges that the manner and duration in which he was restrained forced him to suffer continuing pain and swelling in the wrists, which is so great that it impairs his ability to seek gainful employment.[28]  While it was known by the transporting agents that the restraints could cause temporary swelling and discomfort, that temporary discomfort does not rise to the level of substantial injury or deliberate indifference.[29]

Even if Plaintiff suffered an injury as a result of the manner in which he was restrained, there is no deliberate indifference.  Prison officials may place inmates in restraints while moving them from place to place.[30]  Although full restraints may cause some discomfort, their use is "penologically justified 'by the greater risk of escape … and the reduced number of guards.'"[31]

Moreover, any testimony offered by Plaintiff is belied by his subsequent medical records, which demonstrate that he does not suffer any substantial injury.[32]  Indeed, during his intake at the U.S. Penitentiary – Atlanta, a doctor noted that Plaintiff's upper extremities were normal, both for strength and range of motion.[33]  During a subsequent medical intake at the U.S. Penitentiary – Big Sandy two years later, Plaintiff denied *ever* experiencing swollen or painful joints.[34]  This was confirmed when subsequent examinations showed that Plaintiff had a good range of motion in his upper extremities.[35]

Furthermore, there is no evidence that Plaintiff may present at trial establishing proximate causation of a long-term injury.  In his Initial Disclosure Statement, Plaintiff only identified himself, the CADC grievance officer, the TransCor employee who performed a search for any grievances/complaints filed by Plaintiff, and the TransCor bus crew as witnesses to this

---

[28] SOF ¶ 68.
[29] SOF ¶ 59.
[30] *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996), *amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998).
[31] *Moody v. Proctor*, 986 F.2d 239, 241 (8th Cir. 1993) (quoting *Fulford v. King*, 692 F.2d 11, 14 (5th Cir. 1982)) (although prisoner suffered injury as a result of the use of a black box applied over his handcuffs, its use was justified and there was no evidence that defendants acted with deliberate indifference).
[32] SOF ¶ 68.
[33] SOF ¶ 71.
[34] SOF ¶ 85.
[35] SOF ¶¶ 71, 74.

action.[36]  Plaintiff did not identify any of his medical providers or any expert witnesses who can offer competent testimony that the manner and duration of Plaintiff's restraint proximately caused any continuing impairment of his wrists.[37]

"The use of expert testimony is required since the subject is 'not likely to be within the common knowledge of the average layman.'"[38]  No layperson can be expected to have the capacity, without expert testimony, to assess the likelihood that Plaintiff's condition and damages are permanent.  Both this Court and the District of Columbia Court of Appeals held that expert testimony is necessary to prove that a plaintiff's injuries were proximately caused by defendant's negligence.[39]  While the lack of expert testimony alone is fatal to Plaintiff's claim, his prison employment and work records, further confirm that the manner and duration in which Plaintiff was restrained does not amount to a substantial injury under *Farmer*.

While Plaintiff contends that the pain and lack of strength will prevent him from pursuing a skilled trade, Plaintiff has never pursued skilled employment.[40]  Aside from a GED, the only career training Plaintiff has sought is in custodial maintenance services, general computer skills, and physical fitness.[41]  Even so, Plaintiff has sought and obtained prison detail employment, where he has largely received positive evaluations, working with his hands, such as operating a floor buffer.[42]  Furthermore, any impairment Plaintiff is likely to experience in his ability to seek gainful employment and enjoy everyday activities upon his release, is likely to be caused most

---

[36] *See* Pltf's Initial Disclosure Statement [Doc. #30].
[37] SOF ¶¶ 104-105.
[38] *Allen v. Hill,* 626 A.2d 875, 877 (D.C. 1993) (quoting *District of Columbia v. Barriteau*, 399 A.2d 563, 569 (D.C. 1979)).
[39] *Stewart v. Bepko,* 576 F.Supp. 182, 183 (D.D.C. 1983) ("With respect specifically to the element of causation, it is the plaintiffs' burden to produce a medical expert who can testify that, in his opinion, and to a reasonable degree of medical certainty, the alleged negligence caused the injury."); *Gregory v. Greater Southeast Community Hosp.,* 697 A.2d 1221, 1222 (D.C. 1997) ("expert testimony is required to prove … causation") (citations omitted); *Sponaugle v. Pre-Term, Inc.,* 411 A.2d 366, 368 (D.C. 1980) ("assur[ing] that reliable opinions are given … is particularly important where the causation element is unclear …. [W]here legal and factual causation are major issues, there may well be a sound basis for the requirement that expert medical testimony be given in terms of 'reasonable medical certainty.'")
[40] SOF ¶ 92.
[41] SOF ¶¶ 93-94 and 101.
[42] SOF ¶¶ 95-100.

proximately by Plaintiff's congenital degenerative disk disease, not any condition he experienced during a 40 hour bus ride in 2001.[43]

  **3. Exposure to environmental tobacco smoke ("ETS") can not be shown to be cruel and unusual punishment.**

  Plaintiff alleges that inmates were permitted to smoke during the transport.  As a result of his exposure to secondary smoke, he claims that he could have had a fatal asthma attack and continues to suffer watering of the eyes, which impairs his ability to pursue normal daily activities.  Furthermore, Plaintiff claims that exposure to ETS causes an excess of fluid build-up in his lungs, limiting his occupational opportunities.[44]  Ironically, during the course of Plaintiff's transport from the Sussex II State Prison in Virginia to the U.S. Penitentiary – Atlanta, he had over 100 cigars in his possession.[45]

  However, the risk of an asthma attack is not an actual substantial injury constituting a Constitutional violation.  Plaintiff never alleges that he actually suffered an asthma attack.  Moreover, inmates who required medication, such as Nitroglycerine pills or Asthma inhalers, which needed to be administered quickly, were permitted to keep them on their person during the transport.[46]  Even if Plaintiff had experienced an asthma attack during the transport, he had his inhaler on his person, and could have taken measures to ensure that there was no harm.

