IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Ismail Abdul Malik, a/k/a Roy Thomas,**<br><br>          **Plaintiff,**<br><br>    **v.**<br><br>**District of Columbia,** *et al.***,**<br><br>          **Defendants.** | **Civil Action No. 1:05-cv-1374 (RMC)** |

**DEFENDANTS DISTRICT OF COLUMBIA, CORRECTIONS CORPORATION OF AMERICA AND TRANSCOR'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION SUMMARY JUDGMENT**

1.	Prior to July 2, 2001, Plaintiff, a D.C. Department of Corrections inmate serving a life sentence, imposed on February 10, 1993 in D.C. Superior Court case no. F2152-91 for Murder, assault with a deadly weapon, carrying a firearm, and possession of a firearm, was incarcerated the Northeast Ohio Correctional Center ("NEOCC") in Youngstown, Ohio. NEOCC is owned an operated by Corrections Corporation of America, Inc. ("CCA"). Ex. 1 (Plaintiff's Sentence Monitoring Computation Data as of 8-11-2005) at CCA-IAM 0030.

2.	Pursuant to District of Columbia, Department of Corrections, Contract No. 7329-AA-NS-1-HT, dated February 14, 1997, CCA was to provide housing for up to 1700 inmates at its facilities in Youngstown, Ohio or Florence, Arizona. The contract defines the term "Contract's Facilities" to include both NEOCC and the Central Arizona Detention Center ("CADC") located in Florence, Arizona. The contract includes a prohibition that "The Contractor shall not transfer any of the District's inmates from the Contractor's Facilities *to any other* appropriately classified facility without the express written approval of the District of Columbia Department of Corrections." *See* Compl. [Doc. #1], Attach. 1 (page one of Contract No. 7239-AA-NS-1-HT) (emphasis added).

3.   CCA was responsible for transporting, at its expense, D.C. Department of Corrections Inmates to its facilities. To effect this requirement, CCA contracted with TransCor America, Inc. ("TransCor") to physically transport the inmates between D.C. Department of Corrections Facilities, NEOCC, and CADC. *See* Compl., Attach. 2 (page seven of Contract No. 7239-AA-NS-1-HT).

4.   Pursuant to the court's October 21, 1997 Order in *Busey v. Corrections Corporation of America,* 97-CV-1995 (N.D. Oh.), a class of all D.C. Department of Corrections Inmates incarcerated at NEOCC was provisionally certified. Plaintiff was not a named Plaintiff in either that litigation, nor any of the other inmate suits consolidated therewith. On March 31, 1998 the Court ordered that all inmates be re-classified by CCA, and that any inmate receiving a re-classification score indicating that they are a Maximum Security inmate, were to be returned to the D.C. Department of Corrections or transferred to another facility designated by the D.C. Department of Corrections. On April 21, 1999, the Court approved a settlement of the class action litigation. Ex. 2 (*Busey* docket).

5.   In July 2001, following the transfer of most D.C. Department of Corrections inmates to custody of the Bureau of Prisons pursuant to the National Capitol Revitalization and Self-Government Improvement Act, Pub. L. 105-33, 111 Stat. 251, 712, 734-40, NEOCC was being shut-in, until another customer capable of filling, the 2000-bed medium security facility was located.

6.   TransCor is the largest third-party prisoner extradition company in the United States. TransCor normally transports small numbers of inmates, such as for the inter-state extradition of fugitives from justice, by passenger van. Transportation of larger groups of inmates is accomplished on a mass move, on a "Greyhound-type" bus modified for the transportation of inmates. The bus, from front to back, was divided into the following sections: an area for the drivers and TransCor crew with a sleeping berth at the front; a metal cage to separate the drivers and front guards from the inmates; a second metal cage for inmates in protective custody; a section containing bench seats, with a center aisle, for general population

inmates; and, a metal cage which separated the toilet and rear guard from the inmates. Up to 40 inmates could be transported on a single bus. Ryan Dep. 53:02 – 53:16, 67:01 – 69:05 (excerpts attached as Ex. 3 hereto); Ex. 4 (*TransCor Traveler*, Summer 1998).

7.  TransCor Bus 410, which was used in the mass move from NEOCC to CADC, was manufactured by MCI. TransCor's MCI busses were designed with non-flushing toilets, to eliminate the possibility that the toilet could become clogged. The toilets on TransCor's Blue Bird busses could be clogged. OIC Ryan's practice, when those toilets became clogged, was to stop at a location with RV facilities, and he would unclog the toilet. OIC Ryan never encountered a clogged toilet he failed to fix. Ex. 3 (Ryan Dep.) at 72:14 – 73:09, 155:14 – 156:18; Ex. 5 (Unit Information for Bus No. 410); Ex. 6 (Reid Dep.) at 69:13 – 70:15 (excerpts attached as Ex. 6 hereto); Ex. 10 (Bus Activities Log).

