**EXHIBIT 3**

1              FOR THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2

3

4    RONNIE L. HARRIS,              )
                                    )
5                 Plaintiff,        )
                                    )
6                                   )
                                    )
7                                   )
           v.                       )   Civil Action No.
8                                   )   02-0100 (EGS)
                                    )
9                                   )
                                    )
10   DISTRICT OF COLUMBIA,          )
     CORRECTIONS CORPORATION OF)
11   AMERICA, and TRANSCOR          )
     AMERICA,                       )
12                                  )
                  Defendants.)
13

14

15                       *    *    *
16

17

     DEPONENT:   DAVID RYAN
18

     DATE:       SEPTEMBER 16, 2005
19

20                       *    *    *

21

22   ─────────────────────────────────────────
                  LAUREN I. MILLER, R.P.R.
                    Coulter Reporting, LLC
23              101 East Kentucky Street
                      Suite 200
24          Louisville, Kentucky  40203
                    (502) 582-1627
25              FAX: (502) 587-6299
        E-MAIL:  coulterllc@bellsouth.net

```
1          Q.    And TransCor hired you; is that
2    correct?
3                MR. NELSON:  Objection.  There's lack
4    of foundation.
5          A.    Yes.
6          Q.    Okay.  What was the first position
7    that you held at TransCor?
8          A.    Agent.
9          Q.    Over time -- how many years did you
10   work at TransCor, approximately?
11         A.    I think six.
12         Q.    Over the approximately six years that
13   you were with TransCor did you always remain in the
14   position of agent, or did your position change at all
15   over time?
16               MR. NELSON:  Objection; compound
17   question.
18         A.    Did my position change?
19         Q.    Right.
20         A.    My rank changed, but my position never
21   changed.
22         Q.    Okay.  What's the difference between a
23   change in position versus a change in rank?
24         A.    You have two agents go out on a trip,
25   one's an agent, one's the OIC in charge of the trip,
```

1    but they're both agents.  You have somebody in charge

2    of the trip, but they both do the same job.

3        Q.    And what does OIC stand for?

4        A.    Officer in charge.

5        Q.    Okay.  If someone is an OIC, are they

6    always an OIC?

7        A.    No.

8        Q.    Okay.  So they would be designated as

9    an OIC for a particular trip; is that right?

10       A.    Yes.

11       Q.    What was your rank when you first went

12   to work for TransCor?

13       A.    Agent.

14             MR. NELSON:  Objection; asked and

15   answered.

16       Q.    That was your rank; is that right?

17       A.    Yes.

18       Q.    Okay.  And --

19             MR. NELSON:  Can I just have a minute.

20             (Off-the-record comments between

21             witness and his counsel.)

22             MR. NELSON:  Go ahead.

23       Q.    And I believe that you testified --

24   correct me if I'm wrong -- that your position didn't

25   change but your rank did; is that right?

1      Q.     Right.

2      A.     I would say probably yes.

3      Q.     Do you think that it's just not

4  something that you would remember the details of?

5      A.     Yeah, I just don't remember the

6  details.

7      Q.     Okay.  It appears -- the document is

8  entitled Certificate of Appreciation to David Ryan,

9  and it refers to successful completion of Hawaii air

10  mass move, January 23, 2001.  Do you recall the Hawaii

11  air mass move that is referred to in this document?

12      A.     No.

13      Q.     Did you receive a lot of positive

14  feedback from your superiors while you were working at

15  TransCor?

16             MR. NELSON:  Objection; vague.  "A

17  lot" is vague.  "Positive" is vague.

18      A.     I was told I did a good job.

19      Q.     Who told you that?

20      A.     I wouldn't remember the people in

21  charge of the agents, their name specifically, at a

22  point in time.

