1           A.      Yes, ma'am.

2           Q.      And they had rest room access at the

3    facility at that time; is that right?

4           A.      Yes, ma'am.

5           Q.      And then CI, does that mean that you

6    called the office?

7           A.      Yes, ma'am.

8           Q.      And what was the purpose of calling

9    the office at that point?

10          A.      Any time you do a pickup or a drop-off

11   you're required to call in to let them know that you

12   picked up however many inmates it was and that you

13   were leaving the facility in route to the facility

14   that you were going to drop off.

15          Q.      The next entry is two hours later at

16   2:00; is that right?

17          A.      1330.  1:30.

18          Q.      And the time out would be 2:00.  So

19   that's 30 minutes for fuel; is that right?

20          A.      Yes, ma'am.

21          Q.      Next entry is -- is that 3:20?

22          A.      Yes.

23          Q.      3:20 to 3:50.  That entry says dumped

24   toilet.  What does that mean?

25          A.      It means we dumped the holding tank on

the toilet.

Q. Can you tell by this entry what kind of facility that you dumped it at?

A. It would have been a truck stop. We pulled into like the Pilot truck stop that has the RV things where you can dump your toilet.

Q. The next entry is at 6:30. And these entries all take place on July 2nd, 2001, do you agree with that?

A. Yes.

Q. So the next entry at is 6:30 p.m. to 7:45; is that right?

A. Yes.

Q. And this entry indicates that you fed the 36 inmates dinner; is that right?

A. Yes, ma'am.

Q. The next entry is July 3rd at ten minutes after 12:00 a.m. to 45 minutes after 12:00 a.m., and that was a fuel stop in Troy; is that right?

A. Yes.

Q. The next entry is at 5:45 a.m., July 3rd through 7:10 a.m. in Joplin --

A. Missouri.

Q. -- Missouri. And during that time this log indicates that you fed 36 inmates breakfast?

1          A.      Yes, ma'am.

2          Q.      The next entry is at 12:45 p.m. on

3     July 3rd in Elk City, Oklahoma?

4          A.      (Witness nods).

5          Q.      And between 12:45 and 2:45 p.m. this

6     entry indicates that you got fuel, you fed 36 inmates

7     lunch, you called into the office, and C/F, called

8     facility.  Does this mean that you called the facility

9     where you were transporting the inmates to?

10         A.      Yes.

11         Q.      And called office means you called

12    back to Nashville; is that right?

13         A.      Yes.

14         Q.      Okay.  What would be the purpose of

15    your call back to the office at that point?

16         A.      Just to check in.

17         Q.      The next entry is July 3rd at 7:05

18    p.m. until 8:30 p.m., and this indicates that you fed

19    36 inmates dinner; is that right?

20         A.      Yes.  That's not my writing.

21         Q.      Pardon?

22         A.      That's not my writing.

23         Q.      Do you know whose writing that is?

24         A.      Yes.

25         Q.      Whose writing?

1    A.    Sergeant Reid's.

2    Q.    The writing above that though is

3 yours; is that right?

4    A.    Yes, ma'am.

5    Q.    Is there some reason why Sergeant Reid

6 would have been filling out this line in the log

7 instead of you?

8    A.    I could have been in the back of the

9 bus.  When the bus stops he just grabbed the logbook

10 and logs it in for me.

11    Q.    Where is the logbook kept during the

12 transport?

13    A.    On top of my black box.  It sits in

14 between the two seats.

15    Q.    Is that in the forward cage of the

16 vehicle?

17    A.    Yes, in the front of the vehicle.

18    Q.    Is that standard procedure that that's

19 where it's always kept during transport?

20    A.    It's just up to the OIC wherever he

21 wants to keep that.  I just laid it upside down on my

22 box that I carried all my supplies in.

23    Q.    The next entry is on the 4th of July,

24 2:15 in the morning until 2:40 in the morning.  You

25 had a stop for fuel in Las Cruces, New Mexico; is that

1    right?

2          A.      Yes, ma'am.

3          Q.      And then the next entry, also July

4    4th, at 8:40 a.m. until 9:50 a.m.  This appears to

5    indicate that you dropped off 36 inmates in Florence,

6    Arizona; is that right?

7          A.      And called the office.

8          Q.      And called the office.  Okay.

9                  Now, if you would dump the toilet at

10   any other time besides on July 2nd would there have

11   been an entry in this log?

