**EXHIBIT 6**



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTICT OF COLUMBIA
CIVIL ACTION NO. 02-0100 (EGS)

---

**DEPOSITION OF HENRY S. REID**

---

RONNIE L. HARRIS                    PLAINTIFF

v.

DISTRICT OF COLUMBIA,
CORRECTIONS CORPORATION OF AMERICA,
TRANSCOR AMERICA, INC.              DEFENDANTS

---

        Pursuant to subpoena, the deposition of

**HENRY S. REID** was taken on behalf of the Plaintiff

before Lisa M. Schwarze, Notary Public in and for the

Commonwealth of Kentucky at Large, at the law offices of

Henry, Watz, Gardner, Sellars & Gardner, 401 West Main,

Lexington, Kentucky on Friday, September 23, 2005,

commencing at the hour of 10 a.m.  The deposition was

taken for all purposes permitted under the Kentucky

Rules of Civil Procedure, including use as evidence at

the trial of this matter.

---

**ACTION COURT REPORTERS**
**184 North Mill Street**
**Lexington, Kentucky 40507**
**(859) 252-4004**



1                          **HENRY S. REID,**

2    the deponent herein, having first been duly placed under

3    oath, was examined and testified as follows:

4                            **EXAMINATION**

5    **BY MS. FRANCESCANI:**

6        Q.    Good morning, sir.  Would you please state

7    your name and address for the record.

8        A.    Henry Scott Reid, 83 Highway 1023 Lily,

9    Kentucky 40740.

10       Q.    Can I call you Mr. Reid?  Is that the way I

11   should address you?

12       A.    You can call me Scott.  Whatever you want to

13   call me.

14       Q.    My name is Donna Francescani.  I am a lawyer

15   from Washington, D.C.  And this is my colleague, Mason

16   Emnett, who is also a lawyer in Washington, native of

17   Kentucky, Lexington.  We're here today because we

18   represent the plaintiff, Ronnie Harris, in a lawsuit

19   that's pending in Federal District Court in the District

20   of Columbia.  Mr. Harris is suing the District of

21   Columbia, TransCor and CCA.  And we have been appointed

22   by the court to represent Mr. Harris on a pro bono basis

23   in his lawsuit.  Do you understand all that?

24       A.    Yes, ma'am.

25       Q.    You are here today for this deposition subject

1    is two agents on a trip, one of them has to be the

2    officer in charge --

3        Q.   I see.

4        A.   -- which is ultimately responsible for the

5    whole trip, all the actions of the trip.

6        Q.   Were you ever asked to be a driver on a mass

7    move?

8        A.   No, ma'am, I don't -- I didn't have a CDL.  You

9    have to be a certified driver.

10       Q.   So the drivers were sort of a separate class

11   from the other agents?

12       A.   Yes, ma'am.

13       Q.   Were they even considered agents?

14       A.   Yes, ma'am, they was considered agents.

15       Q.   Driver agents?

16       A.   But they were -- the first job was drivers.

17       Q.   My understanding is on the mass moves there

18   were typically two drivers; is that right?

19       A.   Yes, ma'am.

20       Q.   And that there was an officer in charge; is

21   that right?

22       A.   Yes, ma'am.

23       Q.   And then that there were two other agents?

24       A.   Yes, ma'am.

25       Q.   And one agent was assigned to the rear of the

1    vehicle and one --

2        A.    Yes, ma'am.

3        Q.    -- agent assigned to the forward position?

4        A.    Yes, ma'am.

5        Q.    And those last two that I was just speaking of,

6    they were guards; is that right?

7        A.    Yes, ma'am.

8        Q.    All right.  Did you ever serve in the capacity

9    of a guard on a mass move?

10       A.    Yes, ma'am.

11       Q.    Were you more often serving as a guard, or were

12   you more often officer in charge?

13       A.    I started as a guard for about maybe a year and

14   a half, then I was promoted to officer in charge, and

15   then I ran most of the trips I was on.  But sometimes I

16   would go on trips with Sergeant Ryan, Sergeant David

17   Ryan, and he would be the officer in charge because he

18   out-ranked me, and I would be the front guard.  I was

19   always the front guard when I was on a trip with him.

20       Q.    Why is that?

21       A.    I don't know.  That's just the way he assigned

22   the post.

