1  the trip ended, I think.  I don't think I ever turned
2  one in late, because I always would do mine as soon as I
3  got back and before I would go home.  I would finish my
4  trip so when I went home, everybody was done.  Some
5  officers would go home as soon as they got back and do
6  their trip at home, but I didn't think that was the best
7  way to do it.  I would rather do it and then go home
8  with a clear mind.
9      Q.   It wasn't just this activities log that you had
10 to turn in, there was other paperwork; is that right?
11     A.   Yes, ma'am.
12     Q.   So when you say that *sometimes agents did it*
13 *when they got home,* you are not referring to putting
14 these individual entries in the activities log, are you?
15     A.   No, no, no, no.
16     Q.   This would be as you go?
17     A.   Yes, ma'am.
18     Q.   Could you take a look at the entry on Exhibit 8
19 which is entry nine.
20          (Deponent reviews document)
21     Q.   I just wanted to ask if you recognize that as
22 your own handwriting, because Sergeant Ryan believed
23 that you had assisted.
24     A.   Yeah, I think that's my handwriting.
25     Q.   And if you look at the top of the activities

```
 1        A.   Yes, ma'am.
 2        Q.   And what is it that you remember about that?
 3        A.   I just remember that we moved some out there.
 4   And usually the ones we took to Arizona was the
 5   problems, the ones that would cause problems in the
 6   facility.
 7             MR. HENRY:  Was your question whether he
 8   remembers moving them, or moving them using the short
 9   chains?
10             MS. FRANCESCANI:  Moving them.
11             MR. HENRY:  Moving them, just moving them,
12   okay.
13        Q.   So it sounds like sometimes when you were
14   moving inmates, you had an idea in your head about the
15   reason that they were being moved, and then other times
16   you might not have any understanding of the reason that
17   the inmates were being moved from one facility to
18   another?
19        A.   I never did know why they were being moved from
20   one facility to another.  It was always the supervisor
21   at the facility where we were moving from, but I was
22   briefed of some of the actions of those inmates and how
23   he suspected they would act during the trip, what kind
24   of inmates they were.
25        Q.   I understand.  And did the D.C. prisoners have
```

```
 1  a reputation as being more difficult than other inmates?
 2       A.   Some of them we would be told what bus.  They
 3  would put them in bus loads together, the real bad ones,
 4  and we would be warned of them.  Some of them was real
 5  compliant, very good inmates.  Others you had to watch
 6  your back the whole -- well I watch my back if it was my
 7  family I was transporting, but...
 8       Q.   Would there be any record made of a warning
 9  like that?
10       A.   We would carry the paperwork if -- sometimes
11  they would give us paperwork, sometimes it would just be
12  verbal.  We would call the office and let them know, but
13  the office usually already knew.  They kept in constant
14  contact with the prisons.
15       Q.   And as far as you know, when you were out on
16  the road and you were calling into the office, was there
17  any record that was made of those communications?
18       A.   The dispatcher should have kept -- should have
19  kept record of it, and we keep record too.  Like you
20  will see on Sergeant Ryan's log here *call in, call in*.
21            MR. HENRY:  You are looking at Exhibit 8?
22            THE DEPONENT:  Yeah, Exhibit 8.
23       A.   Line two is *call in*.  Line eight, *call in*.
24  Line 11, *call in*.  Line 14, *call in*.  Line 15, *call in*.
25  So you can see there is various different times that we
```