  Further, Plaintiff's medical records consistently reveal that he only needs to use his inhaler sporadically, his chest is clear and he has good ventilation, belying any testimony Plaintiff himself could provide that he experiences increased fluid in his lungs as a result of the conditions of his transport.[47]

  Plaintiff's claim that the exposure to ETS causes his eyes to continue to water, limiting his enjoyment of athletic activities, is a claim, which no reasonable jury will conclude has merit.  Aside from the fact, the Plaintiff cannot offer competent testimony of causation,[48] Plaintiff's

---

[43] SOF ¶ 91.
[44] SOF ¶ 67.
[45] SOF ¶ 70.
[46] SOF ¶ 25.
[47] SOF ¶¶ 74-75, 79, 83-84, 86-90.
[48] *Supra*  at 8-9.

medical records clearly demonstrate, that Plaintiff has not been limited in the pursuit of his athletic participation, and that any watering of the eyes he experiences is a result of a subsequent athletic injury. A full year after the bus ride, Plaintiff admitted that he has never experienced any eye trouble.[49] Moreover, Plaintiff's enjoyment of athletic activities, including hand ball, basketball, football and rocket ball, seems limited only when Plaintiff is injured during slip and falls or collisions while engaged in those very activities.[50] In fact, Plaintiff never experienced any excessive tearing which prompted him to seek medical attention until after he was hit in the eye with a closed fist during the course of a football game, suffering trauma.[51]

In order to demonstrate the exposure to ETS constitutes cruel and unusual punishment, Plaintiff must do more than merely demonstrate the existence of a substantial injury. To satisfy the objective burden of *Farmer*, Plaintiff's has the additional burdens of proving that "(1) the prisoner [was] exposed to unreasonably high levels of ETS; (2) scientific and statistical evidence establishes a likelihood that an injury to the prisoner's health [was] caused by the exposure; and (3) the risk of harm [was] so grave that it 'violate[d] contemporary standards of decency to expose anyone to such a risk.'"[52] Plaintiff must present proof in the form of a "scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS" and that "the risk of which he complains is not one that … society chooses to tolerate."[53]

During the course of discovery, Plaintiff failed to identify any witness with the requisite levels of relevance and reliability required by *Daubert v. Merrell Dow Pharmaceuticals*,[54] to present testimony that he was exposed to sufficient levels of ETS, the causal likelihood of his alleged injuries, or that those levels to which he was exposed was a risk that violates

---

[49] SOF ¶ 72.
[50] SOF ¶¶ 73, 74, 76-79, 81, 83 and 89.
[51] SOF ¶¶ 80-82.
[52] *Pryor-El v. Kelly*, 892 F.Supp 261, 266-269 (D.D.C. 1995) (*citing Helling v. McKinney*, 509 U.S. 25, 36 (1993); *see also Williams v. District of Columbia*, 439 F.Supp.2d 34, 36-37 (D.D.C. 2006).
[53] *Helling*, 509 U.S. at 36.
[54] 509 U.S. 579 (1993).

1807678.1

contemporary standards of decency.

Furthermore, in order to satisfy the subjective, deliberate indifference claim, it is not enough for Plaintiff merely to rely on the common knowledge of his jurors. The mass move of which Plaintiff complains happened six years ago, and occurred between Ohio and Arizona. It was not until 2006, that a slim majority of voters in the states of Ohio and Arizona approved prohibitions on indoor smoking.[55] In order to satisfy the deliberate indifference prong, Plaintiff needs to establish beyond a reasonable doubt that in 2001 the TransCor agents responsible for his transport, both knew, or should have known, of the serious risk Plaintiff faced and deliberately ignored that risk by permitting other inmates to smoke. To establish that the TransCor agents should have known in 2001 that it violated society's standards of decency to willingly expose *anyone* to ETS, Plaintiff would have had to disclose evidence of the applicable societal standards in 2001. He did not. Plaintiff did not disclose any expert witness or any accepted scientific evidence relevant to his alleged exposure.[56] Thus, Defendants are entitled to summary judgment.

**4.    Plaintiff has plead himself out of a "totality of conditions" claim.**

It is not enough for Plaintiff to allege that the "totality of conditions" is unconstitutional. Even when making such a claim, Plaintiff must prove a deprivation of at least one basic human need.[57] In order for a Plaintiff to present a claim that the "totality of conditions" of his transport constitutes cruel and unusual punishment, he must prove facts which if true "show the nature and extent of the deprivations, either alone or in combination subjected Plaintiff to cruel and unusual punishment."[58] However, when it is inconceivable that the deprivations Plaintiff alleges could exist in combination, Plaintiff is left with the sole burden of showing that each alleged deprivation alone, subjected him to cruel and unusual punishment.

---

[55] Arizona and Ohio's state-wide indoor smoking bans were not approved by voters until November 2006 and only became enforceable on May 1, 2007 and May 3, 2007, respectively. *See* Arizona Department of Health Services website, http://www.smokefreearizona.org/ (accessed July 28, 2007) and the Ohio Department of Health website, http://www.odh.state.oh.us/alerts/ohiosmokingban.aspx (accessed July 28, 2007).
[56] SOF ¶¶ 104-105.
[57] *Wilson*, 501 U.S. at 304-405.
[58] *Campbell-El v. District of Columbia*, 881 F.Supp. 42, 44 (D.D.C. 1995).

Such is the case here, where Plaintiff created a Catch-22 with his claims. He alleges that inmates, who were restrained in the exact same manner he was, were able to smoke prolifically on the bus. Furthermore, Plaintiff alleges that the manner in which he was restrained prohibiting him from using his inhaler, despite the fact that the biomechanics of reaching into his pocket and moving his inhaler to his mouth require the exact same range of motion as another inmate reaching into his pocket and placing a cigarette in his mouth. As a reasonable finder of fact cannot conclude that all of the conditions of which Plaintiff complains could have possibly occurred in concert, Plaintiff's conditions of transport claims should be evaluated independently.