8.  Mass moves were accomplished by using a team of five TransCor agents. Two agents were drivers whose sole responsibility was to drive the bus, and assist the crew as directed at the pick-up and drop-off facilities. Due to Department of Transportation regulations, the bus drivers had almost no interaction with the inmates once the bus left the pick-up facility. Two agents were guards, who were posted in the front and rear of the bus. The Officer-In-Charge ("OIC") was the agent responsible for overseeing the entire operation of the bus and giving the guards breaks as needed. OICs were agents who were given supervisory authority over other agents on a particular trip. Agents did not make TransCor policy. TransCor had Lieutenants, held higher rank and were above the agents in the chain-of-command, as well as Assistant Directors of Agents, a Director of Agents, and the TransCor President. Ex. 3 (Ryan Dep.) at 23:12 – 24:10, 36:23 – 37:02, 38:01 – 38:07, 39:05 – 39:22, 62:24 – 64:01, 143:08 – 143:13; Ex. 4; Ex. 6 (Reid Dep.) at 15:10 – 16:07; Webster Dep. 18:05 – 18:10, 23:15 – 24:07, 55:13 – 55:15 (excerpts attached as Ex. 7 hereto).

9.  The TransCor agent placed in the back of the bus was responsible for monitoring and maintaining security near the toilet, assisting inmates with their restraints when they came to

use the toilet, periodically checking all inmates to ensure that none of the restraints were too tight, and assisting with the distribution of meals to inmates. Ex. 6 (Reid Dep.) at 17:08 – 17:18.

10. The TransCor agent stationed in the front of the bus was responsible for maintaining security and surveillance of the inmates, operating the VCR which played movies to keep the inmate entertained during the trip, and to perform other tasks to assist the OIC and drivers, as necessary. As a result of the TV and movies which were played for the inmates, inmates were generally very quiet. Ex. 6 (Reid Dep.) at 18:15 – 19:05; Ex. 7 (Webster Dep.) at 26:07 – 26:16. *See also,* Ex. 4 ("TV/VCR packages have been added to provide comfort for the inmates on their journey").

11. While it is possible that the front agent could not hear inmate's towards the back of the bus speaking in a conversational tone, had any inmate raised his voice, he easily would have been heard by the Agent in the front of the bus. Ex. 6 (Reid Dep.) at 70:24 – 71:11.

12. TransCor's mass move practices were optimized to minimize the length of time inmates were on the bus, thereby providing a higher quality of service to the inmates. As a result, a cross-county move could be accomplished in less than 72 hours. Ex. 4; Ex. 6 (Reid Dep.) at 21:02 – 22:11; Ex. 7 (Webster Dep.) at 31:08 – 31:11.

13. The driver's proposed the specific route to the OIC, who was responsible for determining the route the bus would travel. While drivers decided when to stop for fuel, the OIC would pick the time and location where the bus would stop for meals. Ex. 3 (Ryan Dep.) at 56:03 – 56:14; Ex. 7 (Webster Dep.) at 51:04 – 51:24.

14. TransCor's agents traveled in identical conditions to the inmates. The agents used the same toilet and ate the same meals as the inmates they were transporting. Ex. 3 (Ryan Dep.) at 76:25 – 77:05; Ex. 6 (Reid Dep.) at 21:23 – 21:24, 76:20 – 77:02.

15. The customary practice of the TransCor agents was to apply the Golden Rule when dealing with inmates. Ex. 6 (Reid Dep.) at 34:21 – 34:25.

16. On June 29, 2001, the D.C. Department of Corrections, Office of Case Management Services Administrator, Edmund P. Walsh, advised TransCor and the Wardens at

both NEOCC and CADC that Plaintiff and 35 other inmates were to be transferred from NEOCC to CADC.  Administrator Walsh directed that those inmates would pass into TransCor custody on July 2, 2001.  Ex. 8 (Memo re: Impending Inmate Transfer).

17.   On July 2, 2001, NEOCC Warden Gardner, authorized the release of Plaintiff, along with 35 other D.C. Department of Corrections inmates, to TransCor for transport CADC.  Ex. 9 (Transfer Authorization Form).

18.   The TransCor bus crew, comprised of TransCor Officer-in-Charge Master Sergeant David Ryan; two drivers, Sgt. Frank Wisdom and Cpl. David Webster; and, two guards, Sergeant First Class Henry "Scott" Reid and Cpl. James Allen, departed their motel in Youngstown *en route* to pick-up the inmates at NEOCC at 8:00 a.m. on July 2, 2001.  Ex. 10 (Bus Activities Log); Ex. 3 (Ryan Dep.) at 101:14 – 101:23, 104:08 – 104:22.

19.   The Bus Activities Log (Ex. 10) contains a record of all stops and activity on the bus.  The bus activities log was completed by OIC Ryan, except for entry no. 9, which was made by Agent Reid.  Ex. 3 (Ryan Dep.) at 100:04 – 100:14; Ex. 6 (Reid Dep.) at 40:18 – 40:24.

20.   Once at NEOCC, the TransCor agents met with NEOCC staff, strip-searched, and restrained the inmates, in preparation for transport.  Ex. 3 (Ryan Dep.) at 104:08 – 104:22.

21.   The TransCor agents were unaware of the reason why Plaintiff and 35 other inmates were being moved from NEOCC to CADC.  Agent Reid believed that CCA was moving all inmates out of NEOCC in July 2001 so it could be repopulated with inmates from a different jurisdiction.  Ex. 3 (Ryan Dep.) at 116:10 – 116:18; Ex. 6 (Reid Dep.) at 50:13 – 50:20, 52:08 – 52:21.

22.   OIC Ryan was unaware of any lawsuit filed against CCA in connection with its operation of NEOCC.  Ex. 3 (Ryan Dep.) at 116:19 – 116:22.

23.   The TransCor agents resided in Tennessee and Kentucky.  Ex. 3 (Ryan Dep.) at 40:11 – 40:14; Ex. 6 (Reid Dep.) at 4:06 – 4:13; Ex. 7 (Webster Dep.) at 4:03 – 4:05.