23      Q.     This document, Plaintiff's Exhibit 5,

24  is signed by two individuals.  One is David Santana,

25  and under his name it says Assistant Director of Agent

```
1    Operations.  Did you know Mr. Santana?

2         A.     Yes, I know him.

3              MR. NELSON:  I'm going to object as a

4    compound question.

5         Q.     Do you remember Mr. Santana telling

6    you you did a good job?

7         A.     No.

8         Q.     What kind of relationship did you have

9    with Mr. Santana?

10             MR. NELSON:  Objection; vague.

11        A.     What kind of relationship?  I had a

12   working relationship with him.  He was -- he was in

13   Nashville for a little while, not long.

14        Q.     He was in what?

15        A.     He worked out of the Nashville office

16   for a little while, but not long.

17        Q.     Did you have a good working

18   relationship with him or a bad working relationship?

19             MR. NELSON:  Objection; compound and

20   vague.  Good or bad, not defined.

21        A.     It wasn't a bad relationship.  I

22   didn't have a bad relationship with anybody.  I didn't

23   work in Nashville, I was on the road.  I'd see him

24   when I'd come in on a trip to leave out or come back

25   in to end my trip, and that was it.
```

1        Q.      Would you consider him to be one of

2   your supervisors?

3        A.      When he was in Nashville I'd say he

4   was my -- he was a supervisor.  Then he was in charge

5   of the Texas office.  So he outranked me.  He had more

6   rank than I did.  He was assistant director of the

7   agents and I was just an agent.

8        Q.      Okay.  What's your understanding of

9   what his responsibilities would have been?

10       A.      I don't know.

11       Q.      Do you understand that he would have

12  had a role in like planning the moves of inmates that

13  you conducted?

14            MR. NELSON:  Objection.  The question

15  asks for information that's not specifically within

16  this witness's knowledge, and asked and answered.

17       A.      I would have been told that we had a

18  mass move to do, I need to be in the office on this

19  day to leave out for the mass move.  And then from

20  there I took over and did the mass move.

21       Q.      Did you ever get instructions like

22  that from Mr. Santana?

23            MR. NELSON:  Objection; vague.

24       A.      I don't remember.  I don't remember if

25  he called me.

```
 1          Q.      But in his position would he have been
 2    someone who would have issued the assignment to you?
 3          A.      I don't remember.  I really don't.  I
 4    don't remember.
 5          Q.      Okay.  The document is also signed by
 6    Sharon Johnson Rion.  Do you know who that is?
 7          A.      Yes.
 8          Q.      Did you ever have any conversations
 9    with Ms. Rion?
10               MR. NELSON:  I'm going to --
11          A.      No.
12               MR. NELSON:  I'm going to object to
13    that last question.  I don't think it's been
14    established that that's actually her signature.  That
15    assumes a fact that this witness could not testify to.
16          Q.      Did you ever have any conversations
17    with Ms. Rion?
18          A.      I would say I did.
19          Q.      What's your understanding of what her
20    position was?
21          A.      She was the president of TransCor
22    America.
23          Q.      And do you know where her office was
24    based?
25          A.      The second floor.
```

1        Q.       In Nashville?

2        A.       Yes, ma'am.

3        Q.       How often were you in the Nashville

4    office?

5        A.       Not much.  I'd leave three hours

6    before I had to go to work and get to Nashville and

7    get my stuff and leave Nashville.  I'd come back to

8    Nashville when my trip ended, clean my van or my bus

9    up, whatever it would be, park it, get in my vehicle

10   and come back home.

11       Q.       So at the time you were working for

12   TransCor you were living about three hours away from

13   Nashville; is that right?

14       A.       I lived in Louisville, Kentucky.

15       Q.       Okay.  So you would be at the

16   Nashville office at the beginning of your trips and at

17   the end of your trips; is that right?

18       A.       Yes.

19       Q.       Would you fill out some paperwork

20   while you were in the Nashville office?

21       A.       Yes.

22       Q.       So on each of those times when you

23   were in the Nashville office at the start of a trip or

24   at the beginning of a trip about how many hours would

25   you be in the Nashville office?

1        Q.      Why was that?

2        A.      Do something different.  The vans

3   dealt with fugitives from justice and you worked

4   24-hour days -- you were scheduled on 24-hour periods.

5   This was just something different.

6        Q.      What exactly was a mass move?

7        A.      Where we went from one prison to

8   another prison moving inmates.

9        Q.      What about the number?  How many

10  inmates on an average were you moving?