12         A.      If I'm loaded with inmates we took us

13   all the way down to where I dropped them off and I had

14   to stop and redump the toilet again, there would be an

15   entry in here stating that I stopped to dump the

16   toilet.

17         Q.      At the very bottom of the page, the

18   last entry -- well, let me just back up.  Do you

19   remember this trip?

20         A.      No.  I remember going to Youngstown

21   and I remember going to Arizona, but I don't remember

22   the trip.

23         Q.      Nothing out of the ordinary happened

24   during this trip that you can remember?

25         A.      No.

1          Q.      Can you tell from here where you were

2     going after you left Youngstown?  Was it to pick up

3     some prisoners?

4          A.      I went back to Youngstown.  So in

5     between dropping off the inmates -- in between

6     dropping off the inmates in Florence, Arizona and

7     going back to Youngstown, somewhere in there we would

8     have reemptied the toilet again.  That way the toilet

9     would be empty.

10              Usually when you drop off your inmates

11     the first thing you did was went and dumped your

12     toilet so it didn't stink up the bus.  It ain't noted

13     on here because I wasn't loaded with inmates.  When

14     I'm not loaded with inmates I can just stop anywhere

15     and dump my toilet.

16          Q.      The last entry here says "Changed to

17     bus 406."  I assume that means you swapped out the bus

18     that you were in and got a different bus; is that

19     right?

20          A.      I got off bus 410 and went to bus 406.

21     That's what it says.

22          Q.      Why would you change buses in the

23     middle of a transport?

24          A.      I don't remember.

25          Q.      Could it have been that something was

1    they gave me, that would be the manifest sheet.

2         Q.    Let me just back up and clarify that

3    for the record.  Did you indicate that you did

4    recognize Exhibit 9?

5         A.    Yes.  This is our prisoner receipt

6    showing that I picked up inmates.

7         Q.    And you did not recognize Exhibit 10;

8    is that right?

9         A.    It's a standard manifest sheet where I

10   signed for it.  I signed for these 36 inmates.

11        Q.    Okay.  Did you review these documents

12   before the deposition today?

13        A.    No.  On the CCA, Corrections

14   Corporation of America, manifest, and I've looked at

15   our prisoner receipt.

16        Q.    Is this your handwriting on Exhibit 9?

17        A.    Everywhere but down at the bottom

18   where it says Print signature in Delivery Information.

19        Q.    Right.

20        A.    Where it's got the white arrow and

21   black spot, that's not my writing.

22        Q.    So the words Gerald Razo, assistant

23   shift supervisor and the signature, that's the

24   handwriting that's not yours; is that right?

25        A.    Yes.

1           Q.     Do you know who Gerald Razo was?

2           A.     Not personally.

3           Q.     Was he a supervisor above you?

4           A.     No.  He worked for CCA in Arizona.

5           Q.     I see.  So this is your signature in

6 the middle of the page next to pickup information; is

7 that right?

8           A.     Yes, ma'am.

9           Q.     Is this one of the documents that we

10 were talking about earlier that you described as

11 indicating your pickup and drop-off information?

12          A.     I don't know what I talked about

13 earlier.  This is a standard form that we used on vans

14 and buses.  Every agent that worked there used this.

15 This ain't nothing special that we did for mass moves.

16 This was on every -- this was a standard form that we

17 always used to transport.

18          Q.     And where it says across the page "See

19 attached sheets," is that your handwriting?

20          A.     Yes, ma'am.

21          Q.     Now, the next two documents that were

22 produced sequentially were the two pieces of paper

23 that I've marked Plaintiff's Exhibit 10.  And I assume

24 that these all went together.  Is this -- is that

25 right?  Would this have been attached to this prisoner

1    receipt that I've marked Plaintiff's Exhibit 9?

2                    MR. NELSON:  Objection; compound

3    question.

4            A.    This would have went in with the rest

5    of our paperwork (indicating).

6            Q.    I guess my question is, where it says

7    "See attached sheets" on Plaintiff's Exhibit 9, does

8    that refer to Exhibit 10?

9            A.    Yes.

10           Q.    Do you know why the prisoners from the

11   Northeast Ohio Correctional Center were being moved to

12   Florence, Arizona in July 2001?

13           A.    No.

14           Q.    Do you know anything about that

15   facility closing down?