23       Q.    Was it common for the front guard to have

24   seniority over the rear guard?

25       A.    Well I was the sergeant first class and the

1    rear guard was a corporal, so...

2        Q.    Which was better from your perspective, being a

3    front guard or the rear guard?

4        A.    It didn't make any difference to me.

5        Q.    Did the front guard and the rear guard have

6    different duties?

7        A.    Yes, ma'am.

8        Q.    What were the duties of the rear guard?

9        A.    The rear guard was to monitor the bathroom, to

10   maintain security for the bathroom, check inmates for

11   straights as they came back to the bathroom,

12   periodically help me as both of us would come from our

13   post and go into the passenger compartment of the bus

14   and check restraints and make sure their arms wasn't

15   swelling or anything like that, and basically maintain

16   security and pass out foods.   The inmates was allowed to

17   get up and get their own water if they wanted it.   We

18   gave them cups when they first came on board for water.

19       Q.    Where did they get the water from?

20       A.    We kept a cooler with clean water, ice water,

21   up in the front right-hand side of the cage that the

22   inmates were instructed when they first got on the bus

23   that any time they wanted water, they was welcome to get

24   water at any time.

25       Q.    How did they get it out of the cooler?   Was it

1    the kind of cooler that you had to push a little button?

2       A.   It had a spigot on the bottom, and we had it

3    positioned where they could reach it with their

4    restraints on to where it wouldn't cause them any

5    problems.  And they looked at it as a chance to get to

6    stretch their legs and things to go get the water.

7       Q.   When you say you had it positioned so that they

8    could get it, the inmates had their wrists shackled at

9    their waist; is that right?

10      A.   Yes, ma'am.

11      Q.   So how high up was this cooler?

12      A.   It was like the top of it was like this high

13   (indicating), and the spigot was at waist level for a

14   normal man.

15      Q.   What special duties or responsibilities, if

16   any, did the front guard have that were different from

17   the rear guard?

18      A.   Maintain security or surveillance; operate the

19   movies and the VCR for the inmates to watch to keep them

20   occupied, give them something to do; and to assist the

21   -- Sergeant Ryan need anything he needed me to do,

22   assist the drivers, anything they needed.

23      Q.   In your experience, when you were the front

24   guard with Sergeant Ryan, did you assist him with

25   paperwork ever?

1     A.   If he needed it, but Sergeant Ryan was very

2 proficient with paperwork and he liked to do his own.

3 If he would have needed anything, I would have been more

4 than willing to help him, but he was very proficient,

5 very professional, and he liked to do his own paperwork.

6     Q.   And when you were the officer in charge, it was

7 your responsibility to fill out paperwork --

8     A.   Yes, ma'am.

9     Q.   -- for mass moves.  So you are familiar with

10 the paperwork an officer in charge fills out?

11     A.   Yes, ma'am.

12     Q.   While you were working at TransCor, do you know

13 about approximately how many weeks per year you were

14 working?

15     A.   Oh, God, that's a very hard question because I

16 may go out on a trip today and stay out for three weeks

17 and come home for four days.  And then I might go back

18 out and go out for two weeks and come home for seven

19 days.  And then I might go out for six weeks and come

20 home for two days, so there's really no way of

21 accurately telling you.  Seventy-five percent of the

22 time I was on the road, would that help?

23     Q.   Yes, that's great.  Can you approximate how

24 many mass moves you were doing per year?

25     A.   I have no idea.

1    bus.

2        Q.    Now, just to try to put a little bit of a time

3    parameter on the length of the move, understanding that

4    they varied --

5        A.    Yes, ma'am.

6        Q.    -- since you were not stopping overnight and

7    since the inmates were I assume sleeping on the bus; is

8    that right?

9        A.    Yes, ma'am.

10       Q.    Did you ever go on a mass move like that that

11   lasted more than a week?

12       A.    Not to my recollection.

13       Q.    But did they on occasion last three, four days?

14       A.    Well on your majorly long trip, it could

15   last -- don't really know an accurate figure to give

16   you -- but it could last a pretty good while.  You think

17   of coming from Ohio to Arizona or Virginia to Arizona,

18   that's a pretty long trip.  It wouldn't take us any

19   longer to move them than it would take anybody in a car

20   to drive.  Actually we would probably make it quicker.