1  would call in to the office.
2      Q.  I was wondering if you know whether those
3  communications were tape recorded or something, so there
4  would be an indication of what the nature of the call
5  was.
6      A.  I don't know.  I don't know if they used tape
7  recorders on their calls or not.
8      Q.  Were you aware that at some point in time the
9  Ohio CCA facility closed?
10     A.  I didn't know that it had completely closed.  I
11 know that they moved all the inmates out at one time,
12 and I thought they re-populated it.  I didn't know it
13 was closed.
14     Q.  You may be correct.  I am not sure of the facts
15 there myself.
16     A.  Well I am not either.
17     Q.  But you said you believed that at one point
18 they moved all of the inmates out.  Do you have an
19 understanding of why that was?
20     A.  No, ma'am.  That was CCA; that was something
21 different.
22         (Plaintiff's Exhibits 39 and 40 marked)
23     Q.  I am going to hand you what I have marked
24 Plaintiff's Exhibits 39 and 40.  These are documents
25 that were produced by the defendants in this case, and

```
 1   Arizona --
 2       A.   Yes, ma'am.
 3       Q.   -- during July, 2001?
 4       A.   Yes, ma'am.
 5       Q.   And you do not have any specific recollection
 6   of that trip; is that right?
 7       A.   No, ma'am, I don't.
 8       Q.   Mr. Harris claims that on that transport he was
 9   kept in restraints for in excess of 40 hours.  Do you
10   have any reaction to that claim?
11       A.   I could check right here and tell you how long
12   he was in them.
13            (Deponent reviews document)
14       A.   He was in restraints from 12 o'clock on the
15   1st --
16            MR. HENRY:  You would have to say what
17   12 o'clock it is.  Is that 12 noon or midnight?
18       A.   12 noon.  From 12 noon on the 1st until looks
19   here like 8:40 a.m. on the 4th.  That's what it looks
20   like to me from the log.
21       Q.   So it's possible that he was in fact kept in
22   restraints for in excess of 40 hours; is that right?
23       A.   Yes, ma'am.  Unless he would have been having
24   problems with them and had them loosened or taken off
25   for a minute or something like that.  If he would have
```

```
 1  had any swelling there, he would have been taken care
 2  of.
 3       Q.   He claims that his wrists were swollen and his
 4  ankles were swollen, and that he complained but he was
 5  not given any relief.  What is your reaction to that?
 6       A.   My honest reaction is that he lied because we
 7  would have took action.  Allen was working the back of
 8  the bus then.  And Allen was a very, very compassionate,
 9  very good officer.  And he did his job, and he would
10  have took care of the man or I would have either if I
11  would have known he was swelled.
12       Q.   Is it possible that there could have been some
13  kind of a diversion or something going on that took the
14  guards' attention away and made them less responsive to
15  an inmate's complaint during a transport?
16       A.   Well, the inmate is going to tell you something
17  is wrong more than one time.  If a situation was
18  happening, obviously the inmate would have the common
19  sense to wait until it was over to let us know something
20  was wrong.  But, yeah, that would be possible that
21  something would happen where we would have to direct our
22  attention to a certain occurrence.
23       Q.   What kinds of things might distract you?
24       A.   Well, an inmate fight or, you know, inmates
25  acting up or any dangerous situation that threatened the
```

```
 1  security and integrity of the bus, or the inmates
 2  fighting.
 3       Q.  And if an incident like that had occurred,
 4  would you have been required to record that in your
 5  activities log?
 6       A.  Yes, ma'am.
 7       Q.  Are you aware of any complaints against
 8  TransCor by inmates complaining that their shackles were
 9  too tight for too long a time, or anything like that?
10       A.  There is always inmates complaining, always.
11  That's Department of Corrections, county jails,
12  TransCor, anywhere else you go.  But, yes, I have heard
13  them complain.  But as for me and the crew that was on
14  that trip, I can say yes, we would have took care of the
15  restraint problem.  We wouldn't let any inmates sit
16  there and suffer.
17       Q.  Mr. Harris also claims that he was in
18  particular discomfort on this transport because before
19  it started he had a back brace that was taken away from
20  him.  Now my question for you is, if an inmate's back
21  brace was taken away from them, would that have been
22  something that happened at the facility they were housed
23  at before the pick up, or would that have something to
24  do with the TransCor agents?
25       A.  Okay that would have had nothing to do with us
```

```
 1  brace or a knee brace, that was something that was
 2  pretty common.
 3     Q.   Mr. Harris has also claimed that his medical
 4  files were not transported with him out to Arizona so
 5  that when he got there, he was not able to receive any
 6  of his medications either while he was on the bus or
 7  when he got out to Arizona.  What's your reaction to
 8  that?
 9     A.   I don't know how that would have happened
10  because Sergeant Ryan would have went through and made
11  sure all of the medical records were there.  If there
12  weren't one -- how did that go?  If there wasn't a
13  medical record for that certain inmate, we would not
14  take him.  So I can't honestly give you an answer on
15  what happened there.  I don't know; I wasn't in charge
16  of the trip.
17     Q.   Do you ever recall transporting inmates without
18  their medical files?
19     A.   At one time we used to transport them and the
20  medical files would be sent, and sometimes they would
21  even take a van and put medical records in to take them.
22  But later on when I started being supervisor, and the
23  last few years I was there, we always took the medical
24  records with us.
25          We were not allowed to get into the medical
```

```
 1   records and look at them, but we would make sure they
 2   were all there before the trip by going over our roster
 3   with all the inmates names that was being transported,
 4   and go through the box and make sure they was there.
 5   And we would take them, but that was -- that was later
 6   on.
 7        Q.   Given that you said that at one point in time
 8   medical records would be sent separately --
 9        A.   Uh-huh.
10        Q.   -- is it possible that on this particular
11   transport in 2001 that that's what you thought was
12   happening or that's what Sergeant Ryan thought?
13        A.   Yeah, that's possible that they could have
14   taken place like that in 2001.  But if it was after we
15   made the change, Sergeant Ryan would have made sure that
16   medical record was in there, or he would not have took
17   the inmate.  So obviously it had to be when they was
18   sending them separately, that would be my guess.
19        Q.   With the medical files, is that something that
20   would have -- strike that.  If you were transporting
21   inmates that needed to take medication --
22        A.   Yes, ma'am.
23        Q.   -- would that fact be reflected in the
24   paperwork that you turned in at the end of your mass
25   move?
```