**5.    Plaintiff cannot demonstrate sufficient facts for a reasonable jury to find in his favor on a First Amendment retaliation claim.**

In addition to alleging that his conditions of transport constituted cruel and unusual punishment in and of themselves, Plaintiff alleges that he was exposed to those conditions by virtue of his membership in the Plaintiff class of a previous lawsuit filed against the District of Columbia, CCA, and NEOCC. Recognizing that *pro se* Complaints are to be construed liberally provided there is sufficient notice, Defendants will demonstrate that Plaintiff cannot establish the elements of a First Amendment retaliation claim, and that they are entitled to Summary Judgment on any such retaliation claim which may be read into the Complaint.

In order to prove a claim of retaliation, Plaintiff must prove that he was (1) "engage[d] in activity protected by the First Amendment, (2) that prison officials impermissibly infringe[d] on [his] right to engage in the protected activity, and (3) that the alleged retaliation did not advance legitimate goals of the prison or was not tailored narrowly enough to achieve such goals."[59] Additionally, retaliation claims also involve a causation element, such that "the protected conduct was a 'substantial factor' or 'motivating factor' in the defendant[s'] decision."[60]

The undisputed facts, however, show that Plaintiff's participation in a class action lawsuit, was not the substantial or motivating factor behind his conditions of transport. As a

---

[59] *Garcia*, 26 F.Supp.2d at 5.
[60] *Pryor-El*, 892 F.Supp. at 274 (citing *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287 (1977)).

prerequisite for such a showing, Plaintiff must first demonstrate that those responsible for his transport knew of his pursuit of a protected First Amendment activity.

On October 21, 1997, the Northern District of Ohio provisionally certified a class of all D.C. Department of Corrections Inmates incarcerated at NEOCC (the "*Busey* class").[61]  Plaintiff was not a putative class plaintiff, and was nowhere named in that suit.[62]  Plaintiff's sole action in the suit was that since he did not opt-out of the provisionally certified class, he was entitled to a share of the settlement fund.  In fact, Plaintiff plead in a prior suit, that he was not even transported to NEOCC until 1999.[63]  On April 21, 1999, the Court approved a settlement of the class-action suit.[64]  Plaintiff was not transported by any D.C. Department of Corrections or CCA employee, who may have had requisite knowledge of the class action suit.[65]  This Court has previously observed that "after the settlement, the District of Columbia monitored NEOCC for 'contract compliance and constitutional treatment of District of Columbia inmates' by, *inter alia*, retaining a full-time, on-site contract monitor."[66]

Plaintiff's mass move, however, does not involve being transported by any CCA or District of Columbia employees.[67]  Rather, the District of Columbia directed that CCA release the inmates into the custody of TransCor for their transport.[68]  The TransCor agents assigned to move Plaintiff consisted of David Ryan, Henry "Scott" Reid, James Allen, David Webster, and Marion Wisdom.[69]  Those agents all resided in either Kentucky or Tennessee, and thus were not

---

[61] SOF ¶ 4.

[62] *Id.*

[63] *See* September 23, 2003 Memorandum Opinion in *Roy Thomas v. District of Columbia,* Civ. Action No. 02-988 (PLF), [Doc. # 36], at 5 ("Plaintiff was transferred to the CCA-run Northeast Ohio Correctional Center in 1999," *citing* Plaintiff's Complaint in that action.)

[64] SOF ¶ 4.

[65] *Anderson-Bey*, 466 F.Supp.2d 51 (dismissing individual officers based on qualified immunity, and denying a motion to dismiss against District of Columbia, *inter alia*, on the fact that news organizations in the Washington, D.C. metropolitan area, provided extensive coverage of the suit.)

[66] *Warren v. District of Columbia*, Civ. Action. Nop. 01-349 (HHK), 2006 WL 2568014 (D.D.C. September 5, 2006) at *4 (citation omitted).

[67] In his opposition to Defendant District of Columbia's Motion to Dismiss [Doc. #12] in this case, at 10, Plaintiff admits that he "cannot *allege* that District officials were on the bus."

[68] SOF ¶ 16.

[69] SOF ¶ 18.

exposed to the media coverage of the *Busey* litigation.[70]  In fact, during depositions two years ago, the TransCor agents denied any knowledge of any suit against CCA related to NEOCC.[71]

Plaintiff infers that he was moved as a result of his involvement in the suit.  However, the facts will demonstrate that CCA and the District of Columbia's five-year contract was nearing its completion, and D.C. Department of Corrections felons were being moved into BOP custody, that there was no need to keep D.C. inmates at NEOCC after July 2001.[72]  At deposition, the TransCor agents testified that they did not know the inmates were being transported on July 2, 2001, and when pressed for a supposition, inferred that CCA was preparing for inmates from a different jurisdiction to arrive at NEOCC.[73]

Furthermore, Plaintiff may assert that CCA was responsible for the retaliation, contending that the NEOCC supervisors briefed the crew that the inmates they were transporting were troublesome.  The TransCor officers, however, will testify otherwise.  The TransCor crew in question had significant experience transporting D.C. inmates.  Based on their experience, they knew that while select inmates could pose problems, they could not rely upon that type of hasty generalization as many D.C. inmates had been very cooperative during mass moves.[74]  Furthermore, even when TranCor agents were warned by officers at the pick-up facility that they were going to transport "troublesome" inmates, they knew from experience that 95% of the time, the inmates presented no problems whatsoever.[75]  If they were so advised on July 2, 2001, the TransCor agents would have made it clear during the pre-trip inmate briefing that order needed to be maintained during the mass move, and they may have exercised somewhat more care when interacting with "troublesome" inmates.[76]  Nevertheless, the agents were professionals who knew that they were out-numbered, in an confined space for a prolonged time, and that by applying the

---

[70] SOF ¶ 23.
[71] SOF ¶ 22.
[72] SOF ¶ 5.
[73] SOF ¶ 21.
[74] SOF ¶ 24.
[75] *Id.*
[76] *Id.*

"golden rule," their jobs would be easier to accomplish.[77]