24.   Occasionally, the pick-up facility supervisor would brief the agents on the inmates, including any potential behavior problems.  When the TransCor bus crew received such

notice from the pick-up facility, the custom and practice was to make it clear during the pre-trip inmate briefing that order would be maintained; additionally, in those cases, the inmates received more detailed observation and the bus crew took more care interacting with the inmates. At least 95% of the time when OIC Ryan's crew was advised by the pick-up facility that they were transporting potentially problematic inmates, the TransCor agents experienced no problems. Overall, Agent Reid observed that while some D.C. Department of Corrections inmates he transported needed additional supervision, many inmates were very cooperative during the transport. Ex. 6 (Reid Dep.) at 50:13 – 51:07, 73:05 – 73:19.

25.     A Nurse at the pick-up facility briefed the OIC on inmates who needed to be administered medication during the transport. A pill pack, containing the medication and times it was to be given, was given to the OIC, who held on to all medication except inhalers and nitroglycerine pills. Inmates who may need to use an inhaler or nitroglycerine pills kept those medications on their person. Ex. 3 (Ryan Dep.) at 83:06 – 83:24, 166:10 – 166:20.

26.     When an inmate's medical files accompanied the transport, as they were required to do on July 2, 2001, they were transported in a storage compartment under the bus. TransCor employees were prohibited from reviewing any inmate's medical file. Ex. 3 (Ryan Dep.) at 66:08 – 66:15, 162:21 – 163:18; Ex. 6 (Reid Dep.) at 66:25 – 67:06; Ex. 4 at CCA-IAM 0023.

27.     Inmates were restrained with Smith and Wesson handcuffs and leg irons, a Martin (belly) chain, a Black Box, and 3-1/2 to 4 feet long interconnect chain, which was used to connect two inmates to each other. TransCor agents were trained on the application of restraints. That training, included a requirement that the agent applying restraints was to put a finger underneath the single-rail of the handcuff while it was being closed to ensure that the restraints were not too tight. Ex. 6 (Reid Dep.) at 26:25 – 27:16, Ex. 7 (Webster Dep.) at 33:23 – 35:15.

28.     The Black Box was designed to cover the handcuff keyholes so that inmates could not pick the locks. The Black Box also serves to keep an inmate's hands straight so that even if they had possession of a handcuff key, they would be unable to get it into the keyhole. The

Black Box did not function to tighten any inmate's handcuffs. Ex. 6 (Reid Dep.) at 27:17 – 28:04; Ex. 7 (Webster Dep.) at 35:16 – 35:20.

29. The customary practice of the TransCor bus crew was to issue each inmate a cup when they boarded the bus. Water was kept in a cooler at the front of the bus, and was secured so that inmates would be able to fill their cups, even while they were restrained. Inmates were permitted to get out of their seats to get water whenever they wanted water, and several inmates used the opportunity to get water, also as an opportunity to stretch their legs. Ex. 6 (Reid Dep.) at 17:05 – 18:14.

30. The customary practice of the TransCor bus crew was to permit inmates to stand at will to stretch, to get water, or use the toilet, provided that no more than two pairs of inmates were standing simultaneously, unless road conditions dictated that it may be unsafe for inmates to stand while the bus was in motion. Ex. 6 (Reid Dep.) at 31:24 – 32:25.

31. TransCor's policy was that inmates were to be permitted to use the toilet every three to four hours. TransCor policy required that on mass moves, all inmates were required to use the toilet on the bus. The customary practice of OIC Ryan's bus crew was to announce at the start of the trip that the inmates could use the restroom any time they needed to, and should just get up and go to the back of the bus. TransCor officials were aware of this practice, and did not take any action to discourage it. Generally, rest room breaks don't appear on the Bus Activities Log, since the bus was equipped with a toilet. While OIC Ryan entered specific times for restroom breaks on the Prisoner Status form (Ex. 11), inmates had 24 hour access to the toilets throughout the mass move. Ex. 3 (Ryan Dep.) at 73:10 – 73:24, 103:06 – 103:21, 118:04 – 120:16, 136:25 – 137:15, 141:08 – 141:11; Ex. 6 (Reid Dep.) at 25:13 – 26:06, 68:25 – 69:08; Ex. 7 (Webster Dep.) at 35:21 – 36:03, 54:17 – 54:21, Ex. 11 (Prisoner Status form).

32. The customary practice of OIC Ryan's bus crew was that whenever and inmate had to use the toilet, the black box was removed. If an inmate had to urinate, a handcuff was adjusted to facilitate elimination. Once the black box was removed, male inmates had sufficient mobility to urinate without removal of the handcuffs. If an inmate needed to defecate, however,

one handcuff was removed, but was affixed to the belly chain so it could not become a weapon. After an inmate finished using the toilet, they were provided with either a sanitary wipe or gel to clean their hands and face, and then were re-restrained. Ex. 3 (Ryan Dep.) at 74:10 – 75:08; Ex. 6 (Reid Dep.) at 26:07 – 26:20, 29:19 – 30:12.

33. While TransCor later provided hand sanitizer on all busses, OIC Ryan's customary practice was to purchase his own hand sanitizer for all inmates to use, both after using the toilet and before meals. Ex. 3 (Ryan Dep.) at 169:09 – 169:24.