11              MR. NELSON:  Objection; compound

12  question and vague.

13       A.      On a bus?

14       Q.      On a mass move.

15       A.      They differed.  You could put 40

16  inmates per bus.

17       Q.      Okay.  On the third page of this

18  document under the first heading Planning it says,

19  "Scheduling takes all of the planning away from him."

20  Do you agree with that statement?

21       A.      "Scheduling takes all of the planning

22  away from him."  Yes --

23              MR. NELSON:  Objection.  There's no

24  context for this statement.

25       Q.      What was the role of -- was there a

```
 1          A.      We did not stop.  I had two bus
 2   drivers.
 3          Q.      What about provisions for food and
 4   things like that on the bus, did Scheduling have
 5   anything to do with planning that aspect of the trip?
 6          A.      No.
 7          Q.      Who was responsible for planning that
 8   aspect of the trip?
 9          A.      I was.
10          Q.      Was that completely within your
11   discretion, or did you have some guidelines to go by?
12          A.      Policy stated I was supposed to feed
13   at 6:00 in the morning, noon, 6:00 at night, as close
14   to that time as I could.
15          MR. NELSON:  Are you finished with
16   this document?  If so, I was just going to suggest it
17   might be a good time for a short break, a couple
18   minutes.
19          MS. FRANCESCANI:  Sure.
20          (RECESS)
21          Q.      I want to ask you some more questions
22   about the general procedures for mass moves.  And I'd
23   like to go through all aspects of it from the time
24   that you received your assignment and all the things
25   that happened through to the end of the assignment.
```

```
 1                    (Off-the-record comments between

 2                    witness and his counsel.)

 3          Q.    Was there any repercussion from that?

 4          A.    No.

 5                MR. NELSON:  Objection; vague.

 6          A.    No.

 7          Q.    What were the different

 8    responsibilities of the agents on your mass move team?

 9                MR. NELSON:  Objection; vague.

10          A.    Repeat the question again.

11          Q.    Let me back up.  You said you were the

12    officer in charge on at least some of the mass moves

13    that you worked on; is that right?

14          A.    All the mass moves that I've worked

15    on, if I'm not mistaken.

16          Q.    So you were the officer in charge on

17    virtually if not all of the mass moves that you worked

18    on; is that right?

19          A.    Yes.  I'd say almost every one of

20    them.

21          Q.    Okay.  And there were other agents on

22    your team; is that right?

23          A.    Yes.

24          Q.    Can you just describe for me what

25    their different roles and functions were?  If you were
```

1    the officer in charge, what was the role or function

2    of the other members of your team?

3                      MR. NELSON:  Objection; vague and

4    compound.

5            A.     I had two bus drivers, and their main

6    job was to drive the bus.  I had two agents, one in

7    the rear of the bus, one in the front of the bus.

8    Their job was to make sure the inmates were secured.

9            Q.     Did the bus drivers take turns

10   alternating driving?  Is that why you had two?

11           A.     Yes.

12           Q.     How long would each of them go before

13   they switched driving?

14           A.     Between eight and ten hours.

15           Q.     And your guard in the front and guard

16   in the rear, they were on duty the whole time; is that

17   right?

18           A.     Yes.

19                   MR. NELSON:  Objection; compound.

20           Q.     And what were you doing while those

21   four others were performing the roles that you just

22   described?

23           A.     Overseeing the whole operation of the

24   bus.  Giving the other agents breaks as they needed.

25   If the agent in the back needed a break, I'd go back

1      in the back and give him a break.

2            Q.      Who was responsible for the

3      maintenance of the bus?

4            A.      The bus drivers.

5            Q.      And did they have backgrounds such

6      that they could repair things if they malfunctioned?

7            A.      No.

8            Q.      So when you say they were

9      responsible --

10            MR. NELSON:  I'm going to object to

11     that last question for vagueness.

12            Q.      When you say they were responsible for

13     the maintenance of the bus, what did that include?