16           A.    No.  Youngstown?

17           Q.    Yes.

18           A.    No.

19           Q.    Do you know anything about any

20   lawsuits against CCA in connection with its running of

21   that facility?

22           A.    No.

23                    (DEPOSITION EXHIBIT NO. 11 MARKED)

24           Q.    I'm handing you what I've marked as

25   Plaintiff's Exhibit 11.

1    that you were charged with filling out as an agent for

2    the company; is that right?

3              A.      As the OIC, yes.

4                      (DEPOSITION EXHIBIT NO. 12 MARKED)

5              Q.      I'm going to hand you what I've marked

6    Plaintiff's Exhibit 12.

7                      (Passing document)

8                      This document bears the Bates stamps

9    RHARRIS 004 through RHARRIS 007.  It was produced by

10   the defendants.  Do you recognize this document,

11   Mr. Ryan?

12             A.      Yes.

13             Q.      What is this?

14             A.      Prisoner Status.

15             Q.      Was this a form that you filled out as

16   officer in charge?

17             A.      Yes.

18             Q.      And does this relate to the mass move

19   between Youngstown, Ohio and Florence, Arizona July

20   2nd through 4th, 2001?

21             A.      Is this sheet right here in reference

22   to that mass move?

23             Q.      Yes, that's the question.

24             A.      Yes.

25             Q.      Your signature is not on this

1    document, but do you recognize this as your

2    handwriting?

3         A.    Yes.

4         Q.    In the middle of the page along where

5    it reads rest room stops there are various dates and

6    times filled in.  And you testified earlier about the

7    access that the prisoners had to the toilet facility

8    when they needed to use it and that you listed the

9    three hours, but actually the inmates had access when

10   they needed it.  So this doesn't exactly reflect what

11   was going on on the bus; is that right?

12        MR. NELSON:  Objection; compound

13   question, mischaracterizes, and just characterizes in

14   general testimony.

15        A.    You're saying that like at 2:30 did we

16   say Do you need to use the bathroom?

17        Q.    No.  You're right, I could ask that

18   question more clearly.  Let me take a break for one

19   second.

20             My question for you is, earlier in

21   your testimony you explained to me that inmates had

22   access to the toilets when they needed to use them but

23   that when you filled out the log you filled it out for

24   every three hours stopping for a rest room break.  Do

25   you remember testifying to that?

```
 1              MR. NELSON:  I'm going to object to
 2  that because it's either been asked and answered or
 3  it's characterizing testimony.
 4         A.    I didn't say we stopped every three
 5  hours for a bathroom break.  I said I usually logged
 6  it down usually every three to four hours for a
 7  bathroom break.
 8         Q.    Exactly.  And my question is, is what
 9  you have here in this document what you were talking
10  about when you said that?
11         A.    Yes.
12         Q.    So that although this says rest room
13  stops at specific dates and times, actually the
14  inmates had access throughout is what you're saying?
15         A.    Twenty-four hours a day.  The whole
16  trip.
17         Q.    The section of this document that says
18  stretch breaks just has a line through it.  What was
19  the policy for stretch breaks?
20         A.    No stretch breaks.
21         Q.    And then the meals, this is where you
22  would log the dates and the type of food that was fed
23  to the inmates?
24         A.    Just --
25         Q.    Let me back up.  It says source of
```

1    food I guess is what this shows.

2            A.      It doesn't say a source of food.  It

3    says meals on 7-2-03.  The B stands for breakfast, L

4    stands for lunch, the D stands for dinner.  At one

5    time we used to give out snacks at midnight.  On

6    7-2-01 it shows that breakfast and lunch was fed by

7    the prison.  I bought the dinner meal.  There was no

8    snack given because we quit giving them snacks.

9    7-3-01 I bought them breakfast and I bought them

10   lunch.

11           Q.      So the C stands for commercially

12   bought?

13           A.      Yes.

14           Q.      And the J means it was provided at the

15   facility?

16           A.      We put J for jail instead of P.

17   Everybody uses J or C throughout the company whether

18   it be the van or the mass move.