21       Q.    How's that?

22       A.    Because we wouldn't stop for the things people

23   would stop for in a car.  We used the restroom on the

24   bus just like the inmates did.  We only stopped for fuel

25   or food to feed our inmates or to get fuel for the bus.

1    And we used the fuel stops for multiple reasons, for

2    letting them use the restroom, get water.  We usually

3    tried to combine our feeding with our fuel stops so we

4    could do everything together.  So we done it as

5    efficiently and as quickly as we possibly could because

6    I didn't like -- I didn't like keeping the inmates on

7    the bus in restraints any longer than I had to.

8        Q.    But on occasion it could take two to three

9    days, sometimes four days; is that right?

10       A.    I don't ever remember one going four days, but

11   a couple days is probably pretty accurate.

12       Q.    Now I want to talk a little bit more about the

13   responsibilities of the different agents on the mass

14   move team.

15       A.    Yes, ma'am.

16       Q.    My understanding is that the drivers would

17   switch, and one driver would drive for a period and the

18   other would sleep, and then they would switch; is that

19   right?

20       A.    Yes, ma'am.

21       Q.    How about the guards, when did the guards

22   sleep?

23       A.    The guards would -- if one got tired and needed

24   a break, he'd come to the front.  Like if the back guard

25   wanted to take a nap, he would come up to the front and

1       A.   Yes, ma'am.

2       Q.   How was it constructed?

3       A.   It was steel tubing, square steel tubing,

4  welded into a frame, and I don't know what it's called,

5  but the wire covering, like the thick, heavy wire

6  covering, welded to it.

7       Q.   So would you say your view as a rear guard was

8  unobstructed, your view of the inmates?

9       A.   Yeah, I would say that.

10      Q.   And how about in the front of the bus?

11      A.   It was the same configuration.

12      Q.   And did the guard in the front get to sleep

13  when the inmates were asleep?

14      A.   Usually the front guard -- one of the guards

15  was awake at all times.

16      Q.   Are you familiar with what TransCor's policy on

17  feeding inmates during mass moves was?

18      A.   Yes, ma'am.

19      Q.   Can you describe that for me?

20      A.   Well, for breakfast we were required to give

21  them a hot sandwich and either milk or juice.  We

22  usually gave them juice; that's what 99 percent of the

23  inmates wanted, and so we always tried to give them

24  juice.  Lunch was a large sandwich and water, and dinner

25  was a large sandwich and water.

1    Q.   Did you have a set budget for feeding the

2    inmates on a mass move?

3    A.   They did at first when I first started there.

4    And it changed so much that actually, to be honest with

5    you, I lost track of what the budget was.  But I never

6    got in trouble over it.

7         Personally, me, Sergeant Ryan, both would

8    always get two sandwiches instead of one for the

9    inmates.  So the company never had a problem with that.

10   And the policy and procedure, if I am not mistaken -- it

11   has been a long time -- but it used to state *one large*

12   *sandwich,* but we always gave them two.

13   Q.   Are you familiar with the TransCor policy on

14   access to toilet for inmates during mass moves?

15   A.   Yes, ma'am.

16   Q.   Can you describe that for me?

17   A.   Yes, ma'am.  They were instructed when they

18   first boarded the bus.  We would get them all in, sit

19   down, settled down, and we would give them a little

20   speech, tell them what we expected of them, what they

21   could expect of us.  And we advised them at any time

22   they needed to use the restroom to just get up, go to

23   the back, and they would be allowed to use the restroom.

24   TransCor's policy was every three to four hours, but we

25   let them go on mass moves at any time they wanted to.

1      Q.    Did anybody ever give you a problem about that

2  at the company?

3      A.    No.

4      Q.    Were they aware that that's the way that you

5  were doing it?

6      A.    Yes, ma'am, as far as I know they were.

7      Q.    And how about when -- what happened when

8  someone actually did get up and they needed to use the

9  bathroom; can you describe that for me?