1    A.    Now that would be -- the nurse would give us a
2  piece of paper that tells us what inmates are on what
3  kind of medication and when they get it, and you have to
4  sign off on that.  And with each inmate's name, there is
5  a thing to fill out for the medication.  So you would be
6  responsible for giving them their medication if it is a
7  required medication.
8         Most medications they like to -- the doctors
9  wanted to give it to the inmates before the trip until
10 they would have enough in their system to do them until
11 they got there.  That's the way it was mostly done.  But
12 there was a lot of medications we administered during
13 trips.  We had to take special care of diabetics.
14    Q.    And I'm just not sure if I fully understood
15 what you said.  Is there a piece of paper that you would
16 turn in at the end of your trip that said, *We*
17 *administered this medication to this inmate at this*
18 *time*?
19    A.    That piece of paper would go to the facility,
20 not to TransCor.
21    Q.    I see.
22    A.    If it was a single transport, it would be on
23 the back of our paperwork.  But on a mass move, it would
24 go to the facility.
25    Q.    Mr. Harris has also claimed in this case that

```
 1  he was denied access to the toilet during the entire
 2  transport, and that he had to urinate on himself during
 3  the transport.  What's your reaction to that claim?
 4       A.   I would say that's a false statement.  I
 5  wouldn't want to sit here and call the man a liar,
 6  because I don't even know him.  But if he was told, *You
 7  could use the restroom at any time you wanted to*, why
 8  would you sit there and use the bathroom on yourself?
 9  Plus if we had an inmate on the bus use the bathroom on
10  himself, we would have stopped and got him a pair of
11  jumper sweats or something to put on him.  We wouldn't
12  let him sit there with wet clothes on.
13       Q.   Do you remember ever working on a transport
14  where there was some malfunction with the toilet and
15  there came a point in time when it was just not usable
16  any more?
17       A.   The old Blue Birds when we had them, 401 and
18  402, I can remember once the toilets stopped up on them.
19  An inmate put a big old wade of toilet paper there and
20  it stopped it up, and we had to snake it out with a
21  clothes hanger.  But that's the only time I can remember
22  of having one full.  The buses we was on, there was no
23  flush to it.  It's just a Greyhound is all it is.  And
24  everything goes down into a holding tank that's got a
25  chemical in it that breaks everything down and
```

```
 1   deodorizes it.  So if anybody has ever rode a Greyhound,
 2   they know what it is.
 3       Q.  Would you remember from looking at the bus
 4   number on the log which kind of vehicle was used for the
 5   transport in July, 2001?
 6       A.  Yes, ma'am.  401, 402 -- 401 and -- 400, 401
 7   and 402 was Blue Birds.  Everything else was MCI's.
 8           MR. HENRY:  I don't think that's her
 9   question.
10       Q.  So if you look at Plaintiff's Exhibit 8 where
11   it says *vehicle # B-410*, are you telling me that you
12   believe that was an MCI?
13       A.  Yes, ma'am.
14       Q.  And the MCI's had the non-flushing toilet?
15       A.  Yes, ma'am.
16       Q.  If you were the guard in the front of the
17   bus --
18       A.  Yes, ma'am.
19       Q.  -- would you necessarily know what was going on
20   in the back with respect to bathroom breaks?
21       A.  Well, I would see the inmates getting up and
22   moving around and see them going to the bathroom because
23   I always kept an eye on the officer in the back.
24       Q.  Would you be able to from the front of the bus
25   hear inmates if they were complaining about their
```