Plaintiff has not disclosed, and cannot present any evidence that the TransCor agents responsible for the conditions of his transport even knew of his involvement as a *Busey* class member. Without affirmative proof of such knowledge, Plaintiff cannot meet the evidentiary burden of showing that his involvement in the *Busey* class was the substantial and motivating factor behind his conditions of transport. Furthermore, it is doubtful that Plaintiff can present evidence that his right to participate in that or subsequent legal action was infringed by those transporting him; the instant litigation is at least Plaintiff's third suit against CCA and the District of Columbia, since his transport from NEOCC to CADC. Finally, the TransCor agents will all testify that their custom and practice with respect to mass moves has legitimate penological justification. As such, Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

**B.    Should Plaintiff demonstrate a constitutional violation, he cannot demonstrate liability by Defendants.**

Even if Plaintiff can somehow demonstrate the conditions of his transport constituted cruel and unusual punishment or impermissible retaliation, Defendants are still entitled to summary judgment. Plaintiff does not sue the individual TransCor agents or any CCA or D.C. employee as being responsible for his deprivations. In order to prevail against Defendants, Plaintiff must possess sufficient evidence that a policy or custom of Defendants *caused* his constitutional violation.[78] As Plaintiff neither alleges nor is capable of presenting any evidence of a policy promulgated by a final policymaker responsible for his alleged deprivation of constitutional rights, only the custom and practice of Defendants merits discussion.

---

[77] SOF ¶¶ 15, 24.

[78] *Garcia*, 51 F.Supp.2d at 7 ("In order to prevail, Plaintiff must allege that the deprivation of his constitutional rights was caused by a policy, custom or practice, or that a single 'municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.") (citing *Bd. Of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 117 S.Ct. 1382, 1388 (1997)); *Baker*, 326 F.3d at 1306; *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004); *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000); *Triplett v. District of Columbia*, 108 F.3d 1450 (D.C. Cir. 1997); *Kivanc v. Ramsey*, 407 F.Supp.2d 270, 278 (D.D.C. 2006); *Ashford v. District of Columbia*, 306 F.Supp.2d 8, 12-13 (D.D.C. 2004);

In his Complaint, Plaintiff relies upon *Bordanaro v. McLeod*,[79] for the contention that it permissible for a finder of fact to infer a municipal custom or practice, based on the violation. *Bordanaro,* however, requires that the final policy makers must have had actual or constructive knowledge of the practice.[80]  Moreover, eight years after deciding *Bordanaro*, the First Circuit distinguished the cases, noting that the *Bordanaro* inference is only correct when "'the practices have been so flagrant that in the proper exercise of their official responsibilities municipal policymakers should have known of them.'"[81]  A practice, sporadic at most, of which only some lower-level managerial employees were aware" is an insufficient basis upon which the finder of fact, may reach that conclusion.[82]  In applying the *Bordanaro* holding in this District, the court has held that while a custom or practice may be inferred from the "concerted action of a large contingent of municipal employees", the Plaintiff "must demonstrate a high degree of dual and a close causal nexus between the identified deficiency … and the ultimate injury."[83]

The uncontrovertable facts of this case indicate that Plaintiff cannot show actual or constructive knowledge, and that given the small number of employees potentially involved, that an inference of such knowledge is improper.  "[I]t is not enough for a § 1983 plaintiff to merely identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."[84]  Moreover "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees."[85]

### 1.    Plaintiff is unable to attribute a D.C. or CCA custom or practice as the "moving force" behind his conditions of transport.

In an effort to establish a custom or practice by Defendants District of Columbia and CCA, Plaintiff contends that (1) "the District has manifested a custom and practice of physically

---

[79] 871 F.2d 1151 (1st Cir. 1989).
[80] *Id.* at 1156-57.
[81] *Silva v. Worden*, 130 F.3d 26, 32 (1st Cir. 1997) (citing *Bordanaro*, 871 F.2d at 1157).
[82] *Silva*, 130 F.3d at 32.
[83] *Kivanc*, 407 F.Supp.2d at 279 (citing *Bordanaro*, 871 F.2d at 1156-57 and *Ferrell v. Walker*, 1991 U.S. Dist. LEXIS 1523, at *5 (D.D.C. 1991).
[84] *Brown*, 520 U.S. at 404.
[85] *Id.* at 405.

abusing prisoners;" (2) has a "custom and practice of inadequately investigating, and tolerating physical abuse of prisoners;" (3) "for several years has manifested, deliberate indifference to the right of District of Columbia prisoners to be free of cruel and unusual punishment;" and, (4) the District doctors failed to inform TransCor of Plaintiff's history of asthma.[86]  As evidence of these customs and practices, Plaintiff attaches a 1998 transcript from the NBC television show *Dateline*, a 1999 transcript from the CBS television show *60 Minutes*, and a 1999 article from *The Nation* magazine, and relies on the allegations of the putative class members in *Busey*, and a 1999 class involving inmates at the D.C. Jail (the *Battle* class).[87]  Furthermore, Plaintiff discloses "Transcripts of News media documentaries and/or programs concerning the use of excessive force or retaliation against by [sic] CCA agents or employees" and "Any newspaper or magazine articles, concerning abusive tactics used by CCA agents or employees, in any of its facilities."[88] Plaintiff does not disclose any other potential evidence or testimony of a custom or practice by either the District or CCA.  As this District has previously held, "The Court does not think that newspaper articles alone are sufficient evidence of a municipality's policy or custom."[89]

However, Plaintiff ignores two critical facts, which entitle both the District and CCA to summary judgment.  First, is that all of his evidence of a custom and practice, predates the actions taken pursuant to the *Busey* settlement, which took steps to ensure both contract compliance and constitutional treatment of D.C. Inmates.[90]  When subsequent remedial actions have been taken for past potential wrongs, those remedial acts, in and of themselves, are sufficient, as a matter of law, to preclude a determination of any continuing deliberate indifference.[91]