34. The configuration of the toilet, and length of the interconnect chain, permitted a male inmate who had to urinate to stand in the toilet, while the inmate connected to him to stand outside the toilet. However, the customary practice of the TransCor agents was to remove the interconnect chain and separate the inmates when one inmate needed to defecate. Ex. 6 (Reid Dep.) at 30:13 – 31:06.

35. The customary inmate briefing prior to departure by OIC Ryan's bus crew was to advise inmates that the restraints could cause their wrists to swell. The inmates were instructed that, while the bus crew would periodically check their restraints to ensure that they weren't too tight, they should not hesitate to let any agent know if they thought they were too tight. If an inmate complained to a driver regarding their restraints, the driver referred the inmate to an agent who would check their restraints. Ex. 6 (Reid Dep.) at 28:08 – 29:18; Ex. 7 (Webster Dep.) at 53:06 – 53:15.

36. It was common practice for the agents to loosen the restraints if an inmate's wrists began to swell. Agent Reid loosened the restraints by taking the inmate to the back cage near the toilet, removing the Black Box, removing one handcuff so the inmate could both move his wrist and arm, recuff that hand, repeat the process with the inmate's other arm. Agent Reid then replaced the Black Box and checked to make sure that there was sufficient room between the handcuff and the inmate's wrist to accommodate at least one of Agent Reid's fingers. Ex. 3 (Ryan Dep.) at 80:10 – 80:23, 160:10 – 160:20; Ex. 6 (Reid Dep.) at 28:08 – 29:18.

1807706.1

37. On occasion, when an inmate complained that his restraints were too tight, the agent would check the restraints and conclude that they were not too tight. If the inmate expressed dissatisfaction with that response, the customary practice of OIC Ryan was to check the inmate's cuffs himself. Ex. 3 (Ryan Dep.) at 151:22 – 154:12.

38. On mass moves under OIC Ryan's direction, it was rare for inmates to complain that their handcuffs were too tight. Ex. 3 (Ryan Dep.) at 80:24 – 81:09.

39. The TransCor bus carried oversized Smith and Wesson leg irons, which are made like handcuffs, with a single bar, hinged to a double-bar. The double bar was placed to the rear of the inmate, and because that side was heavier, it rested on the inmate's ankle above the heel, leading to complaints from inmates. As a preventative measure, OIC Ryan's practice, when applying and checking leg irons, was to ensure that each inmates' pants were on the inside of the leg irons. Occasionally, an inmate's ankles would become swollen from the leg iron. In those rare cases, the customary practice of the TransCor agents was to remove the leg irons until the swelling receded. If, perchance, the swelling did not abate by the time the bus arrived at the drop-off facility, the leg irons were left off, and the inmate was referred for medical attention upon his arrival. Ex. 3 (Ryan Dep.) at 81:10 – 81:25; Ex. 6 (Reid Dep.) at 33:01 – 34:25.

40. During the customary inmate briefing prior to departure from the pick-up facility, OIC Ryan instructed any inmate who was taking medication, to remind an agent when he expected to receive his medication. Ex. 3 (Ryan Dep.) at 83:06 – 83:24.

41. At 12:00 p.m. on July 2, 2001, after inmates were permitted to use the restroom at NEOCC, Plaintiff and 35 other inmates, left NEOCC in TransCor Bus No. 410. No employees of either CCA or D.C. were on the bus. In fact, Plaintiff admits learning after his arrival at CADC that he was transported by a "separate entity." Ex. 10; Ex. 3 (Ryan Dep.) at 103:22 – 104:04; Malik Aff. [Doc. # 36-2, at 14] at ¶ 3.

42. TransCor Bus No. 410 stopped to refuel at 1:30 p.m. on July 2, 2001 in Burbank, OH. Refueling was completed at 2:00 p.m. Ex. 10; Ex. 3 (Ryan Dep.) at 105:15 – 105:20.

43.     At 3:20 p.m. on July 2, 2001, TransCor Bus No. 410 stopped at a truck stop in Sunbury, OH to empty the toilet, which was not necessarily full from a prior trip. In addition to emptying the toilet tank, the rear agent also thoroughly cleaned the toilet. The toilet was dumped and cleaned by 3:50 p.m. Additionally, the custom and practice of the TransCor bus crew was to "spot" clean the toilet during the mass move. Ex. 10; Ex. 3 (Ryan Dep.) at 105:21 – 106:06, 168:25 – 169:09.

44.     The drivers were responsible for dumping the toilet tank. Ex. 7 (Webster Dep.) at 22:19 – 23:14.

45.     At 6:30 p.m. on July 2, 2001, TransCor Bus No. 410 stopped in Cambridge, IN, where all 36 inmates and the TransCor crew were fed dinner. After dinner, the bus resumed moving at 7:45 p.m. Ex. 10; Ex. 3 (Ryan Dep.) at 106:07 – 106:16.

46.     NEOCC fed the inmate's breakfast and lunch on July 2, 2001. The rest of the meals were commercially purchased. Ex. 11; Ex. 3 (Ryan Dep.) at 120:21 – 121:10.

47.     During meals, the bus was stopped, as required by TransCor policy. TransCor established a budget for each inmate meal. TransCor policy specified that inmates were to be given a hot sandwich and milk or juice for breakfast, a large sandwich and water for lunch, and another large sandwich and water for dinner. While the TransCor policy specified that inmates were to receive only one sandwich at lunch and dinner, the practice of OIC Ryan and Agent Reid was to provide two sandwiches for the inmates at each meal. After the inmates were fed, the agents gathered and disposed of any trash, and the trip continued. Ex. 3 (Ryan Dep.) at 137:19 – 138:07; Ex. 6 (Reid Dep.) at 24:16 – 25:12, 35:17 – 35:21; Ex. 7 (Webster Dep.) at 32:25 – 33:14.