14            A.      You have to do a pre-trip inspection

15     on your bus before you move your bus.  They would do

16     the pre-trip inspection on the bus.  If there was

17     something wrong with the bus, we would take the bus

18     and get it fixed.  If we was in Nashville we would

19     pull it into the shop and get it fixed.

20            Q.      So at the beginning of the trip -- is

21     the first thing that happens is you go to the office

22     and you get some paperwork?  Is that the first thing

23     that happens when you're doing a mass move?

24            A.      I would get there and go in and get my

25     itinerary and sign out the shotguns, or one of my

```
 1          A.      What do you mean how were they
 2   transported?
 3          Q.      Did they come in a box?
 4          A.      Yes.
 5          Q.      And you stored them underneath the
 6   bus?
 7          A.      Yes.
 8          Q.      What about inmates with medical
 9   conditions, did you receive any special paperwork
10   about inmates with medical conditions?
11          A.      We received medical files.  That was
12   put under the bus.  Inmates that was on medication, I
13   would ask the pickup facility if I had inmates on
14   medication and they would supposedly give me the
15   medication for the inmates that was on medication.
16          Q.      Was there one particular type of
17   vehicle that you used for the mass moves?
18          A.      I normally used the Blue Bird bus.
19          Q.      Do you know if that's an MC9 bus?
20          A.      I have no idea.
21          Q.      When you say Blue Bird, do you believe
22   that that's the model or the make or something of the
23   vehicle?
24          A.      It would be the make of it, I think.
25   It's called Blue Bird.
```

1    Q.    Can you describe it for me?

2    A.    White.

3    Q.    On the outside it's white?

4    A.    Uh-huh.

5    Q.    What are the seats like on the inside?

6    A.    Bench.

7    Q.    And did they run down the length of

8    the bus or did they run across the width of the bus?

9    A.    Across the width of the bus.

10    Q.    And are there benches on the left side

11    and benches on the right side with an aisle in the

12    center?

13    A.    Yes.

14    Q.    Are there windows on the bus?

15    A.    Yes.

16    Q.    Are the windows tinted?

17    A.    Yes.

18    Q.    Are there some kind of bars or mesh or

19    something on the windows?

20    A.    They have metal, I think like a

21    two-inch strip of metal.  And I think there was three

22    of them that ran from the front of the bus to the back

23    of the bus on the inside.  No, they were on the out --

24    I can't remember if they was on the inside or the

25    outside, but they was on the bus.

1          Q.      Was there typically a bathroom on this

2     Blue Bird bus?

3          A.      Yes.

4          Q.      Toilet facility?

5          A.      Yes.

6          Q.      Where was that located?

7          A.      In the rear.

8          Q.      Where were the inmates placed during

9     the transport?

10         A.      In the middle of the bus.

11         Q.      Okay.  Were they separated from the

12    guard in any way?

13         A.      Yes.

14         Q.      How were they separated?

15                 MR. NELSON:  Objection; vague.

16         Q.      How were they separated?

17         A.      We had cages.  Cage that went across

18    the back of the bus separated the guard from the

19    inmates.  Two cages up front, one we kept open.  The

20    very front cage we kept locked to keep from getting to

21    the drivers, me and the other agent.

22         Q.      Where were you located on the bus?

23         A.      In the front.

24         Q.      Behind the forward cage?

25         A.      Yes.

69

1          Q.      So there was one agent behind the back

2    cage at the back of the bus.  Was the bathroom

3    facility on the guard's side of the cage or the

4    inmates' side of the cage?

5          A.      The guard's side of the cage.

6          Q.      And then you had the benches in the

7    center of the bus where the inmates were kept.  And

8    they were shackled while they were on the bus; is that

9    right?

10          A.      Yes.

11          Q.      Were the shackles attached to the bus,

12    or just to the inmates?

13          A.      Just to the inmate.

14          Q.      And then up in the front you had --

15    there were four individuals, the two drivers, the

16    forward guard and yourself, in the front section of

17    the bus; is that right?

18                  MR. NELSON:  Objection; compound

19    question.

20          A.      Yes.

21          Q.      What was the policy if something on

22    the bus broke down while you were on a transport?