19                   MR. NELSON:  Can we take a break?

20   I've got to use the rest room.

21                   MS. FRANCESCANI:  Sure.

22                   (RECESS)

23                   (DISCUSSION OFF THE RECORD)

24                   MS. FRANCESCANI:  We've just been

25   trying to come to some resolution about Mr. Ryan's

1    to pickup and drop-off." I'm going to one facility

2    and dropping off at one facility. They're going from

3    one jail to another jail and another jail and they're

4    trying to get them to expedite their time where

5    they're not sitting still to get down the road.

6    That's why mass moves were different.

7            Q.    Can I refer you to page 54 at the top

8    of the page where it says Bus Operations. And this is

9    Bates No. 279.

10           A.    At the top of page 54, is that where

11   you're at?

12           Q.    Yes.  First paragraph.

13           A.    Purpose.

14           Q.    And the last sentence of that first

15   paragraph reads, "For purposes of this SOP bus

16   operations include express runs, mass moves and any

17   non-standard bus move."

18           A.    That's what it says.

19           Q.    But do you still believe that the

20   paragraphs we talked about at Bates page No. 282

21   didn't apply to mass moves?

22           A.    This wasn't there when I was there.

23   I've never seen these before.  We never ran behind

24   schedule.  We always ran ahead of schedule.

25           Q.    And at page Bates No. 284 at the

1   bottom where it talks about -- the section with the

2   heading Rest Room Breaks.

3            A.      What page?

4            Q.      Bates No. 284 RHARRIS.

5            A.      284?

6            Q.      284.  Where it says, "All rest room

7   breaks will be accomplished on the bus equipped with a

8   toilet facility."  Is that consistent with your

9   understanding of what TransCor's policy was?

10           A.      Yes.

11           Q.      And was there any policy that required

12  you to stop the bus while inmates were going to use

13  the toilet facilities?  Was there any policy that

14  required you to stop?

15           A.      Not that I'm aware of.

16           Q.      If you look at page RHARRIS 285.  It's

17  page 60 of the document.

18           A.      Okay.

19           Q.      Where it talks about feeding.  I see

20  there it says, "Feeding will be accomplished while

21  vehicle is stopped."  Was that a policy that was

22  regularly complied with, as far as you know?

23           A.      I don't think the -- when I got my

24  book that that was in there like that.  But most of

25  the times we did feed when we were stopped.  Because

1  we were stopped for fuel and that's -- on that

2  activity log you show where I was there for an hour,

3  hour and 15 minutes, that was to give you time to sit

4  down, you know, sit there and eat your food without

5  moving.  That's why the feeding periods on the

6  activity logs are so long, because we did stop to let

7  them eat.

8          Q.      I see.

9                  On page 61 of this manual, and it's

10  Bates No. 286, towards the bottom of the page there's

11  a section Bus Stretch Break that says, "Prisoners are

12  allowed stretch breaks on a bus."  Was that your

13  understanding of what the policy was during the time

14  you worked at TransCor?

15          A.      I don't remember seeing this.  I don't

16  think that was there when I was there.

17          Q.      So that's not consistent with your

18  understanding?  This statement on bus stretch breaks

19  here is not what you understood the policy to be?

20          A.      On the mass moves they didn't get

21  stretch breaks.  When they got their hands free is

22  when they had to use the bathroom.

23          Q.      Page 64 of this manual, RHARRIS 289.

24  The top section refers to Special Needs Prisoner.  In

25  your experience, were special needs prisoners

1    transported along with other prisoners during mass

2    transports?

3              MR. NELSON:  Objection; it's vague and

4    no foundation has been laid.

5         A.    Special needs, I have no clue.  If I

6    was still there I'd ask them what the hell you mean --

7    what the heck you mean by special needs.  The only

8    special needs we come across was people that might

9    have been in protective custody.  We had another cage

10   inside the bus, and if they was in protective custody

11   we would separate them from the other prisoners, and

12   when one of the inmates said they had to use the

13   bathroom, we'd escort them to the back so the other

14   inmates couldn't mess with him.

15        Q.    Did you ever have an incident on one

16   of your mass moves where a prisoner became hysterical

17   on the bus?

18             MR. NELSON:  Objection; vague.

19        A.    No, not that I recall.

20        Q.    Did they ever start crying during mass

21   moves, any inmates?

22        A.    Not that I'm aware.

23        Q.    Did you ever hear of that happening on

24   any other mass moves that you weren't working on?