10     A.    When they come back to the back of the bus?

11     Q.    Yes.

12     A.    We would take the black box off, put their

13  handcuffs back on to urinate, and let them urinate.  And

14  then they would come out and we would give them a

15  sanitary -- like a Wet Ones -- to clean their -- clean

16  their hands.  And I gave them those a lot of times just

17  to clean their face with also, but I always gave them to

18  them to clean their hands, or sometimes we had the

19  sanitary gel, the alcohol gel, or whatever, for them to

20  use that.  Sometimes we had that.

21     Q.    Just so I get a clear picture of this, maybe we

22  should talk a little bit about the restraints

23  themselves.

24     A.    Yes, ma'am.

25     Q.    Can you describe the different equipment that

1    you used to secure inmates during mass moves?

2        A.    On mass moves, their restraints consisted of a

3    pair of Smith and Weston handcuffs; a black box; a

4    Martin or a billy chain, whichever you want to call it;

5    Smith and Weston leg irons; and a little master lock;

6    and an interconnect chain which went to keep two inmates

7    together.  And that was our configuration of restraints.

8        Q.    How long approximately was the interconnect

9    chain?

10       A.    About this (indicating).

11       Q.    About four feet?

12       A.    Three-and-a-half, four feet.

13       Q.    The cuffs themselves, were they the standard

14   kind of thing you see on the TV police shows or was

15   anything special?

16       A.    Standard hand cuffs.

17       Q.    What was the purpose or function of the black

18   box?

19       A.    The black box is used to limit movement.  It's

20   not to completely restrict movement, but it is to limit

21   movement and keep the inmates from being able to pick

22   the locks because it covers -- they are actually called

23   handcuff covers.

24       Q.    I see.

25       A.    But in law enforcement, we call them black

1   boxes because the first ones was black and they keep

2   inmates hands like this (indicating) in front of them

3   straight to where they can't pick the locks.  Even if

4   they had a key, they couldn't get to it.

5        Q.   Are they actually black in color?

6        A.   Not any more.  The ones we were issued were

7   blue, but they were the same thing.

8        Q.   Does having the black box in place and

9   connected have any bearing on the tightness of the cuffs

10  themselves?

11       A.   Well, it holds the cuffs more stationary than

12  not having the box on wood.  And it sometimes -- that's

13  why we keep so close a monitor on the wrist --

14  sometimes if they were bigger, it would make their

15  wrists swell.  The smaller guys could still do anything

16  up and down that they wanted to.  But at times, it could

17  cause the wrist to swell, and that's why we periodically

18  took walks backwards and forwards, and we would ask them

19  and we would have told them when they were first brought

20  on the bus, *You know, at all times keep your eye on the*

21  *restraints and if they get too tight, let one of us know*

22  *and we will loosen them for you.*  And we done that quite

23  often during mass moves, loosen restraints for inmates.

24       Q.   And how would you do that?  If someone's wrists

25  had gotten swollen and they said, *My wrists are swollen,*

1   *can you loosen this for me*, how would you do that?

2   Would you first take the black box off?

3       A.   I would take them -- me, personally, I would

4   take them to the back of the bus to the bathroom and I

5   would take the inmate that had the arm problem inside

6   the cage, take the black box off of him, and give him

7   one hand, keep the restraints on the other hand, and let

8   him work it and, you know, squeeze it and stretch it a

9   little.  And then I would put the restraint back on that

10  hand and I would do the other the same way, and then I

11  would make sure that one finger went in between the cuff

12  and his arm to where it was more loose and more

13  comfortable for him, and then I would secure him back,

14  secure the restraints back.

15      Q.   So the cuffs did have -- you were able to

16  secure them on in a looser fashion if you needed to; is

17  that what you are saying?

18      A.   Yes, ma'am.

19      Q.   And I believe you testified a few minutes ago

20  that as far as the policy when someone needed to go to

21  the bathroom, they would come back and you would take

22  the black box off but keep the cuffs on; is that right?

23      A.   Yes.  Unless they needed to defecate, and then

24  one hand was free completely.

25      Q.   I see.  The idea behind taking the black box

1   off is that they would have more mobility of their

2   hands --

3        A.   Yes, ma'am.

4        Q.   -- and able to go to the bathroom; is that

5   right?

6        A.   Yes, ma'am.

7        Q.   And it is your understanding that that was the

8   TransCor policy?

9        A.   Yes, ma'am.

10       Q.   And the policy was one hand free if they have

11  to defecate?