1  restraints or about needing to use the toilet, you would
2  be able to hear that in the front?
3      A.   No, not necessarily.
4      Q.   Why is that?  Is that because there was some
5  other noise that would --
6      A.   Well the TV and the sound system was on for the
7  inmates, and it was a pretty good distance from the
8  front to the back of the bus.  If somebody would have
9  yelled, yes, I would have heard them.  But just normal
10 talking, you wouldn't -- I don't think you would hear
11 them.
12     Q.   So it is possible that at least for certain
13 periods, inmates might have been asking Sergeant Allen
14 to use the restroom facility and you wouldn't
15 necessarily hear that?
16     A.   And I wouldn't have heard it?
17     Q.   (Moved head up and down).
18     A.   No, I wouldn't of.  But like I said before, if
19 they would have asked Sergeant Allen to use the
20 restroom, he would have let them.  Sergeant Allen was
21 the type that he was always joking and talking with the
22 inmates, and he wasn't the type of hateful, mean person.
23 He's always interacting with them all the time, so they
24 would have had no problem using the restroom.
25     Q.   Did you ever work with anyone who was the

```
 1  meaner type that you just described?
 2       A.  Oh, yeah, I have.  I have worked with some
 3  people that was like that.
 4       Q.  And did you ever hear complaints against them
 5  for not letting inmates use the toilet or something like
 6  that?
 7       A.  No, not for not using the toilet because that's
 8  a policy matter.  You don't tell an inmate they can't
 9  use the restroom.
10       Q.  What about restraints being too tight?
11       A.  No, that's another policy matter.  That's
12  something that you would address immediately, restraints
13  being too tight.  But I can't speak for every agent.
14  I'm just -- for me and the people that work with me, you
15  know, we stayed on top of things like that.  But I can't
16  speak for everyone.
17                  (11:50 BREAK 12:01)
18       Q.  Mr. Reid, I was just asking you a few minutes
19  ago about your reaction to Mr. Harris' claims in this
20  case.
21       A.  Yes, ma'am.
22       Q.  And as we previously discussed, you told me you
23  don't have any specific recollection of the transport
24  that is the subject of his complaint; is that right?
25       A.  No, ma'am, I sure don't.
```