Even more compelling, is the undisputed fact that Plaintiff was not transported by CCA

---

[86] Pltf's Opp. to D.C.'s Mot. To Dismiss [Doc. #12] at 4, 11.
[87] *Id.*, attachments 1-3, and at 6;  Compl. at 7.
[88] Pltf's Init. Discl. Stmt. [Doc. #30] at 4-5.
[89] *Kivanc*, 407 F.Supp.2d at 279, n.5.
[90] *See supra* at 14.
[91]  *Farmer*, 511 U.S. at 844 (where prison officials actually knew of a substantial risk and responded reasonably to that risk, the officials may "be found free of liability …. [e]ven if the harm ultimately was not averted").

or the District of Columbia, but was transported by TransCor.[92]  Thus, even if this Court takes judicial notice of *Battle*, and more significantly its companion case, *Anderson-Bey*, such notice is insufficient to establish a custom and practice.  *Anderson-Bey* involved allegations of retaliation by D.C. Department of Corrections employees who transported two groups of inmates from NEOCC to Sussex II State Prison in Virginia, prior to the *Busey* settlement.[93]  In fact, rather than use its own personnel, the District decided that Plaintiff and 35 other inmates should be moved from the CCA facility in Ohio to the CCA facility in Arizona and that TransCor should be responsible for the mass move.[94]  While between those locations, Plaintiff was in TransCor, not CCA custody.[95]  Furthermore, the District mandated that Plaintiff's medical records should accompany the transport; and, in fact, upon Plaintiff's arrival, the CADC supervisor acknowledged receipt of those medical records from the TransCor OIC.[96]  While the records were in possession of the TransCor agents, because they were not medical providers, concerns over Plaintiff's health information privacy, prohibited the TransCor agents from reading those records.[97]

To the extent that Plaintiff can demonstrate that he endured a violation of his Constitutional protections, any such violation would have arise under the customs and practices of TransCor, not the District or CCA.  "Because it is clear that *respondeat superior* is not a proper theory to impose liability on other defendants for TransCor's actions, plaintiff can state no facts sufficient to constitute a claim against [other] defendants … for injuries suffered during his transport."[98]  Furthermore, the D.C. Court of Appeals has already ruled that the District can delegate its statutory duties of protection of its inmate population to an independent contractor,

---

[92] SOF ¶ 41.
[93] 466 F.Supp.2d at 58 and n.1.
[94] SOF ¶ 16.
[95] SOF ¶¶ 17, 55.
[96] SOF ¶¶ 16, 26, 54.
[97] SOF ¶ 26.
[98] *Daugaard v. Baldwin*, Civ. Action No. 98-612-ST, 1999 WL 778585 (D. Or. September 17, 1999) at *4.  The quotation refers to employees of the Oregon Department of Corrections.  CCA was similarly dismissed since Plaintiff failed to present any evidence that it was responsible for the conditions of Plaintiff's transport.  *Id.* at *7. *See also* n.11, *supra*.

and that the District does not have any supervisory responsibilities with regard to the contractor's employees.[99]

### 2. TransCor's custom and practice was to maximize, not abridge, the Constitutional rights of the inmates they transported.

Plaintiff and Defendants have designated identical witness lists. Most of those witnesses are the TransCor employees, who were not only responsible for effecting Plaintiff's mass move, but accompanied Plaintiff and the other inmates on the bus, and thus experienced conditions identical to the inmates they were transporting.[100]

The TransCor agents were highly qualified both by virtue of their previous corrections, law enforcement and military experience, as well as the extensive initial and continuing training they received.[101] During mass moves, groups of up to 40 inmates were transported on a single "Greyhound-type" bus, and were accompanied by five TransCor agents.[102] TransCor instituted mass moves using busses rather than vans, to limit the duration of the trip.[103] Additionally, movies were played on all TransCor busses for the comfort and enjoyment of the inmates.[104] The TransCor agents had a custom and practice of abiding by the "Golden Rule," *e.g.*, treating the inmates as they would wish for themselves or their family members to be treated.[105]

Pursuant to TransCor policy and training, all inmates were placed in full restraints by TransCor agents.[106] The TransCor agents were trained that when affixing the restraints, to

---

[99] *Herbert v. District of Columbia*, 716 A.2d 196, 199 (D.C. 1997).

[100] SOF ¶¶ 14, 18. Most of those agents were deposed in a previous suit brought by a fellow inmate during the July 2, 2001 mass move, who alleged that he was transported without his medication, was restrained too tightly, and denied use of the toilet. In support of this Motion for Summary Judgment, Defendants rely upon their sworn deposition testimony as to the customs and practices of TransCor, with the reasonable expectation that those agents will testify in conformity with their 2005 depositions. While relevant pages of those deposition transcripts are attached to Defendants' SOF filed concurrently herewith, Defendants are also providing Plaintiff with a complete copy of those deposition transcripts, contemporaneously with the service of the instant motion.

[101] SOF ¶ 64.

[102] SOF ¶¶ 6, 8-11, 18.

[103] SOF ¶ 12.

[104] SOF ¶¶ 10, 12.

[105] SOF ¶ 15.