48.     The custom and practice of OIC Ryan was to interact with the inmates during the mass move, and to assist with feeding the inmates. Ex. 3 (Ryan Dep.) at 82:12 – 83:02.

49.     At 12:10 a.m. on July 3, 2001, TransCor Bus No. 410 stopped in Troy, IL for refueling. Refueling was complete by 12:45 a.m. Ex. 10, Ex. 3 (Ryan Dep.) at 106:17 – 106:20.

50. At 5:45 a.m. on July 3, 2001, TransCor Bus No. 410 stopped in Joplin, MO, where all 36 inmates and the TransCor crew were fed breakfast. After breakfast, the bus resumed moving at 7:10 a.m. Ex. 10, Ex. 3 (Ryan Dep.) at 106:21 – 107:01.

51. At 12:45 p.m. on July 3, 2001, TransCor Bus No. 410 stopped in Elk City, OK for refueling. At that time, all 36 inmates and the TransCor crew were fed lunch, and OIC Ryan reported his status to both TransCor dispatch in Nashville, TN, as well as CADC. Ex. 10; Ex. 3 (Ryan Dep.) at 107:02 – 107:16.

52. At 7:05 p.m. on July 3, 2001, TransCor Bus No. 410 stopped in Tucumcari, NM, where all 36 inmates and the TransCor crew were fed dinner. After dinner, the bus resumed moving at 8:30 p.m. Ex. 10; Ex. 3 (Ryan Dep.) at 107:17 – 108:22; Ex. 6 (Reid Dep.) at 40:18 – 40:24.

53. At 2:15 a.m. on July 4, 2001, TransCor Bus No. 410 stopped in Las Cruces, NM to refuel. Refueling was completed at 2:40 a.m. Ex. 10; Ex. 3 (Ryan Dep.) at 108:23 – 109:02.

54. At 8:40 a.m. on July 4, 2001, TransCor Bus No. 410 arrived at CADC in Florence, AZ. All 36 inmates, including Plaintiff, were dropped off. After the inmates were unrestrained, and all paperwork transferred, OIC Ryan called TransCor dispatch in Nashville to confirm that the mass move was complete. CADC Asst. Shift Supervisor, Gerald Razo, signed the Prisoner Receipt, acknowledging that all paperwork, including medical records, had been received. The TransCor crew left CADC at 9:50 a.m., with an empty bus, to return to NEOCC. Ex. 10; Ex. 3 (Ryan Dep.) at 109:03 – 109:07, 110:01 – 110:15, 114:16 – 115:04; Ex. 53 (Prisoner Receipt).

55. During a mass move, inmates were in the custody of the TransCor the entire time they were on the bus. Once the inmates stepped off the bus, they were in the custody of the drop-off facility. With few exceptions, the TransCor bus crew would remove the restraints at the drop-off facility. Ex. 3 (Ryan Dep.) at 86:15 – 87:11.

56. Due to its capacity, the toilet did not need to be emptied daily. It would not be uncommon for a TransCor mass move bus with a full complement of inmates and agents to

travel for two full days without having to empty the toilet. OIC Ryan's customary practice was to empty the toilet once the inmates had been dropped off. Ex. 3 (Ryan Dep.) at 109:09 – 109:16, 110:10 – 110:15, 159:21 – 160:09.

57.  The TransCor agents, particularly OIC Ryan and Agents Reid and Allen, had a custom and practice of immediately loosening ankle and wrist restraints whenever inmates experienced swelling. Had any incident occurred which would have distracted the agents such that they could not attend to an inmate's complaints, the Bus Activities Log would have noted the incident. No such incident occurred on the mass move from NEOCC to CADC. Ex. 6 (Reid Dep.) at 62:21 – 64:16, 72:10 – 72:15. *See* Ex. 10.

58.  OIC Ryan, does not recall any inmates ever becoming hysterical or extremely upset due to the conditions they experienced during the transport. Ex. 3 (Ryan Dep.) at 139:15 – 140:02.

59.  During their careers at TransCor, neither OIC Ryan nor Driver Webster *ever* saw an inmate who was bleeding as a result of the manner in which he was restrained. Occasionally, and inmate's wrists may become swollen and then develop blisters where the cuffs rubbed against the skin. In those instances, the TransCor agents customarily would wrap the inmate's wrists, to prevent any further blistering. Ex. 3 (Ryan Dep.) at 82:01 – 82:11, 153:13 – 154:12; Ex. 7 (Webster Dep.) at 54:13 – 54:16.

60.  Agent Allen, whose normal post as the rear-guard, had a good rapport with the inmates and would not have denied any inmate access to the toilet. While the toilet may have been closed for brief periods when the rear agent was not at his post, during OIC Ryan's four-five year career with TransCor, no inmate was denied access to the toilet. Ex. 3 (Ryan Dep.) at 154:13 – 155:09; Ex. 6 (Reid Dep.) at 71:12 – 71:24.