23          A.      If my bus broke down on the transport?

24          Q.      Right.

25          A.      Call the company first and then call

1    Nashville.

2        A.     I'd pick the bus up from there.  The

3    prison moves didn't start in Nashville.

4        Q.     I understand.  Now I understand.

5             When you're out on the mass move after

6    you've picked up your bus in Nashville, are there

7    other points during -- before you come back to

8    Nashville that the vehicle is inspected again?

9        A.     Yes.  If we stop the bus -- when we

10   stop the bus for fuel, the driver would walk around

11   the bus checking the tires, checking the rims, check

12   the oil, check the transmission fluid.  Every time we

13   stop the bus for fueling.

14       Q.     So what happens if you pick up the

15   bus, everything is functioning properly, over the

16   course of your trip the bathroom backs up,

17   malfunctions and you're out on the road and you're

18   picking up new inmates?  What happens at that point?

19             MR. NELSON:  Objection; compound

20   question, and it calls for speculation.

21       A.     When the bathroom backed up like it

22   did before, we would get to a -- I believe it was a

23   Pilot truck stop that had the RV facilities, and I

24   would have to get up underneath the bus and undo the

25   hoses to get the toilet paper out that they stuffed

1    down in there and clogged the toilet up with so that

2    the toilet wouldn't operate and then put the stuff

3    back together so the toilet would work.

4         Q.     What if that didn't -- what if it

5    didn't work?

6         A.     It did work.  I always got it

7    unclogged.  I never had a bathroom that never worked.

8    If they clogged it up, we found a place to stop and

9    empty it and get it unclogged.

10         Q.     So what was the procedure for inmates

11   to use the toilet while they were on a mass move?

12         A.     When we had all the inmates on the bus

13   we gave them a briefing.  They was told if they needed

14   to use the bathroom that we was all grown men, get up

15   and go to the back of the bus and my agent would let

16   you in there to use the bathroom.

17              My policy stated that I'm supposed to

18   let you do it every three hours.  If we waited to try

19   to do 40 inmates every three hours, we would never get

20   done with the bathroom break.  So whenever you need to

21   use the bathroom, you get up out of your seat, you go

22   back to the back, we'll let you in and let you use the

23   bathroom.  And that was the standard policy on the

24   bus.

25         Q.     The inmates were shackled together; is

1   that right?

2          A.     Not shackled together.  They had a

3   chain probably three feet, four feet long that was

4   between them.

5          Q.     So two inmates were shackled together,

6   or more than two?

7          A.     Just two.

8          MR. NELSON:  Objection.  He already

9   testified they were not shackled together.

10          Q.     So if one of them -- if one inmate had

11   to use the bathroom facility, the person he was

12   connected to would have to walk down towards where the

13   toilet facility was; is that right?

14          A.     Yes.

15          Q.     And then they would have to ask the

16   rear guard to open the toilet facility for them, or

17   they would not have to?  I'm not clear on that.

18          A.     They would get back to the back of the

19   bus -- the guard would see them coming anyways and

20   know they was coming back.  He'd say, I need to use

21   the bathroom.  He'd unlock the cage, open the cage,

22   open the door to the bathroom.  If the inmate stated

23   he just had to pee, he stepped into it and the door

24   was closed and the other inmate stood there.  They

25   usually always turned their back because the chain was

1    long enough.  And the man used the bathroom if he had

2    to pee.

3                    If he had to do the other one, then he

4    got one of his hands free.  They would take off the

5    black box and release that and give him a hand free

6    and usually undid the other inmate and put the chain

7    and lock on him because he's going to sit down to use

8    the bathroom.

9           Q.     But when it wasn't in use, the toilet

10   was kept locked; is that right?

11          A.     Well, there was a door on it.  It

12   opened and closed where it covered from here

13   (indicating) down past your knees.

14          Q.     But did the guard need to come through

15   the gate in order to unlock the bathroom?

16          A.     No.  The bathroom was right -- the

17   guard sat in the back of the bus sideways.  The

18   bathroom door faced him.  The cage was right here

19   where the inmates come to that point.  He would unlock

20   it and slide the gates open and open the door to the

21   bathroom, and the inmate would step through the first

22   cage and step into the bathroom and he closed the

23   door.