25        A.    No.  Not being hysterical.

1       Q.      What about crying?

2       A.      No.

3       Q.      Were you trained in how to take an

4  inmate to the bathroom at a facility off of the bus

5  for purposes of doing non-mass move transports?

6       A.      Was I trained -- can you repeat that

7  again?  Say that again.

8       Q.      Sure.  Not for mass move purposes, but

9  for purposes of doing other transports did you receive

10  training in the procedure for how to take an inmate to

11  use a toilet facility that wasn't on a bus?

12       A.      I believe so, yes.

13       Q.      So you did do some transports

14  involving vehicles that didn't have a toilet on board;

15  is that right?

16       A.      Yes.

17       Q.      Okay.

18              MR. NELSON:  Objection; asked and

19  answered.

20       Q.      And what was the procedure for taking

21  an inmate to use a toilet facility if there wasn't one

22  on a van?

23       A.      At first you could use any outside --

24  if you found an outside facility, via a gas station

25  that had an outside bathroom where you didn't have to

1    take them outside.  At nighttime the rest stops

2    weren't that crowded, you could use a rest stop.  If

3    you could find a clean port-a-pot you could use a

4    clean port-a-pot.  Or when you went to a jail to pick

5    up somebody or drop off somebody you went in and asked

6    the jail if you could bring the other people in to use

7    the bathroom.

8         Q.    But it's your understanding that that

9    wasn't an option if you were doing a mass move?

10         A.    No.  We didn't use facilities.  We had

11    a facility on the bus.

12         Q.    Can you turn to page 91 of the manual,

13    RHARRIS 316.

14         A.    Okay.

15         Q.    And I want to talk about the chain of

16    command as you understood it during the time while you

17    worked for TransCor.  We talked about this generally a

18    little bit earlier today.  If we go through the chain

19    of command for Nashville and regional teams on a

20    nationwide or out of state regional trip, would you be

21    the OIC that's referred to in this chain of command?

22    In other words, would this chain of command that's set

23    out here, would this relate to you?

24              MR. NELSON:  Objection; vague.

25         A.    When I was there you had agents and

1    document is referring to.

2         A.    I don't know.

3         Q.    When you were on a mass move was the

4    dispatch office who you reported to?

5         A.    I would do my call-ins to Dispatch to

6    let them know where I was at and then they would put

7    it in the computer.

8         Q.    Would you ever have any interaction

9    with anyone at the lieutenant level when you were

10   doing a mass move?

11        A.    If I had a problem on a mass move I

12   would get ahold of Lieutenant Davila or Lieutenant

13   Duffer.

14        Q.    And what kind of problems would cause

15   you to contact one of those two individuals?

16        A.    I'm not for sure right now off the top

17   of my head.

18        Q.    Are you aware of any lawsuits against

19   TransCor in which a plaintiff was making allegations

20   that are similar to the ones that Mr. Harris has made

21   in this case?

22        A.    No.

23        Q.    I'm going to ask you a little bit more

24   specifically.  That was a little bit general.  Are you

25   aware of lawsuits against TransCor where a plaintiff

1    knowledge.  But as far as all the legal ramifications,

2    that's why I have a legal team down there.  If you

3    have a question, you call and ask them.

4             Q.    Did you ever do that?

5             A.    No.

6             Q.    Did other agents that you knew ever

7    call and ask the legal team for advice?

8             A.    I don't know.

9             Q.    Did anyone ever talk to you about

10    calling the legal team?

11             A.    No.

12             MS. FRANCESCANI:  I think I'm pretty

13    close to wrapping up, but can we take a ten-minute

14    break so I can look and see if there's anything else I

15    have?

16             MR. NELSON:  Sure.

17             (RECESS)

18             Q.    I just want to ask you some questions

19    about the plaintiff's allegations in this case so that

20    I have a clear understanding on the record of what

21    your position is.

22             One of the allegations in the case by

23    Mr. Harris against TransCor and CCA and the other

24    defendant is that during the time that he was

25    transported from Youngstown to Florence that he was

1   shackled the entire 40 plus hours and that his wrists

2   bled and that he complained about this and no one

3   loosened his cuffs or his shackles.

4               Now --

5               MR. NELSON:  I'm going to object

6   because I'm not sure that -- I mean, I think you can

7   ask him a general question, but unless you're reading

8   from a document that you're showing him, I'm going to

9   object to the characterization of his allegations.