12       A.   Yes, ma'am, or if it is a female.

13       Q.   Where is the inmate that's connected to the one

14  who has to use the bathroom?  Let me try and ask this a

15  little bit more clearly, because the record is not going

16  to reflect that question well.  If inmate A is connected

17  to inmate B and inmate A needs to use the toilet

18  facilities, what happens to inmate B while inmate A is

19  using the toilet?

20       A.   Okay.  While inmate A is in the toilet, I would

21  take the connecting chain that's between them off of

22  them unless he was just urinating.  If he was urinating,

23  B would stand outside, A would go inside, the door would

24  close so he has still got plenty of room to do his

25  business, and they would come back out and trade and do

ACTION COURT REPORTERS                                30

1    the same thing. And if inmate A had to defecate, I

2    would take his interconnect chain that connects two

3    inmates together, and I would hook it over here to the

4    cage and put the lock back in it and let inmate A be

5    loose to go in and do his business because he was still

6    contained in a secure area.

7        Q.    The toilet facility is on the guard's side of

8    the cage, not the inmate side of the cage?

9        A.    Yes, ma'am.

10       Q.    Now, were you required to make any record of

11   the access that the inmates had to the toilets?

12       A.    On a single inmate move, you would write down

13   in a log every time they used the restroom. But if you

14   have got 30 seats, 40 people on the bus, it is virtually

15   impossible, so we just went by TransCor policy and

16   procedure every three to four hours. But like I said,

17   the inmates were allowed to use it at any time they

18   wished.

19       Q.    Do you mean you logged it down every three or

20   four hours?

21       A.    We put it in the log *as needed,* and sometimes

22   we would draw a line through it and put *as needed* in the

23   line where it said *restroom breaks.*

24       Q.    I see. Does TransCor have a policy on stretch

25   breaks for inmates on mass moves?

1      A.    Stretch breaks were confined to inside the bus.

2   On a van, you could take inmates off at a jail and let

3   them walk around and stretch.   But on the bus, the

4   inmates were considered given stretch breaks by going to

5   get water or going to the restroom or they were allowed

6   to stand up in front of their seat at any time they

7   needed to and just stretch, so they were allowed to have

8   adequate stretch breaks.

9      Q.    Did an inmate need to ask permission before

10  getting up when he was on a mass move?

11     A.    Only if it was on -- sometimes we required them

12  to stay sitting down, and that's if we were on a bad

13  road or some situation like that.   Otherwise if they

14  wanted to stand up and stretch, they were allowed to

15  just stand up and stretch as long as there was not more

16  than two pairs of them at any time.

17     Q.    And what consisted of a stretch break?   I mean,

18  was it just the act of standing up, or did it have --

19     A.    Well, they had their option.   They could walk

20  up to the front of the bus and back to the back, go up

21  to get some water and come back, go to the bathroom if

22  they wanted, and that was a pretty good stretch break.

23  Or they could just stand in front of -- stand up in

24  their chairs in their space and they could stretch if

25  they wanted to.

1      Q.   Can you describe for me the leg shackles that

2  were used to restrain the inmates?

3      A.   Yes, ma'am.  Standard Smith and Wesson

4  oversized leg irons.

5      Q.   How big are they?

6      A.   They were designed and made for leg restraint.

7      Q.   How large are those?

8      A.   The chain between them was about 16, 18 inches.

9  And the cuffs are -- they are a lot bigger to take in

10  people's ankles.

11      Q.   Okay.

12      A.   But they were made just like a handcuff except

13  for a lot bigger.

14      Q.   Is the cuff wider than a standard --

15      A.   Yes, ma'am.

16      Q.   -- handcuff?

17      A.   It's a little bit bigger, so it's a little

18  thicker also.

19      Q.   Are they much heavier than the handcuffs?

20      A.   Not very much.  They are not very much heavy at

21  all.

22      Q.   Now, one of the other agents that we spoke to,

23  as I understood what he was describing to me, he said

24  that the shackles on the inmate's leg were not too

25  tight, it's that they bothered them because of the

1  heaviness or the way they sat.