1    Q.   So the basis for your reaction is just the
2  general recollection of how things were done and not any
3  specific recollection?
4    A.   Yes, ma'am.
5    Q.   And you also testified a few minutes ago that
6  sometimes you would get a signal from a pick-up facility
7  that a group of inmates might be a little bit more --
8    A.   Problems.
9    Q.   -- ruly.  In your experience, were those
10 inmates treated differently than other inmates?
11   A.   No, ma'am, inmates were not treated
12 differently, they were just handled differently.  You
13 had to watch them closer, you had to be more careful
14 interacting with them, and you had to get your point
15 across that you was going to have order maintained on
16 the trip.  But 90 percent of the time -- I'll say 95
17 percent of the time that the facility told me we had
18 problems, I never had a problem with them.  But that was
19 just my luck I guess.
20   Q.   And we also talked about the fact that if there
21 was some kind of security incident, that would be
22 reflected in your log; is that right?
23   A.   Yes, ma'am.  And we would have to do an
24 incident report on any kind of critical incident like
25 that.

```
1        Q.   While you were at TransCor, do you remember
2   receiving a special longevity pay at some point in time?
3        A.   Yes, ma'am, every year you got longevity
4   bonuses.  It was called a bonus because we never
5   received a paid vacation during the year and you never
6   received vacation days, so they give you a longevity
7   bonus at the end of the year.
8        Q.   I saw something in your file that was a
9   longevity pay memo from 1997, and we talked about the
10  fact that you began work in 1995, and two years didn't
11  strike me as very long for a longevity pay.
12       A.   No, you got it every year, but you had to be
13  there a year before you ever received it the first time.
14       Q.   Is there a fair amount of turnover with the
15  agents at TransCor?
16       A.   Yes, it was a very high turnover.
17       Q.   Why is that?
18       A.   It takes a certain kind of person to do that
19  kind of job because you have so much separation from
20  your family, and it's very stressful.  Like me, for
21  instance, now I couldn't go back and do it again because
22  I am a diabetic and you have to eat what the inmates
23  eat.  You know just because you wanted to go over here
24  and eat, you can't stop the bus -- and these inmates
25  have to be somewhere -- to go and eat what you need to
```

```
 1  eat.  So if you are a diabetic, you are in trouble.  So
 2  I couldn't do it now.
 3       Q.   What about inmates who were diabetic, did you
 4  have to make special arrangements for them?
 5       A.   Yes, ma'am, we took care of them special.  The
 6  facility always give us extra snacks for those
 7  individuals that we administered to them.  And we had
 8  coolers to keep their insulin took care of.  And for
 9  feeding, sometimes we had to feed them differently.
10  Like they would -- most diabetics want fish or chicken
11  sandwiches for some reason instead of a hamburger.
12       Q.   I am going to ask you to look at two other
13  documents that were previously marked Plaintiff's
14  Exhibit 9 and Plaintiff's Exhibit 10.  And these were
15  documents produced by the defendants in this case with
16  Bates numbers RHARRIS 1 on Plaintiff's Exhibit 9 and
17  RHARRIS 2 to RHARRIS 3 on Plaintiff's Exhibit 10.  Take
18  a look at these and tell me if you recognize what they
19  are.
20              (Deponent reviews documents)
21       A.   Yes, ma'am, this is a front sheet of our
22  prisoner receipt.
23       Q.   And we're talking about Plaintiff's Exhibit 9
24  now?
25       A.   Yes, ma'am, Exhibit 9.
```

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF KENTUCKY    )

 3   COUNTY OF FAYETTE    )

 4
             I, LISA M. SCHWARZE, Notary Public in and for
 5   the Commonwealth of Kentucky at Large, do hereby certify
     that the facts as stated by me in the caption hereto are
 6   true; that the foregoing answers in response to the
     questions as indicated were made before me by the
 7   deponent hereinbefore named, after said deponent had
     first been duly placed under oath, and were thereafter
 8   reduced to computer-aided transcription by me and under
     my supervision; and that the same is a true and accurate
 9   transcript of the proceedings to the best of my ability.

10
             I further certify that I am not employed by,
11   related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of this
12   action.

13
             No party to this action nor counsel for said
14   parties requested in writing that the foregoing
     deposition be signed by the deponent.
15

16           IN WITNESS WHEREOF, I have affixed my signature
     and seal this 26th day of September, 2005.
17

18

19

20   _____
     LISA M. SCHWARZE
21   Notary Public, State-at-Large
     184 North Mill Street
22   Lexington, Kentucky 40507
     859.252.4004
23

24

25   My Commission Expires:  June 13, 2009.
```