[106] SOF ¶ 20.

ensure that there was sufficient space between the restraint and an inmate's wrist or ankle.[107] The agents placed on of their fingers in the restraint prior to closing and locking it, to ensure that it was not too tight.[108]   However, it is possible that the wrists or ankles of a restrained inmate would swell.  As a result, the custom and practice of OIC Ryan, was to advise the inmates at the beginning of each trip, to monitor their restraints and not to hesitate to let an agent know if their restraints seemed to be too tight.[109]   Additionally, the TransCor agents checked the tightness of the restraints periodically throughout a mass move.[110]   While complaints that restraints were too tight were rare, when they arose, the TransCor agents regularly checked and loosened an inmate's restraints.[111]   If the swelling became so extensive, that the inmate's wrists were in contact with the Black Box, OIC Ryan would remove the Black Box as well.[112]   Very rarely, the swelling was so extensive that an inmate's wrists rubbed against the handcuffs, creating blisters.[113]   When that happened, the TransCor agents would loosen the handcuffs and wrap the inmate's wrists, so that no further blistering would occur.[114]   To prevent any blistering, the leg irons were placed over each inmate's pants legs.[115]

As each inmate boarded the bus, they were issued a cup.[116]   The TransCor agents kept a water cooler so that inmates who were fully restrained could fill their cups.[117]   Inmates were permitted to get out of their seat to get water, when they wished.[118]

TransCor purchased MCI busses, which were designed with a non-flushing, non-clogging toilet.[119]   While Plaintiff was transported on an MCI bus, even on busses which had a flushing

---

[107] SOF ¶ 27.
[108] *Id.*
[109] SOF ¶ 35.
[110] SOF ¶ 37.
[111] SOF ¶¶ 38, 36, 39, 57.
[112] SOF ¶ 36.
[113] SOF ¶ 59.
[114] *Id.*
[115] SOF ¶ 39.
[116] SOF ¶ 29.
[117] *Id.*
[118] *Id.* SOF ¶ 30.
[119] SOF ¶ 7.

toilet, the TransCor agents were able to remove any clogs.[120]    While the TransCor policy mandated that inmates be permitted to use the toilet once every three hours, the agents responsible for Plaintiff's transport, followed a custom of allowing inmates to use the toilet whenever they wished.[121]    Furthermore, while TransCor policy dictated that a male inmate's restraints only are partially removed for defecation, the TransCor agents followed a custom of also partially removing the restraints of male inmates who needed to urinate.[122]    Additionally, when an inmate needed to defecate, the interconnect chain, which is a four-foot chain connecting two inmates to each other to lessen escape risk, was removed.[123]    OIC Ryan began the custom and practice of providing hand cleaner for the inmates to use both after using the toilet, and before meals.[124]    Latter, TransCor began providing hand cleaner on all of its mass move busses.[125]    It was rare for an inmate to soil himself during a mass move; when it happened, the Agents provided that inmate with a change of clothes.[126]

    The TransCor agents had a custom and practice of developing a good rapport with the inmates they transport, and never denied any inmate permission to use the toilet.[127]    Additionally, the toilet was not out of service during the transport.    The toilet on the MCI bus, only needed to be emptied every 2-3 days, when in use by a full bus of inmates.[128]    The toilet was emptied just hours into Plaintiff's transport, and was emptied again at the conclusion of the trip to Florence, Arizona.[129]

    At the beginning of each transport, the inmates were briefed that they would be permitted to stretch their legs at will, provided that no more than two pairs of inmates were standing at the same time, and road conditions were not hazardous.[130]    Additionally, inmates who had

---

[120] *Id.*
[121] SOF ¶ 31.
[122] SOF ¶ 32.
[123] SOF ¶ 34.
[124] SOF ¶¶ 32-33.
[125] SOF ¶ 33.
[126] SOF ¶ 62.
[127] SOF ¶ 60.
[128] SOF ¶ 56.
[129] SOF ¶¶ 43, 56.
[130] SOF ¶ 30.

medication that they did not keep on their person, were instructed to remind the agents to dispense their medication.[131]

Plaintiff and his fellow inmates were provided breakfast and lunch before leaving NEOCC and consumed four commercially purchased meals during the mass move.[132]  While TransCor established a budget for each inmate meal and specified that each inmate was to only receive one large sandwich at each meal, the TransCor agents had a custom and practice of providing two large sandwiches for each inmate.[133]  TransCor was presumably aware of this practice, but took no action to reprimand its agents.[134]

Additionally, TransCor had a staff of eight mechanics who thoroughly inspected and performed preventive maintenance on each bus at the conclusion of each trip.[135]  Such preventative maintenance included ensuring that both the air conditioning and the toilet exhaust fan on the bus were functioning, and, if necessary, to repair them.[136]

Admittedly, the TransCor agents do not specifically recall the July 2, 2001 mass move from NEOCC to CADC.[137]  Given the large number of transports they participated in over several years, they only would recall a particular transport if something extraordinary occurred.[138] All activities on the bus were logged, and the bus log confirms that no extraordinary events, occurred on the bus.[139]  However, those TransCor agents do recall that during their careers, they never observed an inmate crying or become hysterical during the transport, and never observed an inmate who was bleeding because his restraints were too tight.[140] Furthermore, none of the agents are aware of any substantiated formal inmate complaints that an inmate was restrained too tightly or denied access to the toilet, and note that TransCor policy

---

[131] SOF ¶¶ 25, 40.
[132] SOF ¶¶ 45-46, 50-52.
[133] SOF ¶ 47.
[134] *Id.*
[135] SOF ¶ 65.
[136] SOF ¶ 66.
[137] SOF ¶ 63.
[138] *Id.*
[139] SOF ¶ 19.
[140] SOF ¶¶ 58-59

expressly prohibited securing the restraints too tightly or denying an inmate access to the toilet.[141]

      While it is possible that Plaintiff could testify on his own behalf regarding his perceived conditions of a single transport, he cannot controvert the policies, customs and practices of Defendant TransCor.  As those policies, customs and practices demonstrate, TransCor was not only aware of the conditions and risks to the inmates they transported, but took great pains to ensure that the inmates were transported safely and comfortably.  Defendant TransCor is entitled to summary judgment.

## IV.     <u>PLAINTIFF'S CLAIMS ARE TIME BARRED.</u>

      Under this Court's choice of law rules, the Court must apply the law of the state with "the most significant relationship" to the matters at issue.[142]  The conditions of transport as to which Plaintiff complains occurred during a 40-hour period in the states of Ohio, Indiana, Illinois, Missouri, Oklahoma, New Mexico, and Arizona.[143]  As the conditions of which Plaintiff complains all occurred outside of the District of Columbia, even the District's long-arm statute would prevent the Superior Court from exercising personal jurisdiction over Defendants CCA and TransCor, necessitating that this Court to resolve the applicable choice of law.[144]  None of the alleged violations Plaintiff asserts were caused "*in* the District of Columbia."  In fact, Plaintiff has not been "*in* the District of Columbia" since at least 1999.[145]  Because Plaintiff was incarcerated in Ohio and his custody transferred from CCA to TransCor in Ohio, the laws of the State of Ohio have the "most significant relationship" to the matters at issue.