61.  Agents Reid and Webster are unaware of any inmate filing complaints against any TransCor agent relating to denial of toilet access or excessively tight restraints. TransCor policy prohibited agents from denying inmates access to toilets and prohibited agents from restraining

inmates too tightly. Ex. 6 (Reid Dep.) at 71:25 – 72:16; Ex. 7 (Webster Dep.) at 52:20 – 53:05, 54:17 – 54:21.

62. If an inmate had soiled himself, the custom and practice of TransCor OIC Ryan, Agent Reid and Agent Allen was to provide a change of clothing, so that the inmate would not have to wear wet clothing during the mass move. Ex. 6 (Reid Dep.) at 69:09 – 69:12.

63. Given, the large number of inmates transported, OIC Ryan, Agent Reid, and Agent Webster do not recall any particular inmate on the July 2, 2001 mass move between NEOCC and CADC, or even recall this specific trip. However, if something extraordinary had happened to deviate from the normal conditions or customary practices of the transport, the agents would recall that deviation. Based on their lack of any specific recollection of the transport, OIC Ryan, Agent Reid, and Agent Webster believe that the July 2-4, 2001 NEOCC to CADC mass move ran normally, without incident. Ex. 3 (Ryan Dep.) at 109:18 – 109:25; Ex. 6 (Reid Dep.) at 36:22 – 37:04; Ex. 7 (Webster Dep.) at 54:22 – 55:05.

64. TransCor's agents all had at least two years of law enforcement, corrections or military experience, before they would be considered for employment. TransCor required that all new agents to undergo 60 hours of formal class room training, followed by six months of on-the-job training. TransCor also required that each agent undergo forty hours of annual refresher training. Ex. 12 (TransCor promotional materials).

65. TransCor employed eight full-time mechanics to perform regular preventative maintenance. At the conclusion of each trip, the TransCor mechanics did a comprehensive check of the vehicle. TransCor Bus No. 410 was regularly serviced, including being serviced on June 20, 2001. Ex. 12; Ex. 13 (Repair Detail Report for Bus No. 410) at CCA-IAM 0019 – 20.

66. While TransCor Bus No. 410 had received necessary repairs and maintenance of both the air conditioner and the toilet exhaust fan, no such repairs were necessary when the TransCor mechanics inspected the bus on July 30, 2001. Ex. 13 at CCA-IAM 0017 (new toilet fan installed on September 10, 1999), CCA-IAM 0019 (air conditioning repairs on

September 20, 2000, February 13, 2001 and March 5, 2001), and CCA-IAM 0020 (only batteries and two windows needed repair or replacement on July 30, 2001).

67.     Plaintiff alleges that the conditions of his transport, namely exposure to second-hand smoke, were the proximate cause of "sporadic watering of the eyes", limitations "in the pursuit to further his health in participation in sports activities (i.e., softball, basket ball, handball, etc.) due to watering of the eyes, occupation limitation due to fear of blurred vision, and "an increase in coughing and fluid buildup in the lungs and chest." Compl. [Doc. # 1] at 7-8.

68.     Plaintiff further alleges that the duration during which he was restrained by a "black box" was the proximate cause of his "increased pain and swelling in the hands and wrists," "sharp daily pains in both wrists," and weakness in his hand and wrists "which impairs [his] ability to work on manual labor jobs." *Id.*

69.     Plaintiff further alleges that the manner in which he was restrained during the transport, he was "forced to urinate upon himself," refrain from defecating, did not have access to an operative toilet, was denied water to drink or with which to wash his hands, and endured inadequate ventilation. *Id.* at 8-9. As a proximate result, Plaintiff alleges he and other inmates on the bus suffered "hunger and thirst, and the humiliation, discomfort, and stench of having to urinate and defecate in their clothing, or to travel with those who have done so." *Id.* at 10.

70.     Plaintiff was transported from the U.S. Penitentiary – Atlanta to the U.S. Penitentiary – Big Sandy in March, 2004. At the time of his transfer, Plaintiff has 145 cigars among his personal property, which he requested to be forwarded to Big Sandy. (3/3/04 Property Transfer). Upon the arrival of his possessions at Big Sandy, Plaintiff was permitted to keep one pack of those cigars in his possession. Ex. 14 (3/3/04 Personal Property Record at CCA-IAM 00091); Ex. 15 (3/16/04 Personal Property Record).

71.     On July 10, 2002, Plaintiff was examined upon his arrival at the U.S. Penitentiary – Atlanta by Dr. Efren Carbonell. Dr. Carbonell observed that Plaintiff upper extremities, including his hands, were within normal limits for both strength and range of motion. Ex. 16 (Rept. of Med. Exam) at CCA-IAM 00322.

72. During Plaintiff's medical intake at U.S. Penitentiary – Atlanta, Plaintiff denied ever having experienced eye trouble. Ex. 17 (6/02 Medical History Report ) at CCA-IAM 00326.

73. On July 26, 2002, Plaintiff saw Dr. Palte for a complaint of back pain. Plaintiff admitted that he was injured while playing hand ball the day before. Ex. 18 (7/26/02 chart entry).

74. On August 23, 2002, Plaintiff was seen by Dr. Carbonell at the Chronic Care Clinic. Plaintiff advised Dr. Carbonell that "I am OK. I am able to exercise if I exercise when I use my" inhaler. Plaintiff's extremities, including his hands, all had a normal range of motion, and Plaintiff had good ventilation in his lungs. Ex. 19 (8/23/02 chart entry) at CCA-IAM 00283.