24          Q.     I'm just trying to understand why it

25   was necessary for the rear guard to open his gate and

1    come in.

2         A.    He didn't come in.  He stayed right

3    there.  Because that's the back door to the bus.  If

4    they step through his cage, now they're in an

5    unsecured area, and the back door of the bus was right

6    there.

7         Q.    But did the rear guard have to come

8    from the rear cage into the compartment where the

9    inmates were in order to open the door for the

10   inmates?

11        A.    No.  The bathroom was directly across

12   from him on the bus.  He sat sideways and he looked at

13   the bathroom door.  The cage was -- the cage sat --

14   the bathroom sat here (indicating), he sat here

15   (indicating), the cage was here (indicating).

16        Q.    The court reporter can't capture that

17   in her -- but I think I understand what you're saying.

18        A.    The bathroom sat on the left side of

19   the bus, my agent sat on the right side of the bus.

20   The cages was just in front of the bathroom and the

21   agent's chair.

22             MS. FRANCESCANI:  Let's go off the

23   record for a second.

24                  (RECESS)

25        Q.    Mr. Ryan, we were discussing the

```
 1   policies related to inmate use of toilets during mass

 2   moves, and I want to return to that subject briefly.

 3                   Typically, did the guards use the same

 4   toilet on the bus as the inmates?

 5            A.      Yes.

 6            Q.      Was that always the case?

 7            A.      Unless we were stopped somewhere.

 8            Q.      And did you typically stop the bus

 9   when people needed to use the toilet, or did the bus

10   keep going when people were using the toilet as they

11   needed to?

12            A.      The bus kept moving.

13            Q.      Can you describe the equipment that

14   was used to secure the inmates during mass moves for

15   me?

16            A.      At which time?

17            Q.      While they were on the transport

18   vehicle.

19            A.      In the beginning or in the end?

20            Q.      Start with the beginning.

21            A.      In the beginning it was a belly chain.

22            Q.      Let me just clarify it.  When you say

23   "at the beginning," do you mean at the beginning of

24   the transport or earlier in time when you were working

25   at TransCor?
```

1          A.    I don't remember.  It was on a van.

2          Q.    But you weren't involved in that

3    incident?

4          A.    No.

5          Q.    Was it a highly publicized incident?

6          A.    I don't know.  I just know they had an

7    escape.  They got their hands free from the cuffs and

8    the cuffs weren't locked.  That's when they went to

9    the black boxes.

10          Q.    During a mass move if inmates are

11   complaining that the shackles are too tight, what's

12   the policy?

13          A.    Leg shackles?  That's the only

14   shackles you have.  I would check them.  If they were

15   too tight I would loosen them.  If they wasn't too

16   tight I would leave them the way they was.

17          Q.    And what about cuffs?

18          A.    The same thing.  If an inmate said, My

19   cuffs were too tight, my agents would check them, or

20   if I was there I would check them.  And sometimes I

21   would double-check what the agent did.  If they were

22   too tight I would loosen them to the calves where they

23   would have some movement on the cuffs.

24          Q.    Was that a common complaint for

25   inmates to have on these mass moves?

```
 1                    MR. NELSON:  Objection; vague.

 2          A.       Are the cuffs too tight?

 3          Q.       Yes.

 4          A.       No.

 5          Q.       It was uncommon for an inmate to

 6   complain about cuffs being too tight?

 7                    MR. NELSON:  Objection; vague.

 8          A.       They didn't complain about the cuffs

 9   too tight.

10          Q.       What about the shackles on their

11   ankles?

12          A.       They complained that they hurt their

13   legs.

14          Q.       What was the nature of their

15   complaint?

16          A.       That the leg shackles hurt their

17   ankles.

18          Q.       Because they were too tight or because

19   of the weight, or what was the specific complaint?

20          A.       Because of the weight.  Because of

21   them just sitting on there.  And we would take and get

22   the cuffs back up on the outside of their pants to get

23   some barrier between the cuff and their leg to where

24   the cuff just wasn't sitting on their ankles and their

25   foot when they were sitting.
```

1      Q.      In your experience, did you ever see

2    inmates whose wrists or ankles were cut from the

3    tightness of the cuffs or the shackles?