10              MS. FRANCESCANI:  That's fine.

11         Q.      With respect to Mr. Harris' claim that

12  his wrists and his ankles were bleeding during the

13  transport and that he complained and no one did

14  anything, how would you respond to that allegation?

15         A.      It's a lie.

16         Q.      Pardon?

17         A.      It's a lie.

18         Q.      And what do you base that response on?

19         A.      If the man would have told me that his

20  wrists -- that his wrists were bothering him from the

21  handcuffs and leg shackles I would have checked on

22  them.  If they were too tight I would have loosened

23  them.  If his wrists or ankles were swollen because of

24  the black box being on there, which happened, I would

25  take the black box off.

1        Q.     When you say that it happened that

2 someone's wrists or ankles swelled because of the

3 black box being there, is that because during other

4 transports that you worked on that occasionally did

5 happen?

6        A.     Yes.

7        Q.     But you don't have any specific

8 recollection of the July 2001 transport from Ohio to

9 Arizona; is that right?

10       A.     I remember going to Youngstown and

11 picking up and going to Arizona and dropping off.

12 That's the extent of my memory of my transports.

13       Q.     So when you say that Mr. Harris' claim

14 is a lie, that's not because you specifically remember

15 that transport, but as a matter of general policy if

16 someone had asked you you would have loosened it, is

17 that what you base your response on?

18       A.     If somebody complained about their

19 cuffs being too tight we always checked them.  I

20 checked them, my agents checked them.  When the agents

21 checked them and the inmate didn't like the answer

22 that my agent gave them, then they would call me over

23 and I would go check them.

24           If their wrists or legs were swollen,

25 then it was my call to take the black box off.  If

1    somebody's wrists were swollen due to the black box, I

2    would take the black box off.  As far as somebody's

3    wrists or ankles bleeding, that would be something

4    that would have stuck in my mind for years and I would

5    remember it.

6              A lot of times people's hands swelled

7    up.  Sometimes they would get blisters on the back of

8    their hands.  We would wrap their wrists up to keep

9    the cuffs off from rubbing where it swelled up and

10   they still continued to swell.  As far as people

11   bleeding from the shackles and handcuffs, I've never

12   seen it.

13       Q.    Mr. Harris also alleges that during

14   the transport he was not allowed to use the toilet

15   facility and as a result urinated and defecated on

16   himself.  What's your response to that claim?

17       A.    That would be a lie because me and my

18   people gave the same briefing any time we had a

19   transportation that when you had to use the bathroom

20   you got up and you went to the back of the bus to use

21   the bathroom.  The only time the bathroom was ever

22   closed was when we stopped for fuel, my man needed to

23   get out to stretch his legs or go inside and get

24   something to drink.  We would go back to the back of

25   the bus, we would let him out and stand there while he

1    went out, and when he got back in the bus we would

2    start the bathroom breaks.

3          Q.    So, again, your statement that

4    Mr. Harris' claim is a lie is based on your general

5    practices while you were working at TransCor; is that

6    right?

7          A.    The four to five years I did bus

8    moves.  And we never denied anybody the use of the

9    bathroom.

10          Q.    Now, my understanding of Mr. Harris'

11    allegations --

12                MR. NELSON:   Objection.   Go ahead and

13    finish.

14          Q.    My understanding is that on that

15    particular transport at some point in time the

16    bathroom stopped functioning and the inmates were

17    allowed access to the toilet at the beginning of the

18    transport but that it was dirty and clogged, or

19    something to that effect, but at some point it was no

20    longer -- inmates were no longer given access to it.

21    Did that ever happen on any transport that you were

22    on?

23          A.    I know that they got clogged before

24    and we had to stop and get them unclogged.

25          Q.    And what would you do if there was no

1    place to stop and get it unclogged?

2            A.      That's when we would find a place.

3            Q.      Excuse me?

4            A.      We would find a place.  We would find

5    a truck stop like I stated earlier.  I think there was

6    a Pilot truck stop that had the RV centers and we

7    would stop and get it unclogged.  That's one of the

8    times I'd call in and let the company know that, Hey,

9    they clogged up the toilet and I'm stopping to unclog

10   it so we can have a bathroom.

11           Q.      Did it ever happen that you were

12   unable to unclog it?