2      A.   It is the way they angled, the back of them.  I

3  don't know how to -- the front of it is one bar.  Okay

4  the back of it, the way we put them on, the double bar

5  goes to the back; it is like a hinge, and it goes inside

6  itself when it closes.  Okay that makes the back

7  normally heavier, and it will come down like this

8  (indicating).  It would angle to the back and rest on

9  the inmate's ankles, and that was their biggest

10  complaint in leg irons, where they rested on their

11  ankle.

12      Q.   And in your experience, did you see that ever

13  result in swelling of ankles of inmates?

14      A.   Some inmates' ankles would swell just from

15  sitting there so long.  And in certain situations, the

16  inmates' ankles swells severely, we would take the leg

17  irons, leg restraints, off of them completely until the

18  swelling went down.  If the swelling didn't go down by

19  the time we got to another facility, we would just leave

20  them off and explain to the other facility why they was

21  off and direct them to medical.  We took care of these

22  inmates just like they was, you know, your friends or

23  family because I put myself in their situation.  I

24  treated them like I wanted to be treated if I was them,

25  and that's pretty much how we all was.

1     Q.     Were you responsible for giving medication to

2     the inmates on mass moves?

3     A.     When I was in charge I was.  But when Sergeant

4     Ryan was running the trip, sergeant Ryan gave medicine.

5     And he was very proficient in that.

6     Q.     How do you mean?

7     A.     He was very professional and proficient about

8     giving medicine.  When we would go to a facility, the

9     nurse would give us the medication that needed to be

10    administered to the inmates during the trip and the

11    times they needed to be administered.  We would tell the

12    inmates, *You know, if you guys know what time you need*

13    *medicine, let us know in case we get busy, and we don't*

14    *want to give it to you late.*  So most of the time it was

15    coordinated with feeding times, and Sergeant Ryan took

16    care of giving out the medications.

17    Q.     During feeding times, was the bus usually

18    stopped or were you in transit?

19    A.     The bus was stopped.  We fed the inmates,

20    gathered the trash, took the trash off the bus, and

21    continued the trip.

22    Q.     And typically if the inmates were using the

23    toilet facilities as needed, the bus would be in transit

24    when they were using the toilet facilities; is that

25    right?

1        A.   Yes, ma'am, unless we was getting fuel or

2   stopped going in and getting the food.   Usually that's

3   when the medicine was administered.   Sergeant Ryan would

4   send me to get the food and he would do the medicine

5   break, and they would do that at the same time.

6        Q.   Let me ask you a little bit about your

7   preparation for the deposition today.   Besides talking

8   to Mr. Henry, did you discuss your coming for a

9   deposition today with anybody else?

10       A.   No, ma'am.

11       Q.   Did you spend any time preparing for this

12  deposition?

13       A.   No, ma'am.   It's hard to prepare for something

14  you don't know what it is.

15       Q.   Did you look at any documents to refresh your

16  recollection before today's deposition?

17       A.   I looked at some old policy and procedure

18  sheets.

19       Q.   Did they refresh your recollection about

20  your --

21       A.   Nothing that I didn't already know.

22       Q.   Can I ask you, what's your understanding of

23  Mr. Harris' claims in this case?

24       A.   Don't know nothing about the case, and don't

25  remember the inmate.   I mean, but if you transported as

ACTION COURT REPORTERS                    36

1   many inmates as I did, you realistically can't be asked

2   to remember one unless they would have done something

3   that would -- extraordinary to make him stand out in

4   your head.

5        Q.   I see.  I am going to ask you to look at a

6   couple of other documents.

7        A.   Okay.

8        Q.   I'm going to hand you two documents that have

9   previously been marked Plaintiff's Exhibit 8 and

10  Plaintiff's Exhibit 11 from Mr. Ryan's deposition.

11       A.   Yes, ma'am.

12       Q.   And I can tell you that these are documents

13  that were provided to us by the defendants in this case

14  and bear the Bates numbers RHARRIS 008 and RHARRIS 009.

15  And I would just ask that you take a moment to look this

16  over and then once you have looked it over, let me know

17  if you recognize what this is.  When I say *what this is*,

18  I mean --

19       A.   This is a manifest activities log.

20            MR. HENRY:  You have two exhibits there,

21  you have an 8 and a 9.  And are you referencing both of

22  those?

23            THE DEPONENT:  Yes, sir.

24            MR. HENRY:  So his answer -- you were

25  asking collectively for the both of them; is that what