      Under Ohio law, claims for personal injury must be brought within two years of the

---

[141] SOF ¶ 61.

[142] *Kafack v. Primerica Life Ins. Co.*, 934 F.Supp 3, 8 (D.D.C. 1996).

[143] SOF ¶¶ 41-43, 45, 49-54.

[144] The long-arm statute permits jurisdiction over suits arising from a party's "causing tortuous injury *in the District of Columbia* by an act or omission outside of the District of Columbia, if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumer, or services rendered in the District of Columbia."  D.C. ST § 13-423 (emphasis added).

[145] *See*  n.63, *supra.*.

injury occurring.[146]  Ohio's two-year statute of limitations for bodily injuries applies to Section 1983 claims.[147]  Moreover, O.R.C. § 2305.16 was amended to delete imprisonment as one of the disabilities which would toll the statue of limitations for causes of action arising after July 13, 1991.

The conditions of which Plaintiff complains occurred during an approximately 40-hour period of July 2-4, 2001.  However, Plaintiff waited until July 11, 2005, more than four years after his arrival at CADC, to re-file his action.  As Plaintiff's claims are time-barred, Defendants are entitled to summary judgment.

## V.    42 U.S.C. §1997e(e) PRECLUDES ANY RECOVERY BY PLAINTIFF.

In his Complaint, Plaintiff prays for $250,000 in compensatory damages and punitive damages in sufficient amount to deter future misconduct.[148]  In his Rule 26(a)(1) disclosure, Plaintiff contends that he has not yet retained an expert witness and is unable to provide a specific damages calculation.[149]  Plaintiff's theory is that he is entitled to compensatory damages resulting from the tightness of the restraints, which caused decreased strength, impairing his ability to work once he is released from custody.[150]  Similarly, Plaintiff claims that exposure to ETS has caused his eyes to water, creating in him a fear which limits his ability to seek more lucrative skilled employment upon his release, and limits his daily enjoyment of athletics.[151]

In order to recover damages under the Prison Litigation Reform Act ("PLRA"), however, a plaintiff must show an actual physical injury before he is able to receive compensatory damages for mental or emotional injuries.[152]  To the extent that Plaintiff's ETS exposure has created a fear that he could not work with dangerous machinery, the value of any lost income as a result of that fear is properly a mental or emotional injury.  Likewise, Plaintiff has never alleged any physical injury as a result of the four fast food meals he was offered during the mass

---

[146] O.R.C. § 2305.10(a).
[147] *Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989).
[148] Compl. [Doc. #1] at 8.
[149] Pltf's Init. Discl. Stmt. [Doc. #30] at 5.
[150] SOF ¶ 68.
[151] SOF ¶ 67.
[152] 42 U.S.C. § 1997e(e).

move, his purported deprivation of the use of the toilet, culminating in his constipation, or alleged thirst, or any potential First Amendment claim he may have.

Prior to enactment of the PLRA, without competent testimony that Plaintiff suffered actual compensable injury, only nominal damages of $1 may be awarded to him in a Section 1983 action.[153]   42 U.S.C. § 1997e(e) bars any recovery of even nominal or punitive damages, absent a demonstrated physical injury.[154]   The standard of actual physical injury is identical to the "substantial injury" requirement necessary to allege an Eighth Amendment deprivation under *Farmer.*  The undisputed facts, discussed *supra* at §§ III.A.2. and III.A.3., demonstrate that the physical infirmities which Plaintiff alleges, are either non-existent, or were not developed until long after Plaintiff's arrival at CADC.  Plaintiff subsequently denied ever experiencing sore joints or eye trouble, until after he was hit in the eye while playing football.[155]   Those facts, coupled with Plaintiff's failure to designate any competent expert testimony to establish causation of his injuries, demonstrate no physical or actual injury entitling him to any compensatory damages.  Accordingly, 42 U.S.C. §1997e(e) bars any award of damages in this case.

## VI.   PLAINTIFF CANNOT DEMONSTRATE SUFFICIENT FACTS ENTITLING HIM TO PUNITIVE DAMAGES

### A.   Plaintiff is barred from recovering punitive damages from Defendant District of Columbia.

Punitive damages are not available against the District of Columbia absent an express statutory mandate, or possibly, in "extraordinary circumstances."[156]   The D.C. Circuit has interpreted "extraordinary circumstances" as situations "where a jurisdiction's taxpayers *are directly responsible* for perpetrating the policies that caused [a] plaintiff's injuries" or where "a

---

[153]  *Carey v. Piphus*, 435 U.S. 247, 266 (1978)

[154]  *Davis v. District of Columbia*, 158 F.3d 1342, 1348 (D.C. Cir. 1998).  Akin to *Davis*, Plaintiff did not pray for nominal damagers and is not entitled to proceed any further on that basis alone.  *Id.* at 1349.

[155]  SOF ¶¶ 72, 80-82, 85.

[156]  *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981); *Butera v. District of Columbia*, 235 F.3d 637, 658 (D.C. Cir. 2001); *Smith v. District of Columbia*, 336 A.2d 831, 832 (D.C. 1975).

municipality or its policy makes have intentionally adopted [an] unconstitutional policy that caused the damages in question."[157]

Here, there is no statute authorizing punitive damages against the District of Columbia. Furthermore, Plaintiff has not disclosed any evidence capable of identifying any role of the D.C. taxpayers in his conditions of transport, or the intentional adoption of an unconstitutional policy by any final-policy maker of the District government or the Department of Corrections. In fact, Plaintiff has not disclosed any District employee as a witness whose testimony he may rely upon to support his claims.[158] Without a proffer of evidence of "extraordinary circumstances", Defendant District of Columbia is entitled to summary judgment that punitive damages are unavailable.[159]

### B.    Plaintiff is not entitled to recover punitive damages against Defendants CCA and TransCor.

Punitive damages may be awarded under Section 1983 when a defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[160] Thus, Plaintiff must prove an evil motive or intent, or reckless or callous indifference by corporate Defendants CCA[161] and TransCor in order to recover punitive damages. He cannot.