75. On November 21, 2002, Plaintiff was seen by Dr. Negron at the Chronic Care Clinic, where he reported doing well at the present time and voiced no complaints. It was observed that plaintiff's lungs were clear. Ex. 20 (11/21/02 chart entry) at CCA-IAM 00275.

76. On May 27, 2003, Plaintiff was seen by Supervisory Mid-Level Practioner Ittayem for complaints of left ankle pain. Plaintiff explained that he injured his ankle while playing "Rocket ball." Ex. 21 (5/27/03 chart entry) at CCA-IAM 00269.

77. On June 12, 2003, Plaintiff was seen by Mid-Level Practioner DelValle and Dr. Negron for complaints of a swollen left knee. Plaintiff reported that his knee had been swelling for the past six months, when he sprained his knee playing handball. Ex. 22 (6/12/03 Chart entries) at CCA-IAM 00267.

78. On August 29, 2003, Plaintiff was seen by a Physicians Assistant during sick call complaining of neck pain. Plaintiff explained that on Monday (August 25, 2003) he was playing basketball, and while he was going for a loose ball, another player ran over him. Ex. 23 (8/29/03 chart entry).

79. On September 4, 2003, Plaintiff was seen by Dr. Negron in the Chronic Care Clinic. Plaintiff reported experiencing neck pain as a result of a cervical strain he received while playing basketball. It was observed that Plaintiff's chest was clear. Ex. 24 (9/4/03 chart entry) at CCA-IAM 00257.

80.     On October 18, 2003, Plaintiff was accidentally hit in his left eye, and experienced some swelling and blurred vision as a result. Ex. 25 (Inmate Injury Assessment).

81.     On October 20, 2003, Plaintiff was seen by Supervisory Mid-Level Practioner Ittayem and the in-house Optometrist for an eye injury he sustained when he was hit with a closed-fist while playing football. Swelling and trauma were noted and Plaintiff was scheduled to be seen by the Ophthalmologist. Ex. 26 (10/20/03 chart entry); Ex. 27 (10/20/03 Optometry Consultation Sheet).

82.     On October 22, 2003, Plaintiff was seen by Dr. Palte, the U.S. Penitentiary – Atlanta Ophthalmologist for a follow-up examination regarding his eye injury. Plaintiff reported that since the injury, he was experiencing increased tearing. On November 18, 2003, Plaintiff was again seen by the Ophthalmologist for a follow-up, who notes that the tearing reported by Plaintiff was due to trauma, and had been resolved. Ex. 26 at CCA-IAM 00256; Ex. 28 (10/22/03 Ophthalmology Consultation Sheet); Ex. 29 (11/18/03 Ophthalmology Consultation Sheet).

83.     On December 8, 2003, Plaintiff was seen by Dr. Carbonell at the Chronic Care Clinic. Plaintiff stated that he did not have to use his inhaler every day and his lungs were clear. Plaintiff further stated that he was "able to exercise without too much trouble." It was observed that Plaintiff's slight congestion was a result of Allergic Rhinitis. Plaintiff had a normal range of motion in his hands. Ex. 30 (12/8/03 chart entry) at CCA-IAM 00249.

84.     On January 2, 2004, Plaintiff was seen by Dr. Richards at the Chronic Care Clinic. Plaintiff advised Dr. Richards that he only uses his inhaler 6-8 times per month. It was observed that Plaintiff's lungs were clear. Ex. 31 (1/2/04 chart entry) at CCA-IAM 00246.

85.     On March 5, 2004, Plaintiff arrived at U.S. Penitentiary – Big Sandy, with both an inhaler and Citirizene, an anti-histamine, for control of his asthma. Plaintiff stated that he does not use the Citirizine and declined a prescription for it. Additionally, Plaintiff denied ever suffering from swollen or painful joints or eye trouble. Ex. 32 (3/5/04 chart entry); Ex. 33 (3/5/04 Medical History Report) at CCA-IAM 00324.

86. On March 10, 2004, Plaintiff was seen by Dr. McIntyre and Medical Assistant Dingess in the Chronic Care Clinic. Plaintiff voiced no complaints regarding his asthma and it was observed that his chest was clear. Ex. 34 (3/10/04 chart entry) at CCA-IAM 00240

87. Furthermore, Plaintiff's chest x-ray, taken on March 10, 2004, confirmed that his lungs were clear, and no bony or soft tissue abnormalities were apparent. Ex. 35 (3/13/04 Radiology report).

88. On June 14, 2004, Plaintiff was seen by Dr. McIntyre and Medical Assistant Dingess in the Chronic Care Clinic. Plaintiff's asthma was well controlled and his chest was clear. Plaintiff was observed to be breathing comfortably and was able to speak in full sentences Ex. 36 (6/14/04 chart entry).

89. On August 31, 2004, Plaintiff was seen by Dr. Conrotto and Nurse Hay at the Big Sandy, Chronic Care Clinic. Plaintiff complained of chest and left flank pain resulting from a fall while he was playing handball. Plaintiff did not complain of any breathing problem and it was observed that his nose and throat were clear. Ex. 37 (8/31/04 chart entry).

90. Plaintiff's chest x-ray, taken on May 11, 2005, revealed that his lungs were clear. Ex. 38 (5/11/05 Radiology report).

91. On January 17, 2006, Plaintiff had x-rays read, which indicate that he suffers from Degenerative Disc Disease ("DDD"), which is a change in the disks and joints over time, as people age. Ex. 39 (1/17/06 Radiology reports). *See* Ex. 40 (3/4/06 Chart entry) ("There are chronic [changes]").