4      A.      Not cut.

5      Q.      You never saw that?

6      A.      No.

7      Q.      Did you ever hear an inmate

8    complaining about being cut from the tightness of the

9    cuffs or the shackles?

10     A.      Not cut, no.  I don't remember.  I

11   don't remember anything like that.

12     Q.      How frequently on one of these mass

13   moves would you leave the front cage portion of the

14   transport vehicle to be in the portion of the vehicle

15   where the inmates were located?

16     A.      I don't know.  It just depends on what

17   was going on.  I could go back there 20 times in a

18   trip, I could go back there one time in a trip.  It

19   just depends.  Feeding time you was always back there

20   with them.  You handed them their food.

21     Q.      Was that you personally who performed

22   the feeding, or was that one of your other agents who

23   performed the feeding typically?

24     A.      Usually me and somebody else.  They

25   would go to the back of the bus and I'd start at the

1    front of the bus and we'd start handing out the food

2    to the inmates.

3         Q.    If you had an inmate with special

4    medical needs, would you receive -- let me rephrase

5    that.

6              If you were transporting an inmate who

7    needed to take medication during the transport, would

8    you receive some paperwork that told you what you were

9    supposed to do in terms of administering the

10   medication?

11        A.    Usually it was on the -- either the

12   envelope that they gave me or the pill pack.

13        Q.    And when you say "they," who are you

14   referring to?

15        A.    The pickup -- where I picked up the

16   prisoners at.  There would be directions on there of

17   when they was supposed to take it.  And then you

18   would -- me or one of my agents would tell the

19   inmates, you know, Let us know when it's time for you

20   to take your medication.  We've got stuff going on, we

21   might forget about it.  Most of the time we remember,

22   but if we forget about it, say, Hey, man, I was

23   supposed to have my medication, and we'll give you

24   your medication.  It's not a problem.

25        Q.    Are there circumstances under which

1      alert button on the computer and we could hit it and

2      they'd call the police and send the police to our

3      location.  Like if a fight would break out on the bus

4      and we couldn't control it.

5              Q.      That was the next thing I was going to

6      ask you, if there was any kind of security situation

7      with the inmates, if you're required to call in for

8      that sort of thing.  Is that right?

9              A.      Say that again.

10              Q.      If there was some sort of incident

11      with the inmates that you perceived as a security

12      risk, is that the sort of thing that you would have to

13      call in?

14              A.      Yes.

15              Q.      When you'd deliver the inmates to your

16      destination point, what's the point at which the

17      custody transferred away from you and to someone else?

18              A.      When we got them to their facility.

19      It was their facility, I had no control.  When they'd

20      come off my bus into their facility they belonged to

21      them.

22              Q.      Who was in charge of taking the

23      shackles off the inmates at the destination facility?

24              A.      We did it 99.99 percent of the time.

25      I can only think of two places that we didn't take the

1  shackles off.

2          Q.      Why was that?

3          A.      Their DOC did it.

4          Q.      And DOC stands for what?

5          A.      Department of Corrections did it.

6          Q.      And where was that?

7          A.      Virginia and Hawaii.

8          Q.      And was that just their policy so on

9  all the moves involving those two departments of

10 correction they did that?

11         A.      That was their policy.

12                 MR. NELSON:  Objection; vague.  And

13 actually asked for information not within his

14 knowledge.

15         Q.      If an inmate developed a medical need

16 during transport, was it your responsibility to let

17 the officials at the delivery facility know that?

18                 MR. NELSON:  Objection; vague, calls

19 for -- "responsibility" is not defined.

20         A.      Define medical need.

21         Q.      Well, what don't you understand?

22         A.      You're asking for a medical need.  I

23 don't know what you mean by -- if he had something

24 come up as a medical need, what do you mean by a

25 medical need?

1    sheet." And they'd flip it over and there would be

2    the manifest the prison gave me of all the inmates on

3    the bus for that move.