13           A.      No.

14           Q.      And did anyone ever complain to you

15   that they had been forced to urinate on themself or

16   defecate because they didn't have access to a toilet

17   while it was clogged?

18           A.      No.

19           MS. FRANCESCANI:  That is all I have

20   for the moment.

21

22                   EXAMINATION

23

24   BY MR. NELSON:

25           Q.      Let's go back to Exhibit 8 and Exhibit

1    do that?

2          A.      That's the bus they used for the

3    express runs.

4          MS. FRANCESCANI:  I'm going to object

5    that there's no foundation that's been established for

6    his knowledge as to what type of a bus bus 406 was.

7          Q.      You drove these buses, right?

8          A.      Yes.

9          Q.      Were you familiar with all the

10   different buses that TransCor had?

11         A.      At one time I was.

12         Q.      Did you drive -- did you ever drive

13   a -- bus 406?

14         A.      I believe so.

15         Q.      If you'd been on a bus 406 on July

16   8th, would you have been familiar with it?

17         A.      Yes.

18         MS. FRANCESCANI:  My objection stands

19   because it's not been established that the vehicle

20   number has a bearing on the make or model of the car.

21         Q.      How often would you generally dump the

22   toilet?

23         A.      After every run.  After we dropped off

24   at a facility.

25         Q.      Would it be uncommon for you not to

1    dump the toilet for two days?

2          A.     No, it wouldn't be uncommon.

3          Q.     How long could a toilet normally

4    remain usable without dumping it?

5          A.     Depends on how often they use the

6    bathroom, how much they use the bathroom and if it

7    filled up the holding tank.  I've gone three days

8    without dumping it and then it got full and we dumped

9    it.

10         Q.     If an inmate complained that his hands

11    were swelling because of the black box, what would you

12    do?

13         A.     If he complained to me I would look at

14    him to see if they were swelling, and if they were

15    swelling due to the black box, I would take the black

16    box off the inmate.

17         Q.     If the inmate didn't complain about

18    that would you necessarily have any reason to know

19    that his hands were swelling?

20         A.     No.

21         Q.     Exhibit 16 was offered by the

22    plaintiff, the Agent Operations Manual.  Are any of

23    the policies and procedures that were discussed in

24    Exhibit 16 different than the policies and procedures

25    that you understood to be in effect in 2001?

1    was given to me to make sure we just didn't miss his

2    medication, and if it wasn't there I would tell the

3    inmate that I'd have to go look into the medical files

4    to see if maybe CCA or whatever facility it would be

5    just forgot to give us his medication.

6              So I would open up the medical record

7    box and find his name and pull open his file and look

8    in there, and sometimes there would be medication in

9    there, and I would take the medication out and take it

10   up there and say, Here's your medication, and give it

11   to him.

12             And then when I got to the facility I

13   was going to I would instruct them that I'd opened up

14   the medical box -- this medical box for this inmate

15   because he instructed me that he was taking medication

16   and the facility didn't give it to me, so I got the

17   medical record and looked at his file just by taking

18   the lid off and finding his name and pushing his file

19   open and there was the pill packet in his file and

20   then I could give him his medication that way.

21        Q.    Did you always -- during your time

22   working for TransCor did you always have access to the

23   inmate's medical files when you transported them?

24        A.    They always sent their medical files

25   with them.  I had them under the bus.

1          Q.     Were you always able to review those

2     files?

3          A.     I never reviewed their file.  I never

4     read nothing in the file.  I would just open the file

5     to where I could see and see if there was medication

6     in it or no.

7          Q.     But was the policy ever changed on

8     that?

9          A.     I was told not to do it anymore

10    because I'm not a medical staff.

11         Q.     Who told you not to look in the

12    medical files?

13         A.     Larry Coats.

14         Q.     And did he give you any explanation

15    for why you weren't supposed to look in the medical

16    files?

17         A.     Because they was privileged

18    information and I'm not a medical person.

19         Q.     And when did that occur?

20         A.     I'm not for sure.

21                MR. NELSON:  I don't have any other

22    questions.

23

24

25

1    pill pack, you take this pill breakfast, lunch and

2    dinner and nighttime, or it was on -- sometimes they

3    took a little yellow folder -- not a folder, but a

4    little yellow envelope and put pills in there and

5    wrote on there what time to give them.  Like here's

6    this -- here is this inmate's medication, here is his

7    6:00 a.m. dose, here is his 12:00 a.m. dose, and if he

8    was supposed to take one pill there would be one pill

9    in there and you would pour it into his hand.