Plaintiff did not disclose any witness capable of testifying as to the mindset of a final policymaker at CCA or TransCor. In fact, Plaintiff only disclosed the CADC grievance officer, and six TransCor employees, the five who were on the bus with him, and one who searched for any informal grievance he may have submitted to TransCor.[162] While David Ryan was the OIC

---

[157] *Daskalea*, 227 F.3d at 447; *see Butera*, 235 F.3d at 658.

[158] *See* Pltf's Init. Discl. Stmt. [Doc. #30] at 1-4. Plaintiff never supplemented his disclosure to identify any other witnesses. SOF ¶ 104.

[159] *Kivanc*, 407 F.Supp.2d at 277.

[160] *Smith v. Wade*, 461 U.S. 30, 56 (1983).

[161] Of course, a prerequisite for even getting to a punitive damages assessment, is that the finder of fact must conclude that a particular Defendant was liable for the violation. As it is undisputed that TransCor, not CCA, transported Plaintiff from NEOCC to CADC, as a mater of law, CCA has no role in Plaintiff's conditions of transport and may not have punitive damages awarded against it. *See* n.95, *supra.*.

[162] Pltf's Init. Discl. Stmt. [Doc. #30] at 2-4. Plaintiff has never supplemented this disclosure to identify additional witnesses whom he may rely upon to support his claims. SOF ¶ 104.

during the transport, he is just one TransCor employee, and did not have any say over corporate policy decisions.[163]

 Albeit in the context of employment discrimination, the Supreme Court cited the dissent in a D.C. Circuit case for the proposition that "in the punitive damages context, an employer may not be vicariously liable for the … decisions of managerial agents where those decisions are contracts to the employer's 'good faith efforts.'"[164]  That suit was brought under Section 1983 and it's rationale is equally applicable here.  As there is no material dispute that TransCor policies required that an inmate's restraints be checked to ensure they were not too tight and that TransCor policies required that inmates be provided food, water, and access to the toilet, TransCor's policies constitute good faith efforts, which overcome any unsupported allegations of reckless indifference, callous disregard or evil mindset by the corporate defendants.[165]  Corporate Defendants CCA and TransCor are thus entitled to summary judgment that punitive damages are unavailable.

## VII. CONCLUSION

 Because Plaintiff can establish no genuine issue of material fact disputing that (1) Plaintiff did not endure any Constitutional violation; (2) Municipal and Corporate defendants did not have a policy or custom which was the proximate cause of any Constitutional Violation; (3) Plaintiff's claims are time barred; (4) Plaintiff's failure to disclose testimony relating to the proximate causation of his alleges injuries bars any recovery under 42 U.S.C. § 1997e(e); and, (5) as a matter of law, Plaintiff is not entitled to recover punitive damages, Defendants District of Columbia, CCA and TransCor respectfully request their Motion for Summary Judgment be granted and Plaintiff's claims dismissed with prejudice.

---

[163] SOF ¶¶ 8, 13.
[164] *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999) (quoting *Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 974 (D.C. Cir. 1998) (Tatel, J., dissenting).
[165] SOF ¶¶ 27, 31, 47, 61.

1807678.1

Dated: August 1, 2007

s/ Timothy J. Bojanowski
Daniel P. Struck, (D.C. Bar No. CO0037)
Timothy J. Bojanowski, (D.C. Bar No. OH0014)
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-7324
Facsimile: (602) 263-7387

Mariana Bravo, (D.C. Bar No. 473809)
Colleen Durbin , (D.C. Bar No. 473809)
CARR MALONEY, PC
1615 L Street, NW, Suite 500
Washington, DC 20036
Telephone: (202) 315-5500
Facsimile: (202) 310-5555

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of August, 2007, a true an accurate copy of the foregoing Defendants Corrections Corporation of America and TransCor's Motion for Summary Judgment, was sent via first-class mail, postage-prepaid, to:

Ismail Abdul Malik, #11340-007
a/k/a Roy Thomas
**UNITED STATES PENITENTIARY BIG SANDY**
Post Office Box 2068
Inez, Kentucky 41224
*Plaintiff Pro Se*

s/ Michael N. Giardina

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Ismail Abdul Malik, a/k/a Roy Thomas,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**District of Columbia, *et al.*,**<br><br>**Defendants.** | **Civil Action No. 1:05-cv-1374 (RMC)** |

## ORDER

Upon Motion of District of Columbia, Corrections Corporation of America and TransCor for Summary Judgment and for good cause shown therein, it is this _____ day of _____ 2007:

**ORDERED,** that Defendants' Motion be and the same hereby is granted, and it if further;

**ORDERED,** that all claims against Defendants District of Columbia, Corrections Corporation of America and TransCor hereby are **dismissed with prejudice.**


_____
Judge Rosemary M. Collyer

cc:    Ismail Abdul Malik, #11340-007
       a/k/a Roy Thomas
       **UNITED STATES PENITENTIARY BIG SANDY**
       Post Office Box 2068
       Inez, Kentucky 41224

       Daniel P. Struck, Esq.
       Timothy J. Bojanowski, Esq.
       **JONES, SKELTON & HOCHULI, P.L.C.**
       2901 North Central Avenue, Suite 800
       Phoenix, Arizona 85012

       Mariana Bravo, Esq.
       Colleen Durbin, Esq.
       **CARR MALONEY, PC**
       1615 L Street, NW, Suite 500
       Washington, DC 20036

1807678.1