92. Plaintiff has never held skilled employment. Plaintiff has admitted to having worked only two jobs while out of custody, and denies ever having any other employment. For eight months between 1987 and 1988, Plaintiff worked for Capital Auto Finance, where he drove people to car lenders for $5.50/hr. Plaintiff left this job when he was incarcerated. After his release, Plaintiff worked for approximately three months as a cashier and stock person at Capital Clothier where he earned $5.00/hr. Ex. 41 (Plaintiff's Presentence Report) at CCA-IAM 00223.

93. Plaintiff did not complete High School, but possesses as GED. Ex. 42 (7/26/02 Report of Test Result).

94. In September 2003, while at the U.S. Penitentiary – Atlanta, Plaintiff completed the Custodial Maintenance Course and received certifications in Custodial Maintenance, Industrial Safety and Health, Maintaining Floors and Other Surfaces, Carpet and Upholstery Care, Rest Room Care, Floors and Floor Care Equipment, and Cleaning Chemicals. Ex. 43 (USP-Atlanta Educational Certificates).

95. Upon his arrival at U.S. Penitentiary – Big Sandy, Plaintiff requested an inmate detail position in either the recreation or custodial departments. However, Plaintiff was approved for a food service detail position. Ex. 44 (3/6/04 Inmate Request to Staff).

96. Prior to being assigned a food service detail job, on March 12 2004, Plaintiff submitted a request to work as a rear corridor orderly. Plaintiff expressed that he had hands on experience in cleaning, buffing and sanitation. Plaintiff was approved for a transfer once a food service replacement was available. Ex. 45 (3/12/04 Inmate Request to Staff).

97. Plaintiff obtained "Satisfactory" ratings for his kitchen detail job clearing tables at the U.S. Penitentiary – Big Sandy from March 2004 until April 2004. Ex. 46 (March – April, 2004 Work Performance Ratings).

98. With exceptions for time missed due to medical restrictions following athletic injuries, Plaintiff received ratings progressively increasing from "Fair" to "Satisfactory" to "Good" for his performance as a Corridor #1, P.M. Orderly during the period from April 2004 until April 2005. Ex. 47 (April 2004 – April 2005 Work Performance Ratings).

99. With exceptions where Plaintiff was unable to work due to various athletic injuries, Plaintiff received "Satisfactory" ratings for his performance as on the Compound Sanitation detail for the period from May 2005 to April 2006. Ex. 48 (May 2005 – April 2006 Work Performance Ratings).

100. Plaintiff has received "Good" work performance ratings carrying out his duties as an "Orderly" in his housing unit at U.S. Penitentiary – Big Sandy for the period from May 2006 through December 2006. Ex. 49 (May 2006 – December 2006 Work Performance Ratings).

101. Since his arrival at U.S. Penitentiary – Big Sandy, Plaintiff has earned additional education certificates in Keyboarding, Microsoft Office, Physical Fitness Trainers, Calisthenics, and has been a candidate to become a National Federation of Personal Trainers Certified Trainer. Ex. 50 (excerpts from Plaintiff's BOP education records).

102. Plaintiff has never requested psychological services relating to any mental health conditions, such as humiliation, relating to his transport. Ex. 51 (7/1/02 Psychology Services Intake Screening); Ex. 52 (3/11/04 Psychology Services Intake Screening).

103. On November 6, 2006, this Court entered a Scheduling Order, providing that Plaintiff's designation of experts and reports pursuant to FED. R. CIV. P. 26(a)(2) were to be made no later than February 1, 2007 and that all discovery was to be completed no later than July 2, 2007. Sched. Order [Doc. #21] at ¶¶ 3, 7.

104. Plaintiff served his Initial Disclosure Statement, out of time on February 12, 2007. On February 22, 2007, the Court granted Plaintiff leave to file out of time. Plaintiff did not file or serve any supplemental disclosures. Ex. 54 at ¶ 21 (Bojanowski Decl.); *see* Plaintiff's 26(a)(1) Disclosure Statement [Doc. #30], 2/22/07 Minute Entry Order granting Plaintiff leave to file out of time.

105. Plaintiff did not designate any experts or reports pursuant to FED. R. CIV. P. 26(a)(2). Ex. 54 at ¶ 20. (Bojanowski Decl.)

Dated: August 1, 2007

    s/ Timothy J. Bojanowski
Daniel P. Struck, (D.C. Bar No. CO0037)
Timothy J. Bojanowski, (D.C. Bar No. OH0014)
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-7324
Facsimile: (602) 263-7387

Mariana Bravo, (D.C. Bar No. 473809)
Colleen Durbin , (D.C. Bar No. 473809)
CARR MALONEY, PC
1615 L Street, NW, Suite 500
Washington, DC 20036
Telephone: (202) 315-5500
Facsimile: (202) 310-5555

*Attorneys for Defendants*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of August 2007, a true an accurate copy of the foregoing Defendants' Statement of Uncontroverted Material Facts In Support of Their Motion for Summary Judgment, was sent via first-class mail, postage-prepaid, to:

Ismail Abdul Malik, #11340-007
a/k/a Roy Thomas
**UNITED STATES PENITENTIARY - BIG SANDY**
Post Office Box 2068
Inez, Kentucky 41224
*Plaintiff Pro Se*

s/ Michael N. Giardina__

- 20 -