4            Q.    What was the purpose of this

5    activities log? What purpose did this serve?

6            A.    It shows where and when I started my

7    trip, the date I started it, the time I started it.

8    The next line, of course, would be Youngstown, Ohio

9    where I picked up 36 inmates and left out of there at

10   12:00 in the afternoon. The next one it shows I

11   stopped in Burbank, Ohio and got fuel.

12           Q.    Let me just back up. Is this your

13   handwriting on this document, Mr. Ryan?

14           A.    Not all of it. Most of it.

15           Q.    Starting up at the top, the box where

16   names are filled in.

17           A.    That's all mine.

18           Q.    That's yours, okay. And let me just

19   see if I can --

20                 MR. NELSON: Just let her finish the

21   question.

22           Q.    Let me see if I can read this. That's

23   your name, Mr. Wisdom, Mr. Webster, Mr. Reid, and

24   Mr. Allen; is that right?

25           A.    Yes.

```
 1              Q.      And this log indicates that it begins
 2      7-2 and ends 7-11.  So is it your understanding that
 3      this is the first page of the log?
 4                      MR. NELSON:  Objection; characterizes
 5      the document and compound.
 6              Q.      Is it your understanding that this is
 7      the first page of the activities log?
 8              A.      Yes, because it doesn't have "end
 9      trip" on it.
10              Q.      I'm not sure if I made myself clear.
11      I'm trying to figure out if this is the first page of
12      the log.
13              A.      I said yes.
14              Q.      Now, would your logs -- it wouldn't
15      start with Nashville?
16              A.      I was -- but this log I would say I
17      was already out on the road because it's not Nashville
18      up there, we was already out.  We went to Youngstown,
19      Ohio.  I'd have to see the trip before this.  We
20      probably spent the night in Youngstown, Ohio and got
21      up in the morning, left the hotel and went to the
22      prison to pick up.  That's why this one is starting in
23      Youngstown, Ohio.
24              Q.      And at the end of a mass move when you
25      get back to Nashville, do you turn in your activity
```

1    but it's not necessarily part of this log is what

2    you're saying?

3          A.     Yes.

4          Q.     Okay.

5          A.     This log.  You're right, this log.

6          Q.     Can you read for me at the bottom of

7    the page the legend, because I just want to make sure

8    I'm reading it all correctly.  RR is rest room break.

9    And what is that?  What does that mean?

10         A.     On your vans you have -- you don't

11   have bathrooms on your vans.  You have to stop at

12   facilities and/or before you can stop at an outside

13   bathroom, a gas station, whatever, rest stop.  You

14   physically took them into the bathroom and let them

15   use the bathroom and you recorded them.

16                Every three or four hours you had to

17   stop and let them use the bathroom.  That's what you

18   recorded.  On the bus we just wrote down every three

19   hours on the back of our logs and they could use the

20   bathroom whenever they wanted, because we had the

21   facility to do it.

22         Q.     So where the activities log indicates

23   RR, like on the second line, does that mean that they

24   used the rest room at the Youngstown facility before

25   leaving Youngstown?

1             MR. NELSON:  Objection.  That

2     characterizes the document and there's been no

3     foundation laid for that.

4             A.     Yes.

5             Q.     By the way, is this still your

6     handwriting on the first two lines of the log, sir?

7             A.     Yes.

8             Q.     Let's just go through the chronology

9     here.  Why don't we start with the first entry, which

10    I believe says 8:00 a.m. Youngstown, Ohio and start

11    trip.  And the next entry I'm going to ask you what

12    happened.  The next entry is 12 noon, also Youngstown,

13    Ohio.  Does this mean that between 8:00 a.m. -- well,

14    there's a time gap between 8:00 a.m. and 12 noon.

15    What were you doing during that time period between

16    those two periods?

17            A.     I'd left the hotel and we got to the

18    facility and met with their staff, started strip

19    searching inmates and shackling them getting them

20    ready to transport them on the bus.  After we got

21    everybody done and got them on the bus we left at

22    12:00.

23            Q.     And the notations to the right in the

24    second row, would that be pick up 36 inmates; is that

25    right?