10        Q.    And did you keep the medication up in

11    the forward cage section of the bus or did the inmates

12    keep it?

13        A.    No, I kept it.  The only thing the

14    inmates kept was inhalers and nitro pills.  On the

15    pill packs, if I gave an inmate his medication, on one

16    of the envelopes after I gave it to him I kept that

17    with his stuff.  When I got to the facility that I was

18    going to, Here's what's left of his medication, this

19    is what's given to him.  So they knew I gave him this

20    dose, this dose, this dose, like that.

21        Q.    Could you look at Exhibit 15 for a

22    moment -- excuse me -- 16 at page 60, which is Bates

23    page 285.  Halfway down the page under Agent Duties

24    Drivers, the first paragraph, could you read that

25    first paragraph.  I'm going to read it into the

1          A.       Yes.

2          Q.       Was it at all unusual to dump the

3    toilet just -- let me back up.   I'm looking at Exhibit

4    8 at the time entries we looked at before.   I'm

5    looking at the entries at line 2 and line 4.   We

6    discussed these earlier.   Picked up the inmates at

7    noon, they had rest room access then, and then this

8    log shows that the toilet was dumped three hours and

9    50 minutes later.

10               I'm curious why you would have dumped

11   the toilet after the trip already started as opposed

12   to doing it before you picked up the inmates.

13          A.       Off the top of my head I don't know.

14   But what I can pretty much figure out why we did it

15   was we was on our way to the hotel to get sleep to get

16   ready for this next pickup and we didn't feel like

17   stopping and messing with it on the way back to

18   Youngstown, Ohio.   We was empty and we wanted to get

19   to the hotel and lay down and get rest because we'd

20   been running -- I don't know.   I'd have to see the

21   activity report before this.   We might have been

22   running three days and were tired and wanted to get to

23   the hotel and get our sleep.   That's why it shows me

24   in Youngstown and picking up and dumping it.

25          Q.       So your understanding of this would be

1   that you had a full toilet at that point and it needed

2   to be dumped?

3        A.      I wouldn't say it was full.  It had

4   been used from the trip before.

5        Q.      Okay.

6        A.      So it's better to start out a run with

7   an empty toilet than it is a half full one.  So when

8   we stopped to dump my agent in the back cleaned it and

9   we kept it clean as we went down the road.  We had

10  hand sanitizer there.  After you got done using the

11  bathroom you got hand sanitizer, you gave them a

12  squirt of hand sanitizer to squirt their hands.

13       Q.      Was that standard equipment on the

14  transport vehicle?

15       A.      It's stuff that I bought and put on

16  the truck.  I think eventually TransCor put it on all

17  of them.  Because I looked at it like if I was an

18  inmate and somebody handed me food and I'd been using

19  the bathroom and I hadn't had a chance to wash my

20  hands, I really wouldn't want to touch my food.  So I

21  mean, when we sat down to feed them, we always went

22  through with the hand sanitizer, you want some and

23  gave them a squirt of it just so they had clean hands

24  to get their food.

25       Q.      Was there any support mechanism in the

```
 1    STATE OF KENTUCKY      ) (

 2    COUNTY OF JEFFERSON    ) (

 3              I, LAUREN I. MILLER, Notary Public, State of

 4    Kentucky at Large, hereby certify that the foregoing

 5    deposition was taken at the time and place stated in

 6    the caption; that the appearances were as set forth in

 7    the caption; that prior to giving testimony the

 8    witness was first duly sworn by me; that said

 9    testimony was taken down by me in stenographic notes

10    and thereafter reduced under my supervision to the

11    foregoing typewritten pages and that said typewritten

12    transcript is a true, accurate and complete record of

13    my stenographic notes so taken.

14       I further certify that I am not related by blood or

15    marriage to any of the parties hereto and that I have

16    no interest in the outcome of captioned case.

17       My commission as Notary Public expires March 26,

18    2009.

19       Given under my hand this the _____ day of

20    _____, 2005, at Louisville, Kentucky.

21                        _____

22                        LAUREN I. MILLER
                          NOTARY PUBLIC
23

24

25
```